No. 24-1350

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

DAHUA TECHNOLOGY USA, INC.,
*Plaintiff - Appellant*,

v.

FENG ZHANG,
*Defendant - Appellee*.

*Appeal from United States District Court for the District of Massachusetts*
*No. 1:18-cv-11147-IT*

**BRIEF OF APPELLANT DAHUA TECHNOLOGY USA, INC.**

Daron L. Janis
Daryl J. Lapp
Locke Lord LLP
111 Huntington Avenue, 9th Floor
Boston, MA 02199
(617) 239-0100
*Counsel for Appellant*

# CORPORATE DISCLOSURE STATEMENT

Appellant Dahua Technology USA, Inc. ("Dahua") is a wholly owned subsidiary of Central Motion Picture USA Corporation, which is privately held. No publicly held corporation owns 10% or more of Dahua's stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS .................................................................................. ii

TABLE OF AUTHORITIES ............................................................................ iv

STATEMENT REGARDING ORAL ARGUMENT ........................................ vii

JURISDICTIONAL STATEMENT .................................................................... 1

STATEMENT OF THE ISSUES......................................................................... 2

INTRODUCTION ............................................................................................... 3

STATEMENT OF THE CASE............................................................................. 7

    I.   Factual Background ................................................................................ 7

    II.  Procedural History ............................................................................... 14

    III.  Rulings Presented for Review .............................................................. 18

SUMMARY OF THE ARGUMENT .................................................................. 19

ARGUMENT ..................................................................................................... 21

    I.   De Novo Standard of Review................................................................ 21

    II.  The District Court Misapplied Massachusetts Law in Connection with Dahua's Reformation Claim........................................................... 21

        A.   Massachusetts Law on Reformation Aligns with the Restatement...21

        B.   The District Court Misapplied Section 155 of the Restatement. ......22

            1.   Reformation Under § 155 Does Not Depend on Risk of Mistake or Require Prior Agreement on All Contractual Terms. ..................................................................................23

2. Massachusetts Case Law Confirms that a Prior Agreement on All Terms is Not Required....................................................30

C. The District Court Failed to Apply Restatement §§ 161 and 166.....37

III. The District Court Should Have Resolved the Parties' Dispute Through Contract Interpretation...................................................................40

A. The Restatement Counsels Courts to Use Contract Interpretation to Avoid the Need for Reformation......................................................40

B. The Severance Provision is Ambiguous When Viewed in Context. 42

IV. The District Court Should Have Exercised its Equitable Power.................46

V. Judgment Should be Entered for Dahua on its Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing.....................................50

CONCLUSION ........................................................................................52

CERTIFICATE OF COMPLIANCE.......................................................54

CERTIFICATE OF SERVICE ...............................................................54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank v. Thermo Elemental Inc.*,
  888 N.E.2d 897 (Mass. 2008)................................................................42

*Caron v. Horace Mann Ins. Co.*,
  993 N.E.2d 708 (Mass. 2013).............................................21, 34, 35

*Colony v. McMann*,
  No. 08-P-1121, 2009 WL 1883847 (Mass. App. Ct. July 2, 2009)....................24

*Covich v. Chambers*,
  397 N.E.2d 1115 (Mass. App. Ct. 1979) ....................................22, 47

*Dahua Tech. USA, Inc. v. Zhang*,
  988 F.3d 531 (1st Cir. 2021)................................................................15

*De Vincent Ford Sales, Inc. v. First Mass. Corp.*,
  146 N.E.2d 492 (Mass. 1957)................................................................22

*Gen. Convention of the New Jerusalem in the U.S.A. v. MacKenzie*,
  874 N.E.2d 1084 (Mass. 2007)................................................................43

*German Am. Ins. Co. v. Davis*,
  131 Mass. 316 (1881) ................................................................30, 31

*James B. Nutter & Co. v. Estate of Murphy*,
  88 N.E.3d 1133 (Mass. 2018)................................................................45

*Kamen v. Kemper Fin. Servs., Inc.*,
  500 U.S. 90 (1991)................................................................41

*LPP Mortg., Ltd. v. Sugarman*,
  565 F.3d 28 (1st Cir. 2009)................................................................21

*Mates v. Penn. Mut. Life Ins. Co.*,
  55 N.E.2d 770 (1944) ................................................................22

*McCone v. New England Tel. & Tel. Co.*,
     471 N.E.2d 47 (Mass. 1984) ...............................................................50

*Merrimack Valley Nat'l Bank v. Baird*,
     363 N.E.2d 688 (Mass. 1977) ............................................................45

*OneBeacon Am. Ins. Co. v. Travelers Indem. Co.*,
     465 F.3d 38 (1st Cir. 2006) ..............................................21, 22, 32, 33

*Paraflon Invs., Ltd. v. Fullbridge, Inc.*,
     960 F.3d 17 (1st Cir. 2020) ...............................................................21

*Platten v. HG Bermuda Exempted Ltd.*,
     437 F.3d 118 (1st Cir. 2006) .............................................................46

*Polaroid Corp. v. Travelers Indem. Co.*,
     610 N.E.2d 912 (Mass. 1993) ..........................................21, 22, 33, 34

*Sancta Maria Hosp. v. Cambridge*,
     369 Mass. 586 (1976) ......................................................................35

*Shea v. Bay State Gas Co.*,
     418 N.E.2d 597 (Mass. 1981) ...........................................................45

*T.W. Nickerson, Inc. v. Nickerson*,
     No. BACV200200427, 2011 WL 7788023 (Mass. Super. Feb. 24,
     2011), *aff'd sub nom. T.W. Nickerson, Inc. v. Fleet Nat'l Bank*, 83
     Mass. App. Ct. 1123 (2013) ..............................................................50

*Torrao v. Cox*,
     525 N.E.2d 1349 (Mass. App. Ct. 1988) ..................22, 24, 38, 47, 48

*U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*,
     508 U.S. 439 (1993) ..........................................................................41

*Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*,
     805 N.E.2d 957 (Mass. 2003) ...........................................................50

*Ward v. Ward*,
     874 N.E.2d 433 (Mass. App. Ct. 2007) .............................................38

*Wareham Sav. Bank v. Partridge*,
     56 N.E.2d 867 (1944) .......................................................................22

**Statutes and Rules**

28 U.S.C. § 1291 ..................................................................................1

28 U.S.C. § 1332(a) ............................................................................1

Mass. Gen. Laws ch. 231, § 6C ......................................................51

**Treatises and Commentary**

E. Allan Farnsworth, *Farnsworth on Contracts* § 7.5 (2001) .................................21

Restatement (Second) of Contracts, Introductory Note...........................................47

Restatement (Second) of Contracts § 155...........................................................23

Restatement (Second) of Contracts § 155 cmt. b...................................................41

Restatement (Second) of Contracts § 155 cmt. a...............................................23, 24

Restatement (Second) of Contracts § 157...........................................................23

Restatement (Second) of Contracts § 157 cmt. a...................................................23

Restatement (Second) of Contracts § 158(2)........................................................47

Restatement (Second) of Contracts § 161...........................................................37

Restatement (Second) of Contracts § 161 cmt. e...............................................38, 39

Restatement (Second) of Contracts § 166 cmt. a...............................................39, 40

Restatement (Second) of Contracts § 205...........................................................50

## STATEMENT REGARDING ORAL ARGUMENT

This appeal presents important issues of Massachusetts law regarding the circumstances in which a court should (1) reform a contract due to a mutual mistake or a mistake known only to one party; (2) interpret the contract according to the parties' intent; or (3) exercise its equitable power to effectuate that intent and avoid an unjust result.

The trial court found that "Dahua has established that it made a mistake when setting forth the severance payment as $680,000 per month for sixteen months rather than $680,000 payable over sixteen months" and that "the mistake was mutual or that [Appellee] Zhang had reason to know of the mistake." Addendum ("Add.") 28. But the court concluded as a matter of law that it could not (1) reform the severance term to correct the mistake because the parties did not reach a prior agreement on *other terms*; (2) interpret the severance provision according to the parties' intent; or (3) exercise its equitable power to serve justice. The court consequently awarded Zhang a severance amount that is $10,200,000 more than the $680,000 to which he agreed and ultimately received from Dahua.

While the consequences in other cases might not be as dramatic as they are here, the legal issues presented in this appeal are likely to reoccur. This Court should, therefore, allow oral argument to aid it in determining Massachusetts law.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000. Appendix ("App'x") 5. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 based on the Amended Judgment the district court entered on March 28, 2024, which disposed of all claims and determined the rights of all parties. Add. 49. Dahua filed its notice of appeal on April 9, 2024. App'x 1788.

# STATEMENT OF THE ISSUES

1.　　Did the trial court err by refusing to reform the severance amount to comport with its finding of a mutual mistake or mistake known only by one party?

    a.　　Did the trial court err by misapplying the rule in Restatement (Second) of Contracts § 155 and Massachusetts law that reformation requires prior agreement only on the mistaken term?

    b.　　Did the trial court err by failing to apply the rules in Restatement §§ 161 and 166 that courts should grant reformation where a party had reason to know of a mistake but remained silent?

2.　　Did the trial court err by failing to follow the Restatement's rule that courts should use contract interpretation to avoid the need for reformation, and failing to construe the provision at issue to require severance of $680,000 in total?

3.　　Did the trial court err by concluding it lacked equitable power to grant relief to Dahua when the Restatement says it has that power and the Massachusetts Court of Appeals has exercised that power?

4.　　Did the trial court err by entering judgment against Dahua on its claim for breach of the implied covenant of good faith and fair dealing?

## INTRODUCTION

This is a dispute about a former executive's severance in which the trial court found the relevant facts in favor of the employer, Appellant Dahua Technology USA, Inc. ("Dahua"). The court would have entered judgment for Dahua had it not misconstrued and failed to apply Massachusetts law, which accords with the relevant portions of the Restatement (Second) of Contracts. This Court should correct the trial court's legal errors and enter the judgment for Dahua that is compelled by that court's findings of fact.

This case arises from a mistake that was exacerbated by Appellee Feng (Frank) Zhang's initial failure to say anything about it and subsequent insistence on a windfall to which he knew he was not entitled. When Dahua removed Zhang from his executive position in August 2017, it still owed him a total of $680,000 in salary, payable over the sixteen months remaining on his then-existing employment agreement. The trial court found that Zhang agreed with Liquan Fu (Dahua's sole director and the founder and Chairman of Dahua's parent company) that Zhang's severance would be that amount, payable over that time-period. Through additional negotiation, Zhang also agreed to a non-executive consulting position with a total guaranteed salary of $480,000 in exchange for a release and restrictive covenants.

When the written agreement was drafted, it said (in English) that Dahua would "make monthly severance payments to [Zhang] in the amount of $680,000 for

sixteen (16) months" instead of clearly stating that $680,000 was the total amount of severance to be paid over sixteen months, as previously agreed. Fu was unaware of the mistake because he cannot read English. The trial court found that Zhang, who can read English and who reviewed the agreement before signing it, either had reason to know of the mistake or also was unaware of it. In any event, he said nothing about the mistake.

Zhang accepted four monthly severance payments from September 2017, to December 2017, each in the amount of $42,500, without ever complaining of a purported underpayment. When Dahua subsequently terminated him from his consulting position in January 2018, Zhang still said nothing about the monthly payments he had been receiving or the drafting error; he simply asked that payment of the remaining severance be accelerated. The first anyone said anything about the mistake was on January 29, 2018, five months after the agreement was executed, when Zhang's attorney raised it in a letter to Dahua's counsel. Since then, Zhang has insisted that he was owed $10,880,000 in severance instead of the $680,000 to which he and Fu agreed. Zhang has tried to justify this windfall by claiming Dahua meant to pay him an additional $10.2 million as consideration for the release and restrictive covenants.

The trial court pointedly rejected this argument. It found (1) the parties intended the severance amount to be a total of $680,000 payable in sixteen monthly

installments; (2) a mistake was made when reducing that term to writing; (3) either the mistake was mutual, or Zhang had reason to know of it; and (4) the consideration for Zhang's release and restrictive covenants was the consulting position with its additional $480,000 in guaranteed salary. But the trial court concluded it had no legal power to reform *the severance amount* because the parties did not reach a prior agreement on the *other* terms of their deal.

Massachusetts law looks to and comports with the Restatement (Second) of Contracts on reformation matters, and it compels judgment for Dahua based on the trial court's fact findings for the following reasons:

- Section 155 of the Restatement provides, and Massachusetts cases confirm, that courts should reform a mutually mistaken term when, as here, the parties previously agreed *on that disputed term* regardless of whether they also agreed on *other* terms.

- Sections 161 and 166 of the Restatement provide, and Massachusetts cases confirm, that courts should reform a mistaken term where, as here, one party had reason to know of the mistake but failed to make it known to the other party until long after the contract was signed.

- Section 155 of the Restatement also counsels that, if a case does not cleanly fall within the reformation rules, courts should simply interpret the contract in a way that effectuates the parties' intent.

- Section 158(2) of the Restatement provides that courts have power to grant equitable relief if the other Restatement rules will not avoid injustice, and the Massachusetts Court of Appeals has done just that.

This Court should reverse and render a judgment that gives the parties what the trial court found they bargained for—no more and no less.

## STATEMENT OF THE CASE

### I.   FACTUAL BACKGROUND

Dahua Technology USA, Inc. ("Dahua") was the wholly owned United States subsidiary of Zhejiang Dahua Technology Co. Ltd. ("Zhejiang"), a publicly listed Chinese technology company.[1] Add. 2-3; App'x 45, 262. Liquan Fu founded Zhejiang and served as both its Chairman and the sole director of Dahua. Add. 3; App'x 262.

Zhejiang's sales revenue from its North American operations steadily grew from $16 million in 2012, to $140 million in 2015. App'x 323-26, 387-89. In late 2015, Fu recruited Feng (Frank) Zhang for an executive-level position overseeing those operations. Add. 3; App'x 326-33]. Zhang was hired to exceed the prior growth rates and thereby narrow the gap with Dahua's competitors. App'x 398-400.

Zhang's initial employment agreement (the "2015 Employment Agreement") provided him an annual base salary of $510,000 ($42,500 per month). Add. 3, 60. Zhejiang employed Zhang, but Dahua paid his salary and gave him the standard benefits offered to Dahua's employees. Add. 4, 60. The 2015 Employment Agreement did not contain any restrictive covenants. Add. 4, 60.

---

[1] After the judgment being appealed was issued, Dahua became a wholly owned subsidiary of Central Motion Picture USA Corporation. *See* Corporate Disclosure Statement *supra*.

Zhang began his employment on January 1, 2016. Add. 4, 60. His leadership did not lead to higher growth rates or narrow the gap with Dahua's competitors. App'x 367-68, 387-98. Instead, during his first year at the helm, Dahua experienced its first-ever decline in sales revenue. App'x 367-68, 387-98. That decline accelerated during the first half of 2017. App'x 400-03. By mid-2017, a decision was made to remove Zhang from day-to-day management of the North American business. Add. 4, 6.

Haiyan Yue, in-house counsel, and Cathryn Le Regulski, outside counsel, collaborated on an internal memo outlining Dahua's legal options for the removal. Add. 6. They concluded it would require a severance package that provided Zhang with his salary under the 2015 Employment Agreement from the date of removal through the end of the three-year term and "[a]dditional compensation to entice him to release all claims against Dahua." Add. 7; App'x 1902.

Fu travelled to Massachusetts to negotiate Zhang's removal. Add. 8; App'x 262. They met at the airport on the evening of August 27, 2017, and Zhang drove Fu to his hotel. Add. 9. Fu explained on the way that he was considering replacing Zhang, but it was late, so they agreed to talk more in the morning. Add. 9.

Zhang returned to the hotel the next morning. Add. 10. Fu said he wanted to transition Zhang to a different position, and they discussed various options. Add. 10. Zhang eventually said he would be happy to accept a different role, but first wanted

to know how the remaining terms of the 2015 Employment Agreement would be resolved. Add. 10. Fu told him, "[W]e will follow whatever [the] agreement says." Add. 10; App'x 1244. Zhang responded, "[I]f [you] can take care of the agreement, I'm okay." Add. 10; App'x 1245. Fu then stepped away to make a phone call. Add. 11; App'x 1246. When he returned, he told Zhang, "We're all set." Add. 11; App'x 1246.

Zhang believed at that point he had an agreement with Fu, such that Zhang would receive the remaining salary under the 2015 Employment Agreement and transition to a new role as a senior corporate adviser for a two-year term, for which he would be paid an additional $240,000 annual salary. Add. 11. Those terms matched the severance package that Yue and Le Regulski had advised would likely be required to effectuate Zhang's removal. Add. 7; App'x 1900-02.

Yue confirmed those terms when she emailed them to Le Regulski for preparation of the written agreements based on what Fu and Zhang had agreed to at the hotel. Add. 12; App'x 1819. Yue wrote, "It's been decided: Frank will serve as a consultant. Dahua will pay him the remaining 16 month salary plus a monthly consulting fee. The consulting period is 2 years." Add. 12; App'x 1819.

Yue and Le Regulski produced two documents—a separation agreement and consulting agreement—which Yue presented to Zhang at the office later that day. Add. 12. Zhang rejected the consulting agreement because it provided at-will

employment and did not include the additional compensation Fu promised him. Add. 13. He also rejected the separation agreement because it did not include the compensation from his 2015 Employment Agreement, and it contained releases and restrictive covenants that had not been discussed. Add. 12-13, 14-15.

Zhang told Yue, "Go sync up with Mr. Fu" because "[t]his is not what I discussed with Mr. Fu. And, also, this not what Fu said, treat me well." Add. 13; App'x 1252; *see also* App'x 1365 ("This is not what I discussed with Mr. Fu in the morning at the hotel. Please sync up with him."). Le Regulski subsequently drafted a separation agreement (the "Release Agreement") and consulting agreement (the "2017 Employment Agreement") (collectively, the "Agreements") that collectively conformed to the terms Fu and Zhang had agreed on at the hotel earlier that morning. Add. 14-17. Her draft of the Release Agreement left the severance amount blank because she did not know Zhang's salary under the 2015 Employment Agreement. Add. 14-17, 55; App'x 1844, 1889. Because Zhang was being given a consulting role with corresponding salary in addition to severance, the Release Agreement also contained a general release of all claims against Dahua and Zhejiang arising from his employment, a non-competition clause, a mutual non-disparagement clause, a confidentiality clause, and contingent separation benefits which required his compliance with the Release Agreement's terms. Add. 14-16, 18, 50-54.

The 2017 Employment Agreement gave Zhang a non-executive position as Senior Corporate Advisor at Dahua with a two-year term. Add. 55. His salary for that position was "$10,000 bi-weekly, which equates to $240,000 on an annualized basis …." Add. 55. It did not require cause for Dahua to terminate Zhang's employment thereunder. Add. 55.

Yue filled in the severance amount in the final version of the Release Agreement. Add. 17-18. But instead of clearly stating that the total amount of the sixteen monthly severance payments was $680,000—*i.e.*, the amount of base salary remaining under the 2015 Employment Agreement—the Release Agreement stated:

> In consideration for your execution, non-revocation and compliance with this Agreement, the Company agrees to make monthly severance payments to you in the amount of $680,000 for sixteen (16) months following the offer termination Date (the "Severance Period") ….

Add. 50.

After finalizing the Agreements, Yue presented them to Zhang and Fu. Add. 19. The Agreements were in English, which Zhang could read but Fu could not. Add. 11, 19. Neither of them asked to have the agreements translated into Mandarin. Add. 19. Yue asked Zhang to review the Agreements and informed him he had the right to engage counsel, which he declined. Add. 19. After Zhang reviewed the Agreements for ten to fifteen minutes, he and Fu signed them. Add. 19.

Dahua paid Zhang $62,500 per month over the next four months—$42,500 for severance and $20,000 for his salary under the 2017 Employment Agreement.

Add. 19; App'x 1390. Zhang never asserted during that time that Dahua was paying him less than he was owed under the Agreements. App'x 1865.

On January 10, 2018, Dahua informed Zhang it was terminating him from his position as Senior Corporate Advisor and enclosed a new separation agreement for his consideration and signature. Add. 20. At that point, Dahua had paid Zhang $170,000 in severance and $80,000 in salary under the Agreements. Add. 20; App'x 1866. Dahua offered a severance amount that included the remaining $510,000 in severance and $400,000 in salary it believed was still owed under the Agreements. Add. 20; App'x 1865-66.

Zhang refused to sign and reported that his attorney would be reviewing and negotiating the terms of his separation. Add. 20; App'x 1859. He also "formally request[ed] the payment acceleration of the agreed to severance amount defined in the first term" of the Release Agreement without specifying any severance amount or asserting that Dahua had underpaid him. Add. 20; App'x 1859.

On January 29, 2018, Zhang's attorney rejected the severance offer and informed Dahua that, "[b]ased on our review, we have concluded that … the Company is already contractually obligated to pay Mr. Zhang over $11,000,000 …." App'x 1862. Le Regulski responded a few days later, stating that Dahua had "just learned that there is a scrivener's error in the Release Agreement, such that the wording of the agreement with respect to the severance amount does not comport

with the intention of the parties …, which was a monthly severance payment of $42,500 for 16 months, totaling $680,000." App'x 1865.

Le Regulski asked that Zhang execute an amendment to correct the mistake. App'x 1866-69. Zhang's counsel refused on his behalf, claiming that "even just the non-competition and non-disparagement provisions standing alone" justified the $10.2 million difference between what Zhang now claimed he was owed in severance and the $680,000 to which he and Fu agreed at the hotel. Add. 21; App'x 1871.

The district judge who tried the case rejected Zhang's contention that Dahua would have agreed to pay $10.2 million for the release and restrictive covenants. Add. 29-30. The judge found instead that:

- "[t]he discrepancy between $10,880,000 … and the initial … offer, with no discussions of intermediate offers, supports Dahua's claim of mistake";

- "the sticking point in the negotiations between the parties was not the amount of severance but the termination of Zhang's employment";

- "Zhang had no reason to think that Dahua would increase the severance … to $10,880,000"; and

- "Zhang had reason to know, from his own prior experience dealing with Fu and Zhejiang, that the company would not jump to such a large number without first trying to buy his silence and cooperation for some lesser amount."

Add. 28-30.

Accordingly, the judge found that "Dahua has established that it made a mistake when setting forth the severance payment as $680,000 per month for sixteen months rather than $680,000 payable over sixteen months" and that "Dahua has established that the mistake was mutual or that Zhang had reason to know of the mistake." Add. 28. "The parties agree that since August 28, 2017, Dahua has paid Zhang $680,000 in severance in connection with the Release Agreement and $480,000 in salary promised in the 2017 Employment Agreement." Add. 21.

## II.  PROCEDURAL HISTORY

Tensions between the parties escalated after Zhang refused to correct the mistake by amending the Release Agreement. Add. 21. Frustrated with Zhang's insistence on a windfall and his threats of legal action, Dahua eventually filed this action on May 31, 2018, seeking reformation of the severance amount in the Release Agreement. Add. 21; App'x 9-10. Dahua also claimed Zhang breached his implied covenant of good faith and fair dealing by trying to take advantage of the mistake, and sought damages resulting from that breach. App'x 10. Zhang counterclaimed for breach of contract, asserting Dahua owes him an additional $10.2 million in severance. App'x 51-52.

The parties filed cross-motions for summary judgment. App'x 59, 80. The district court allowed Dahua's motion and denied Zhang's. App'x 226. Zhang

appealed. App'x 227. The court declined to award damages on Dahua's breach claim, so Dahua cross-appealed. App'x 229, 231.

Viewing the facts in the light most favorable to Zhang in the previous appeal, this Court held there were "at least three triable issues of fact: whether Dahua made a mistake (informing whether any mistake defense is viable), whether Zhang made a mistake (informing whether a mutual mistake defense is viable), and, if only Dahua was mistaken, whether Zhang knew or should have known of Dahua's mistake (informing whether a unilateral mistake defense is viable)." *Dahua Tech. USA, Inc. v. Zhang*, 988 F.3d 531, 539-40 (1st Cir. 2021). The Court consequently affirmed the denial of Zhang's motion, dismissed Dahua's cross-appeal, vacated the summary judgment in Dahua's favor, and remanded for further proceedings. *Id.* at 542.

The case was reassigned to a different judge following remand. Add. 3. After a ten-day bench trial and post-trial briefings and argument, the judge entered Findings of Fact and Conclusions of Law. Add. 2. Regarding the first fact issue this Court identified, the trial court found that "Dahua has established that it made a mistake when setting forth the severance payment as $680,000 per month for sixteen months rather than $680,000 payable over sixteen months." Add. 28. As to the second and third fact issues, the court found that "Dahua has established that the mistake was mutual or that Zhang had reason to know of the mistake." *Id.*

The trial court also found that, prior to executing the Agreements, the parties reached agreement on the severance amount even while they continued to negotiate other aspects of Zhang's removal from executive office. *See id.* ("[T]he sticking point in the negotiations between the parties was ***not the amount of severance pay but the termination of Zhang's employment***.") (emphasis added). For example, the court found that "[w]hen Zhang and Fu concluded those discussions [at the hotel], Zhang believed … he would … *continu[e] to receive the salary and benefits for the remaining sixteen months of the contract*. … But Zhang and Fu had no discussion *about Zhang separating from Zhejiang or agreeing to these restrictions*"—*i.e.*, release and restrictive covenants. Add. 22-23 (emphasis added).

This distinction between the existence of a prior agreement on the severance amount and the absence of a prior agreement on the other terms of Zhang's removal proved crucial when the court ultimately rejected Dahua's reformation claim as a matter of law solely because "there was no prior oral agreement with Dahua *concerning Zhang's separation of employment from Zhejiang*." Add. 25 (emphasis added); *see also* Add. 23 ("Where *Zhang's separation of employment from Zhejiang and the additional restrictions* were not discussed at all, the court finds no prior oral agreement ….") (emphasis added).

The court also rejected Dahua's affirmative defense of rescission because it concluded Dahua bore the risk of mistake and would be unjustly enriched by a

rescission. Add. 30-32. But those findings had no effect on Dahua's claim to reform the Release Agreement to reflect the parties' prior agreement on the severance amount, which the judge acknowledged was separate and distinct, and involved different elements, from its rescission defense. *See* Add. 26 ("If successful, this defense does not support reformation of the contract but rescission. … Because the result is no contract, rather than a reformed contract, the elements are somewhat different.").

Before entering judgment, the court invited further briefing on whether, in light of its findings, it had authority to fashion an appropriate remedy as a matter of equity or whether it was required as a matter of law to enforce the Release Agreement as written. Add. 32-33. The parties completed the supplemental briefing on December 20, 2022. App'x 1638-1700.

On March 15, 2023, Dahua filed a motion to supplement the trial court's conclusions of law. App'x 1757-59. Dahua asked the court to follow guidance from the Restatement (Second) of Contracts and resolve the parties' dispute by simply interpreting the contract in accordance with the court's existing findings. App'x 1757-58. Dahua also asked the court to follow the Restatement to grant equitable relief on such terms as justice requires if such relief is not available under a mistake doctrine or through interpretation. App'x 1758.

Almost a year later, the district court issued a Memorandum & Order denying Dahua's motion to supplement and concluding it could not grant Dahua equitable relief. Add. 34-47. The court entered judgment for Zhang on his counterclaim for breach of contract and awarded him $10,200,000 in damages, with post-judgment interest as provided by law. Add. 48. The judgment was amended on March 28, 2024, to add pre-judgment interest in the amount of $6,753,787.88 (for a total award of $16,953,787.88). Add. 49. Dahua timely appealed. App'x 1788.

## III.   RULINGS PRESENTED FOR REVIEW

Dahua presents the following rulings for review in this appeal:

- Amended Judgment (Doc. 214, Mar. 28, 2024);

- Judgment (Doc. 209, Mar. 12, 2024);

- Memorandum & Order (Doc. 208, Mar. 12, 2024); and

- Findings of Fact and Conclusions of Law (Doc. 194, Oct. 21, 2022).

# SUMMARY OF THE ARGUMENT

This is a classic case in which reformation of a contract term is necessary to fix what the trial court found was either a mutual mistake or a mistake known only to Zhang. The trial court erred as a matter of law by refusing to make that reformation, interpret the provision at issue in accordance with the parties' mutual intent, or exercise its equitable powers to justly enforce the parties' shared intent.

Massachusetts cases are substantially in accord with the reformation rules articulated in Restatement (Second) of Contracts. One of those rules (§ 155) provides that, while a prior agreement is required for reformation of a contract term, that agreement need only be on the mistaken term. Here, that was the severance amount in the Release Agreement. The trial court found there was a prior agreement on that amount—*i.e.*, a total of $680,000 payable over sixteen months. But, instead of applying the Restatement's rule, it based its decision on whether the parties also reached agreement on other terms for which no mistake was alleged. The court's error of law requires reversal.

The district court also failed to apply Restatement §§ 161 and 166, which set forth the rules for reforming a mistaken term that is known only to one party who fails to make it known to the other party. The court found that Zhang had reason to know of the mistakenly described severance amount, but he remained silent. Sections 161 and 166 provide that such silence supports reformation even if there

was no prior agreement as to the mistaken term. The court's failure to apply these rules is also an error of law requiring reversal.

The trial court similarly failed to follow the Restatement's counsel in § 155 to interpret the disputed contract language in context and according to the parties' intent as an alternative to reformation. If it had done so, it would have interpreted the severance provision to mean that the total severance amount is $680,000. Its refusal to resolve the parties' dispute through contract interpretation is another error of law for which reversal is warranted.

The trial court also erred by declining to exercise its equitable power to avoid the manifestly unjust result it felt was compelled by the parties' written agreement. Restatement § 158(2) expressly provides that courts should exercise such power in situations like the one here, and the Massachusetts Court of Appeals has exercised its own such power in similar circumstances.

These errors ultimately led the trial court to reject Dahua's claims as a matter of law. The result was a manifestly unjust windfall to Zhang of nearly $17 million. This Court should exercise de novo review, reverse the trial court's judgment, and render the judgment that court should have rendered.

# ARGUMENT

## I. DE NOVO STANDARD OF REVIEW

The district court made errors of law. This Court reviews such rulings de novo. *Paraflon Invs., Ltd. v. Fullbridge, Inc.*, 960 F.3d 17, 24 (1st Cir. 2020); *LPP Mortg., Ltd. v. Sugarman*, 565 F.3d 28, 31 (1st Cir. 2009).

## II. THE DISTRICT COURT MISAPPLIED MASSACHUSETTS LAW IN CONNECTION WITH DAHUA'S REFORMATION CLAIM.

### A. Massachusetts Law on Reformation Aligns with the Restatement.

"Under Massachusetts law, a written contract may be reformed if its language 'does not reflect the true intent of both parties.'" *OneBeacon Am. Ins. Co. v. Travelers Indem. Co.*, 465 F.3d 38, 41 (1st Cir. 2006) (quoting *Polaroid Corp. v. Travelers Indem. Co.*, 610 N.E.2d 912, 917 (Mass. 1993)). Such reformation "exists to effectuate the agreement intended by the parties … where the contract language fails to capture that agreement." *Caron v. Horace Mann Ins. Co.*, 993 N.E.2d 708, 712 (Mass. 2013). "Central to this doctrine is the fundamental underpinning that the parties had reached an agreement *on a point* which they intended to enshrine in the written contract but which, for some reason, was mistakenly omitted from that written contract." *Id.* (emphasis added). "'The classic case for reformation' is when the mutual mistake can be traced to a typo or transcription error," but "a scrivener's error is not a prerequisite for reformation." *OneBeacon*, 465 F.3d at 41 (quoting E. Allan Farnsworth, *Farnsworth on Contracts* § 7.5 (2001)). "Mutual mistakes

justifying contract reformation may result simply from the parties' inattention." *Id.* (citing *Polaroid*, 610 N.E.2d at 917; *De Vincent Ford Sales, Inc. v. First Mass. Corp.*, 146 N.E.2d 492, 494 (Mass. 1957)).

Reformation may also be warranted "by a mistake of one party … which is known to the other party …." *Torrao v. Cox*, 525 N.E.2d 1349, 1352 (Mass. App. Ct. 1988) (citing *Mates v. Penn. Mut. Life Ins. Co.*, 55 N.E.2d 770 (1944); *Wareham Sav. Bank v. Partridge*, 56 N.E.2d 867 (1944)). "Under the rule stated in Restatement (Second) of Contracts § 161(c) (1981), reformation is justified if the party knowing of the mistake fails to make it known to the mistaken party," which the Restatement analogizes "to misrepresentation by silence …." *Id.*

Courts applying Massachusetts law frequently rely on the reformation rules articulated in the Restatement. *See, e.g.*, *OneBeacon*, 465 F.3d at 41 (citing examples); *Torrao*, 525 N.E.2d at 1352. And Massachusetts "cases are substantially in accord with these rules" and "principles concerning the doctrine of mistake …." *Covich v. Chambers*, 397 N.E.2d 1115, 1121 (Mass. App. Ct. 1979); *see also* Add. 27 n.13 ("Massachusetts law adopts the principles set out in the Restatement (Second) of Contracts for the rescission of contracts.").

### B. The District Court Misapplied Section 155 of the Restatement.

The district court acknowledged that Restatement § 155 applies to Dahua's reformation claim, *see* Add. 22, but then misapplied that rule.

### 1. Reformation Under § 155 Does Not Depend on Risk of Mistake or Require Prior Agreement on All Contractual Terms.

Section 155 of the Restatement addresses when a mistake of both parties as to a written expression justifies reformation. It provides:

> Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement, except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected.

Restatement (Second) of Contracts § 155. Simply stated, "[t]he province of reformation is to make a writing express the agreement that the parties intended it should." *Id.* § 155 cmt. a.

Unlike the rule that applies to *rescission* of a contract based on mutual mistake, *reformation* under § 155 is not subject to the risk-of-mistake rule stated in § 154; rather, it "is subject to the rule of fault stated in § 157[,]" *id.*, which bars reformation only if "[a] mistaken party's fault in failing to know or discover the facts before making the contract … amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing." *Id.* § 157. Thus, "[r]eformation is not precluded by the mere fact that the party who seeks it failed to exercise reasonable care in reading the writing." Restatement (Second) of Contracts § 155 cmt. a.; *see also id.* § 157 cmt. a ("The mere fact that a mistaken party could have avoided the mistake by the exercise of reasonable care does not preclude …

reformation (§ 155). Indeed, since a party can often avoid a mistake by the exercise of such care, the availability of relief would be severely circumscribed if he were to be barred by his negligence.").[2]

Particularly important here, the Restatement clarifies that, while "there must have been some agreement between the parties prior to the writing" for the rule in § 155 to be invoked, "[t]he prior agreement *need not … be complete* and certain enough to be a contract." Restatement (Second) of Contracts § 155 cmt. a (emphasis added). Instead, "[i]f the parties reach agreement *as to only part of the prospective bargain*, and if they are later mistaken in their attempt to put in writing this agreement *together with such other terms as will make a contract*, reformation is still an appropriate remedy." *Id.* (emphasis added). The agreement only must "be certain enough to permit a court to frame relief in terms of reformation." *Id.*

---

[2] The trial court did not address § 157's rule of fault, which applies to *reformation* under § 155. *See* Add. 22-25. Rather, it confined its discussion of who bore the risk of mistake to its analysis of whether *rescission* is available under § 152. *See* Add. 27, 30-32. In any event, neither rule precludes reformation on this record or under the trial court's fact findings, so any contrary conclusion by that court constitutes legal error. *See, e.g.*, *Torrao*, 525 N.E.2d at 1351-52 (declining to hold plaintiff to mistaken term in a deed where he could not read English and his attorney made an error in drafting the deed); *Colony v. McMann*, No. 08-P-1121, 2009 WL 1883847, at *1 (Mass. App. Ct. July 2, 2009) (plaintiff did not bear the risk of mistake by not reading the written agreement before signing it because she trusted that it set forth the previously agreed-to terms).

The only term Dahua asked to be reformed is the severance amount in the Release Agreement. *See* App'x 9-10. Thus, as the Restatement and Massachusetts law state, the only relevant question was whether there was a prior agreement as to that amount. Whether there was also a prior agreement on any other terms that may have been included in the Agreements is irrelevant to the issue of reformation.

The district court found a prior agreement with respect to the severance amount when it concluded that "Dahua has established that it made a mistake when setting forth the severance payment as $680,000 per month for sixteen months rather than $680,000 payable over sixteen months" and "that the mistake was mutual or that Zhang had reason to know of the mistake." Add. 28. There could have been no mistake in expressing the severance amount in the Release Agreement without a prior agreement to which that expression could be compared.

The evidence overwhelmingly supports that conclusion. For instance, when Zhang told Fu at the hotel that he wanted to know how the remaining terms of the 2015 Employment Agreement (including the salary still owed to him) would be resolved, Fu said, "[W]e will follow whatever [the] agreement says." Add. 10; App'x 1244. Zhang manifested his assent to receiving the remaining salary under the 2015 Employment Agreement as severance by responding, "[I]f [you] can take care of the agreement, I'm okay." Add. 10; App'x 1245.

Fu then stepped aside to make a call and, when he returned, he confirmed, "We're all set." Add. 11; App'x 1246. The terms Fu and Zhang struck at the hotel were reflected in Yue's email to Le Regulski the same day: "It's been decided: Frank will serve as a consultant. Dahua will pay him the remaining 16 month salary plus a monthly consulting fee. The consulting period is 2 years." Add. 12; App'x 1819.

The district court found that Zhang believed at that point he had an agreement with Fu, such that Zhang would receive the remaining salary owed to him under the 2015 Employment Agreement ($680,000) and transition to a new role as a senior corporate adviser for a two-year term, for which he would be paid an additional guaranteed $240,000 annual salary. Add. 11. Those terms were the same that Yue and Le Regulski had advised would be required to effectuate Zhang's removal from his executive position. Add. 7; App'x 1900-02.

Although Zhang argued that Dahua subsequently increased the severance amount sixteen-fold to secure his agreement to the release and restrictive covenants in the Release Agreement, the district court rejected this argument because "Zhang had no reason to think that Dahua would increase the severance … to $10,880,000"; "it does not support the notion that Zhejiang and Dahua – which had a sizable team working hard to get [] the company exactly what it wanted – would have offered the large sum, rather than a much smaller amount, to buy Zhang's silence and cooperation"; "Zhang had reason to know, from his own prior experience dealing

with Fu and Zhejiang, that the company would not jump to such a large number without first trying to buy his silence and cooperation for some lesser amount"; and there had been "no discussions of intermediate offers[.]" Add. 28-30.

The court could have also rejected Zhang's argument because it is implausibly coincidental that the severance amount would be $680,000 times sixteen payments when the remaining salary under the 2015 Employment Agreement was sixteen payments totaling $680,000. Moreover, the record shows that Zhang's agreement to the release and restrictive covenants was obtained, not by any additional promised severance, but by his continued employment with the guarantee of an additional $480,000 in salary. Add. 28-30; App'x 1816.

That the parties reached a prior agreement as to the severance amount is confirmed by the district court's conclusion that "the sticking point in the negotiations between the parties was *not the amount of severance pay but termination of Zhang's employment*." Add. 28 (emphasis added). The amount of severance was not a sticking point because, as reflected above, it was the first term to which Fu and Zhang agreed at the hotel on the morning of August 28, 2017. That agreement was for severance that equaled the total salary Zhang would have received under the remaining sixteen months of the 2015 Employment Agreement: $680,000. *See* Add. 22 ("When Zhang and Fu concluded those discussions [at the hotel], Zhang

believed … he would … *continu[e] to receive the salary and benefits for the remaining sixteen months of the contract*.") (emphasis added).

Because Dahua requested reformation only of the severance amount, the district court's finding of a prior agreement on that term should have been the beginning and end of its reformation analysis. Instead, the court based its decision regarding reformation solely on whether there was a prior agreement on the *other terms* relating to Zhang's removal from office, which are not in dispute. *See* Add. 23-25. For instance, the court observed that Zhang and Fu had no discussion at the hotel "*about Zhang separating from Zhejiang or agreeing to these restrictions*"— *i.e.*, release of claims and restrictive covenants. Add. 24. Consequently, the court inferred "there was no prior oral agreement with Dahua *concerning Zhang's separation of employment from Zhejiang*." Add. 25 (emphasis added). These findings are irrelevant to Dahua's claim for reformation, however, because they do not have any legal effect on reforming the error in the severance amount—and that is all that matters under Restatement § 155.

Indeed, the trial court's rationale would backfire if taken to its logical conclusion. By focusing single-mindedly on whether there was a prior agreement on every material term instead of just the mistaken term, the court suggested there was no "meeting of the minds" to form a binding contract in 2017. That is because, when the parties signed the Agreements, Dahua's understanding of the severance amount

was drastically different than what Zhang later claimed he understood it to be. The trial judge refused to find "no meeting of the minds" because she was concerned that would be unfair to Zhang, but that is not correct. Even if no contract was formed in 2017, Zhang would still be in a better position today than where he started because he has been paid $480,000 in addition to the $680,000 he was owed and paid under the 2015 Employment Agreement. To the extent he complied with any restrictions after his employment was terminated four months later, his compliance was well-compensated by the $400,000 in salary he received while not an employee of Dahua or Zhejiang. Thus, if this Court will not reform the severance amount, it should hold there was no "meeting of the minds" and no contract was formed in 2017.

If this Court thinks that outcome is incorrect, however, it is because of the logic embodied in Restatement § 155. The parties *did* reach agreement on all material aspects of their contract; we know that because they signed the Agreements. The only problem was that the Release Agreement incorrectly described the amount of severance Zhang would receive. But when Fu and Zhang signed those documents, there was no doubt they had previously agreed on a severance amount equal to the remaining salary from the 2015 Employment Agreement, and there was no doubt they agreed at that moment on all the other terms expressed in the Agreements. The district court should, therefore, have simply reformed the severance provision in the Release Agreement to comport with the parties' prior agreement on that term.

### 2. Massachusetts Case Law Confirms that a Prior Agreement on All Terms is Not Required.

Instead of applying the Restatement in accordance with Massachusetts law by analyzing solely whether there was a prior agreement as to the severance amount, the district court incorrectly determined that reformation requires a prior agreement on all terms of the written contract, not just the mistaken term sought to be reformed. In doing so, the court misunderstood and mistakenly relied upon dicta from a 143-year-old case when it stated: "To reform a contract, the court must therefore find 'that the precise terms of a contract had been orally agreed upon between the parties, and that the written instrument afterwards signed fails to be, as it was intended, an execution of the previous agreement.'" Add. 22 (quoting *German Am. Ins. Co. v. Davis*, 131 Mass. 316, 317 (1881)). This language from *German* is the only authority the district court cited for its conclusion that a prior agreement must encompass all terms expressed in the written contract. But *German* does not support that conclusion. In fact, the *German* court was clear that its disposition had nothing to do with mutual mistake.

*German* involved two fire insurance policies. 131 Mass. at 317. The homeowner voided the policies when she conveyed the house to a third party. *Id.* Her lender also voided the policies when it entered for the purpose of foreclosure. *Id.* Nevertheless, the insurance company and lender added indorsements to the policies that provided coverage to the lender. *Id.* When they did so, they were either

unaware, or did not think, of the fact that the policies had also been voided by the homeowner's prior conveyance. *Id.* The house was later destroyed by fire and the insurance company tried to avoid coverage by arguing the policies should be reformed to negate the indorsements because, when the parties added them, they did not consider that the policies had also been voided by the homeowner's conveyance. *Id.* at 317-18.

The *German* court rejected this argument, concluding instead that the doctrine of mutual mistake was irrelevant because the alleged mistake had nothing to do with the bargain the parties struck. *Id.* at 318. It explained: "The fact that [the homeowner] had made a previous conveyance of the house, and that this was unknown to the company, *does not seem important*. Both parties understood that the policies were avoided by the entry to foreclose, and *the fact that it was also void for another reason was immaterial to the risk, and could not have any bearing upon the question as to what contract the parties should make for the future*." *Id.* (emphasis added).

Because *German* was not decided based on mutual mistake, it provides no express or contextual clues as to what the court meant when it said "the precise terms of a contract [must have] been orally agreed upon between the parties" for there to be reformation based on mutual mistake. *Id.* at 317. In contrast, the 143 years of Massachusetts case law since *German* was decided, which is reflected in Restatement § 155, is clear that the mistaken term is the only term on which there

must have been prior agreement for there to be reformation. That law is best reflected in the most recent decisions of this Court (*OneBeacon*) and the Massachusetts Supreme Judicial Court ("SJC") (*Polaroid* and *Caron*) on this subject. The district court should have followed these cases, but it did not.

In *OneBeacon*, the plain language of an insurance policy provided coverage to the insured's lessees who had not independently insured their leased vehicles through OneBeacon. 465 F.3d at 42. OneBeacon nevertheless claimed that neither it nor the insured intended for the policy to extend such coverage. *Id.* The district court refused to reform the policy and ordered OneBeacon to pay $1,000,000 to reimburse another insurer which had settled a vehicle liability suit against a lessee of the insured. *Id.* at 39.

On review, this Court found that the course of conduct between OneBeacon and the insured amply and persuasively demonstrated a mutual understanding and intent to exclude from coverage the insured's lessees who did not independently insure their vehicles with OneBeacon. *Id.* at 42-46. Unlike the district court here, this Court in *OneBeacon* confined its analysis to whether the parties had manifested a mutual and clear intent with respect to the only term that OneBeacon asked to be reformed. *Id.* Finding there was such intent, and that it was not accurately expressed in the policy, this Court reversed, and directed the district court to enter judgment

for OneBeacon providing for reformation of the policy.[3] *Id.* at 46. The trial court in this case should have followed *OneBeacon* and ended its analysis with its determination that there was a prior agreement as to the severance amount. Add. 28.

Similarly, in *Polaroid*, both an insurer and the insured believed that umbrella policies included a pollution exclusion even though the policies did not. *See* 610 N.E.2d at 917-18. Taking advantage of the lack of such exclusion, Polaroid sought recovery of its costs incurred in the defense and settlement of claims against it arising from the discharge of pollutants. *Id.* at 914. The trial court allowed the insurer to reform the policies so they would contain pollution exclusions, which barred Polaroid from any recovery. *Id.*

The SJC granted direct appellate review and affirmed. *Id.* at 914-15. It found that, because Polaroid's prior policies with the insurer included a pollution exclusion and the insurer had always included such an exclusion in its policies with other insureds, the parties shared a mistake which warranted reformation of the policies to

---

[3] Notably, this Court never found that parties' mutual intent was expressed in a prior oral agreement. Rather, it concluded that evidence "reflect[ing] the *course of conduct* between" the parties "*paint[ed] a consistent picture* showing that LAI intended to shift responsibility for liability coverage on its vehicles to the long-term lessees of those vehicles and that OneBeacon also operated on the assumption that it provided such coverage only when a lessee individually applied and was approved." *OneBeacon*, 465 F.3d at 42-43 (emphasis added). In other words, it was sufficient that the parties communicated their mutual understanding and intent through their course of conduct rather than through an express oral agreement.

include that exclusion.[4] *Id.* at 918-19. Unlike the district court here, the SJC did not examine whether there was prior agreement on other terms reflected in the policies; such terms were irrelevant to the SJC's analysis because they did not concern a term the insurer was asking to be reformed.

The district court also should have considered the contrasting facts in *Caron*, which led to a different result than *OneBeacon* and *Polaroid*. In *Caron*, the SJC held there was no mutual mistake warranting reformation of a homeowner's insurance policy where the evidence failed to establish a prior agreement between the parties as to the policy's limitation of liability for animal bites. 993 N.E.2d at 709. The homeowner mistakenly assumed, and the insurer's agent mistakenly believed, that the policy did not contain any such limitation. *Id.* at 710. However, they never discussed the issue, and it was undisputed that, contrary to their mistaken assumption and belief, the insurer itself intended for the limitation to be included in the policy because that endorsement was mandatory in all the insurer's policies. *Id.* at 710-12.

The question before the SJC in *Caron* was whether the agent's misunderstanding, which he happened to share with but never expressed to the homeowner, warranted reformation of the policy based on mutual mistake. *Id.* at

---

[4] As in *OneBeacon*, the SJC did not require an express prior oral agreement between the insurer and insured that excluded pollution from coverage under the policies. Rather, like this Court, the SJC relied on the insurer's prior course of conduct and the insured's knowledge of that conduct.

712. The SJC held it did not because reformation requires "that the parties *expressed agreement* and an *intention to be bound* in accordance with the terms that we are asked to establish and enforce." *Id.* at 712-13 (quoting *Sancta Maria Hosp. v. Cambridge*, 369 Mass. 586, 595-96 (1976)) (emphasis in original). There was no prior "*expressed* agreement" between the agent and homeowner because the agent never communicated his misunderstanding to the homeowner. *Id.* (emphasis added).

This case is distinguished from *Caron* because Fu and Zhang expressed to each other their mutual understanding that the severance amount would be the remaining salary due under the 2015 Employment Agreement—*i.e.*, a total of $680,000 payable in sixteen monthly installments. This case is indistinguishable from *OneBeacon* and *Polaroid* for the same reason: as in those cases, there was a prior, expressed agreement with respect to the specific term sought to be reformed.

Taken together, *OneBeacon*, *Polaroid*, and *Caron* show that reformation is warranted when (1) the parties have expressed to each other, through words or conduct, a mutual understanding and intent with respect to a specific term of their agreement, and (2) a mistake is then made when expressing that term in their written contract. In this case, the trial court found the parties expressed their mutual understanding and intent that Dahua would pay Zhang a total of $680,000 in severance, and a mistake was then made in reducing that term to writing in the Release Agreement. Consequently, the court erred as a matter of law by not

reforming the mistaken term, as this Court did in *OneBeacon* and the SJC did in *Polaroid*, to reflect the parties' manifested intent.

The district court also erred when it stated that, "if there was any prior oral agreement, the agreement would be with Zhejiang, not Dahua" because "[w]hile Mr. Fu served as both the sole director of Dahua and Chairman of Zhejiang, when he made his offer for Zhang *to continue in a different role at Zhejiang*, the offer was necessarily on behalf of the parent company, as the subsidiary would have no authority to offer Zhang a position with the parent." Add. 24 (emphasis added). As with the court's other errors of law discussed above, this statement mistakenly focuses on terms related to Zhang's new role, which are not at issue. It also ignores the fact that Dahua was responsible to pay Zhang's salary under the 2015 Employment Agreement and was providing him with employee benefits. App'x 1861. Zhang and Fu agreed that the severance amount would be the remaining salary due under that agreement. Add. 10-11; App'x 1244-46, 1861. Because Dahua was the one obligated to pay that salary, it naturally follows that Fu's agreement to pay the remaining portion as severance was necessarily on behalf of Dahua, not Zhejiang. Yue confirmed this when she advised Le Regulski of the terms to which Zhang and Fu had agreed at the hotel: "It's been decided: … *Dahua* will pay [Zhang] the remaining 16 month salary" under the 2015 Employment Agreement as

severance under the Release Agreement. App'x 1819; *see also* App'x 1817 ("[H]e will get the 16 months of his salary as severance ….").

These errors of law directly resulted in the district court's refusal to reform the severance amount in the Release Agreement to conform with the parties' intent, as reflected by their prior agreement at the hotel. This Court should, therefore, reverse that court's judgment and render judgment reforming the severance amount in the Release Agreement to a total of $680,000 payable over sixteen months.

### C.    The District Court Failed to Apply Restatement §§ 161 and 166.

For similar reasons, Massachusetts law will not give Zhang a windfall when he knew of the mistake regarding the severance amount but said nothing when the parties signed the Agreements or in the several months that followed. Sections 161 and 166 of the Restatement provide that a party who knows of a mistake must disclose that mistake, not remain silent for his own benefit.

The district court erred as a matter of law by not applying those rules, which state: "A person's non-disclosure of a fact known to him is equivalent to an assertion that the fact does not exist … where he knows that disclosure of the fact would correct a mistake of the other party as to the contents or effect of a writing, evidencing or embodying an agreement in whole or in part." Restatement (Second) of Contracts § 161. "One party cannot hold the other to a writing if he knew that the other was mistaken as to its contents or as to its legal effect. He is expected to correct

such mistakes of the other party and his failure to do so is equivalent to a misrepresentation, which may be grounds either for avoidance under § 164 or for reformation under § 166." *Id.* § 161 cmt. e. The Massachusetts Court of Appeals has cited these rules with approval as a correct statement of Massachusetts law on reformation based on a knowing party's failure to correct a mistake. *See, e.g.*, *Torrao*, 525 N.E.2d at 1352 ("As a general rule, reformation of an instrument may be warranted not only be fraud or by mutual mistake, but also by a mistake of one party which is known to the other party. Under the rule stated in the Restatement (Second) of Contracts § 161(c) (1981), reformation is justified if the party knowing of the mistake fails to make it known to the mistaken party.") (cleaned up); *Ward v. Ward*, 874 N.E.2d 433, 437 n.5 (Mass. App. Ct. 2007) (quoting *Torrao*).

The trial court found that "Zhang had reason to know of the mistake" concerning the severance amount, but he said nothing when he and Fu signed the Release Agreement. Add. 28. The evidence supports that finding. *First*, Zhang reviewed the Agreements for ten to fifteen minutes before signing them. Add. 19. Neither is very long, and the severance amount is set forth in the very first provision of the Release Agreement. Add. 50-59. *Second*, Zhang showed he was capable of reviewing the Release Agreement and determining whether it comported with his agreement with Fu by doing exactly that when he rejected the first version earlier that day. Add. 13-14. *Third*, as discussed above, Zhang knew the total severance

amount should be $680,000 payable over sixteen months because that was what he and Fu had agreed to. *See supra* § II.B.

So, "if Zhang realized that the Release Agreement, as written, provided for $680,000 per month, he had reason to know of the mistake" and he was obligated to disclose that fact to Fu. Add. 30. That he knew Fu could not read English (unlike himself) and that the Agreements had not been translated into Mandarin, Add. 11, 19, only accentuated his obligation to speak up if he truly interpreted the Release Agreement to provide for severance payments of $680,000 per month.

Zhang also had ample time and opportunity to inform Dahua of the mistake over the next four months, during which Dahua paid him the $42,500 per month to which he and Fu had agreed. Add. 19; App'x 1390. But he chose silence. Add. 19; App'x 1390. Under § 161 and these circumstances, Zhang's silence was a misrepresentation that requires reformation under § 166. Restatement (Second) of Contracts § 161 cmt. e.

Dahua sought reformation on the basis that Zhang had reason to know of the mistake in how the severance amount was expressed in the Release Agreement, *see* App'x 1518, 1521, but the district court did not consider whether reformation was appropriate under Restatement §§ 161 and 166. It only considered reformation based on mutual mistake under § 155. That is clear error because "[r]eformation is more broadly available for fraudulent representation than for mistake." Restatement

(Second) of Contracts § 166 cmt. a. In fact, no prior agreement of any kind is required for reformation under §§ 161 and 166. *See id.* ("Reformation for mistake [under § 155] is limited to the situation in which the parties, having already reached an agreement, later fail to express it correctly in a writing. … Where, however, only one party is mistaken and the other has fraudulently misrepresented the writing's contents, or effect, reformation may be granted *even though there was no prior agreement*.") (emphasis added).

Thus, even if the district court properly rejected Dahua's reformation claim based on mutual mistake, it still should have reformed the severance amount in the Release Agreement pursuant to Restatement §§ 161 and 166.

## III. THE DISTRICT COURT SHOULD HAVE RESOLVED THE PARTIES' DISPUTE THROUGH CONTRACT INTERPRETATION.

The district court also erred by refusing to resolve the parties' dispute over the severance amount through contract interpretation. It should have construed the Release Agreement in context to prevent Zhang's windfall.

### A. The Restatement Counsels Courts to Use Contract Interpretation to Avoid the Need for Reformation.

The Restatement provides relevant guidance on when courts should simply interpret a contract to reflect the parties' mutual intent to avoid the need for reformation, even if the parties treat the issue as one of mistake. It counsels:

> In some instances where it might appear that both parties are mistaken with respect to the reduction to writing of a prior agreement,

*interpretation of the writing will show that the mistake is only apparent and not real*. Where, for example, the parties use language in the writing in an unusual way, interpretation of the writing in accord with the meaning attached by the parties will protect their expectations, and reformation is unnecessary. … *In a borderline case a court may avoid the necessity of reforming the writing by viewing the issues as one of interpretation.*

Restatement (Second) of Contracts § 155 cmt. b (emphasis added).

The district court rejected this Restatement provision on waiver grounds and because the court did not find the severance provision to be ambiguous. Add. 40. Both grounds were incorrect. Dahua made interpretation of the severance provision an issue from the outset. In its answer to Zhang's counterclaim, it denied his allegation concerning how the severance provision should be interpreted and called upon the court to render the proper interpretation. App'x 51, 55, 1772. Dahua raised interpretation again in its motion to supplement the court's conclusions of law before judgment was entered. App'x 1757-59.

The Supreme Court repeatedly has held that a court may consider any issue which is ultimately dispositive of a claim properly before it. *See U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 440 (1993) ("[A] court may consider an issue antecedent to and ultimately dispositive of the dispute before it, even if the parties fail to identify and brief the issue."); *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) (recognizing that when a claim is properly before the court, the court "retains the independent power to identify and apply the proper

construction of governing law"). Zhang's breach claim was properly before the district court, and the issue of how to interpret the severance provision was clearly dispositive of the parties' dispute regarding that claim.

### B. The Severance Provision is Ambiguous When Viewed in Context.

The district court also erred as a matter of law by concluding that the severance provision was not ambiguous. Add. 40-41. "Determining the existence of a contract ambiguity presents a question of law for the court" and "is subject to plenary review on appeal." *Bank v. Thermo Elemental Inc.*, 888 N.E.2d 897, 907 (Mass. 2008). "Contract language is ambiguous where the phraseology can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken." *Id.* (cleaned up).

The language of the severance provision could reasonably be interpreted two different ways. It states in relevant part that "the Company agrees to make monthly severance payments to you in the amount of $680,000 for sixteen (16) months …." Add. 50. While it provides for sixteen monthly severance payments, it does not say that *each* of those monthly severance payments will be $680,000 or that $680,000 is a *per month* amount; nor does it state that $680,000 is the *aggregate* or *total* amount of the sixteen monthly payments. Thus, on its own, the language of the severance provision can reasonably support either meaning.

The absence of any clarifying language to distinguish whether $680,000 is a monthly amount or an aggregate amount is exacerbated because "[t]he words of a contract must be considered in the context of the entire contract rather than in isolation." *Gen. Convention of the New Jerusalem in the U.S.A. v. MacKenzie*, 874 N.E.2d 1084, 1087 (Mass. 2007). As the district court found, the parties' entire agreement encompasses both the Release Agreement and the 2017 Employment Agreement because "[b]oth documents expressly supersede the 2015 Employment Agreement and cross reference each other" and "Dahua considered the agreements to be integrated." Add. 19.

When one compares the severance provision in the Release Agreement with the base salary provision in the 2017 Employment Agreement, it is evident why the severance provision is ambiguous. The base salary provision provides: "Your initial salary will be at the rate of $10,000 bi-weekly, which equates to $240,000 on an annualized basis …." Add. 55. Because this provision provides both a periodic amount ($10,000 bi-weekly) and an aggregate amount ($240,000 on an annualized basis), both the monthly and total amounts of salary are clear.

In contrast, the severance provision does not provide any other amount to which $680,000 can be compared to determine whether $680,000 is a periodic amount or an aggregate amount, nor does it explicitly say which type of amount the $680,000 is. Add. 50-54. If the severance provision had followed the same format

as the base salary provision, it would have said either: (1) "the Company will pay you severance for sixteen (16) months at the rate of $680,000 monthly, which equates to $10,880,000 in total" or (2) "the Company will pay you severance for sixteen (16) months at the rate of $42,500 monthly, which equates to $680,000 in total." Alternatively, there would have been no ambiguity if it stated either: (1) "the Company agrees to make monthly severance payments to you in the amount of $680,000 *[per month]* for sixteen (16) months"; or (2) "the Company agrees to make monthly severance payments to you in the *[total]* amount of $680,000 *[over]* sixteen (16) months." Add. 50. Either way, additional language is required to remove any reasonable doubt as to whether $680,000 is a monthly or total amount.

That uncertainty is the crux of the parties' dispute in this lawsuit. Interpreting the severance provision in accordance with the meaning attached by the parties would, therefore, have resolved the dispute, protected the parties' expectations, and rendered reformation unnecessary. As the district court found, the parties expected the total severance amount to be $680,000, so that is how the district court should have interpreted the severance provision.

The district court's final error regarding contract interpretation occurred when it reasoned, without any discussion, that any ambiguity in the severance provision would have to be construed against Dahua as the drafter of the Release Agreement. Add. 41. That is plainly wrong under Massachusetts law. Before ambiguous contract

language can be construed against the drafter, two conditions must be satisfied. *First*, the non-drafter's interpretation must be *reasonable and practical under all the circumstances*. *See Shea v. Bay State Gas Co.*, 418 N.E.2d 597, 602 (Mass. 1981) ("A prerequisite to the application of (that) rule is that the alternative interpretation placed upon the alleged ambiguity by the contractor be, under all the circumstances, a reasonable and practical one."). *Second*, ambiguous language can be construed against the drafter only "if the circumstances surrounding its use … do not indicate the intended meaning of the language." *James B. Nutter & Co. v. Estate of Murphy*, 88 N.E.3d 1133, 1139 (Mass. 2018) (quoting *Merrimack Valley Nat'l Bank v. Baird*, 363 N.E.2d 688, 690 (Mass. 1977)).

In finding that "Dahua … made a mistake when setting forth the severance payment as $680,000 per month for sixteen months rather than $680,000 payable over sixteen months" and that "the mistake was mutual or that Zhang had reason to know of the mistake," Add. 28, the district court necessarily concluded that Zhang's interpretation of that provision is not reasonable and practicable under all the circumstances. Those circumstances clearly show that the intended meaning of the severance provision was for Dahua to pay Zhang a total of $680,000 spread over sixteen monthly payments because that was what he and Fu agreed to at the hotel on August 28, 2017, it was consistent with the amount remaining due under the 2015

Employment Agreement, and it was consistent with the parties' course of dealings. Accordingly, the severance provision cannot be construed against Dahua.

Instead of avoiding the question of interpretation by relying on a mistaken finding of waiver and an incorrect statement of Massachusetts law, the district court should have followed the Restatement's suggestion to resolve the parties' dispute by simply giving the severance provision the meaning the parties intended it to have. The court already had correctly found the parties intended the total severance amount to be $680,000, so all it had to do was interpret the severance provision to comport with that intent. Instead, it awarded Zhang the $10.2 million windfall that it found he "had reason to know" was mistaken. Add. 28

## IV. THE DISTRICT COURT SHOULD HAVE EXERCISED ITS EQUITABLE POWER.

The district court further erred by refusing to exercise its inherent equitable power to avoid an absurd and unjust result. The court's justification was that "Massachusetts law does not allow litigants to override an express contract by arguing unjust enrichment." Add. 42 (quoting *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 130 (1st Cir. 2006)). However, none of the cases the court cited on this issue involved a situation like this one, where the court found there was either a mutual mistake or a mistake known to only one party as to a material term of the express contract, and enforcing the contract as written would result in an unjust enrichment of one party at the expense of the other because of that mistake.

In contrast, the Restatement covers the precise scenario presented here. It says: "In any case governed by the rules stated in this Chapter, if those rules together with the rules stated in Chapter 16 [regarding remedies] will not avoid injustice, the court may grant relief on such terms as justice requires including protection of the parties' reliance interests." Restatement (Second) of Contracts § 158(2). That principle is further explained as follows:

> *The rules governing all of the situations dealt with in this Chapter have traditionally been marked by flexibility and have conferred considerable discretion on the court.* In part, this has been due to the protean character of the situations involved and the circumstances that they are almost inevitably unforeseen by the parties. In part it has been due to the fact that *the law of mistake was shaped largely by courts of equity which had broad discretionary powers.* This characteristic of flexibility marks the rules stated in this Chapter, as is evidenced by such necessarily imprecise language as "materially" (§ 152), "unconscionable" (§ 153), and "bears the risk" (§§ 152, 153, 154). In addition, *§ 158 makes clear that if these rules will not suffice to do substantial justice, it is within the discretion of the court to grant relief on such terms as justice requires.*

Restatement (Second) of Contracts, Introductory Note (emphasis added).

The Massachusetts Court of Appeals has embraced and applied this doctrine. *See Covich*, 397 N.E.2d at 1121 (Massachusetts law is substantially in accord with the "principles concerning the doctrine of mistake … contained in the Restatement"); *Torrao*, 525 N.E.2d at 1352 n.5 ("[Section] 158 makes clear that courts are flexible in framing appropriate equitable relief in any situation ….").

In *Torrao*, the plaintiff sought to reform a deed which conveyed to the defendants more land than intended. 525 N.E.2d at 1350. The defendants discovered the mistake prior to closing, but they were not sure whether it was intentional and they alerted the plaintiff's attorney to the possible mistake. *Id.* at 1352. The trial court found there was no mutual mistake because the defendants and the plaintiff's attorney were both aware of the issue when the closing took place, and it denied reformation of the deed. *Id.* at 1350.

The appeals court reversed, holding that the attorney's knowledge of the enlarged property description in the deed could not be attributed to the plaintiff. *Id.* at 1352-53. But that left the court with a problem because the applicable Restatement rules did not provide for reformation of the deed; they only provided for rescission based on the plaintiff's unilateral mistake, and the defendants might have preferred reformation to rescission. *Id.* at 1352 & n.5. The court resolved that concern by turning to Restatement § 158, which it held "governs the present case and calls for equitable relief" by providing the court "flexib[ility] in framing appropriate equitable relief[.]" *Id.* The court then exercised its equitable power by directing the trial court to reform the deed unless the defendants elected within 30 days of remand to rescind the purchase altogether. *Id.* at 1353. In doing so, the appeals court applied the rule in § 158 to fashion an equitable remedy that the other Restatement rules would not have permitted and that the written contract did not provide.

In contrast, the district court here refused to do equity. Instead of giving Zhang the option of either rescinding the Agreements or having the Release Agreement reformed to reflect the severance amount to which the parties previously agreed, as the Massachusetts Court of Appeals did in *Torrao*, the court here awarded Zhang $10.2 million despite finding that Zhang knew Dahua never offered or agreed to pay him that amount. Add. 10-12, 22, 28-30; App'x 1244-46, 1819. That manifestly unjust result was compounded by the addition of approximately $7 million in pre-judgment interest. Add. 49.

The district court's disregard for the miscarriage of justice in this case and its unwillingness to exercise its equitable powers is an abuse of its discretion. Even if it did not err in its application (or lack thereof) of the reformation rules governing mistake, and did not err in its refusal to interpret the contract in accordance with the parties' intent, it should have exercised its equitable powers to grant relief on such terms as justice requires. Inasmuch as the district court failed to do so, this Court should do what the Massachusetts Court of Appeals did in *Torrao*. It should exercise its own equitable power to fashion a remedy which comports with the parties' intent when they signed the Release Agreement.[5]

---

[5] As discussed above, that equitable remedy could be to hold that no contract was formed in 2017, because there was no meeting of the minds. *See supra* § II.B.1.

## V. JUDGMENT SHOULD BE ENTERED FOR DAHUA ON ITS CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

The trial court's final error was to enter judgment against Dahua on its claim for breach of the implied covenant of good faith and fair dealing. That covenant is implied in every contract. *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 805 N.E.2d 957, 964 (Mass. 2003). The covenant "concerns the manner of performance" and its "purpose … is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." *Id.* (citing Restatement (Second) of Contracts § 205).

Regardless of whether the mistake at issue here was mutual or known only to Zhang, the fact remains that Zhang refused to faithfully perform the Release Agreement in accordance with the parties' intended and agreed expectations as to the severance amount. When Dahua pointed out the mistake and asked Zhang to correct it by amendment, he refused, demanded payment of an additional $10.2 million, and threatened to sue. His conduct is a clear breach of the implied covenant of good faith and fair dealing.

"[A] suit for breach of an implied covenant of good faith and fair dealing is a suit on the contract," so the appropriate damages are those available under the contract. *McCone v. New England Tel. & Tel. Co.*, 471 N.E.2d 47, 50 n.8 (Mass. 1984); *see also T.W. Nickerson, Inc. v. Nickerson*, No. BACV200200427, 2011 WL 7788023, at *7 (Mass. Super. Feb. 24, 2011), *aff'd sub nom. T.W. Nickerson, Inc. v.*

*Fleet Nat'l Bank*, 83 Mass. App. Ct. 1123 (2013) ("The damages for breach of the implied covenant of good faith and fair dealing are the contract damages."). The Release Agreement provides: "In the event that you [Zhang] breach any of your obligations under this Agreement, you agree that the Company may cease making any payments due under this Agreement, *and recover all payments already made under this Agreement*, in addition to all other available legal remedies." Add. 53 (emphasis added). The damages for Zhang's breach of the implied covenant of good faith and fair dealing are, therefore, the $680,000 that Dahua paid him as severance under the Release Agreement. *See* Add. 21 ("The parties agree that since August 28, 2017, Dahua has paid Zhang $680,000 in severance in connection with the Release Agreement.").

If this Court reforms the severance provision, as it should, Zhang's breach and the resulting contract damages are clear from the record. The trial court consequently erred by not entering judgment in favor of Dahua on its claim for breach of the implied covenant of good faith and fair dealing, and by not awarding Dahua, as contract damages, disgorgement of the $680,000 it paid Zhang as severance plus pre-judgment interest on that amount. Prejudgment interest is calculated "at the rate of twelve percent per annum from the date of the breach or demand," or, "[i]f the date of breach has not been established, … from the date of the commencement of the action …." Mass. Gen. Laws ch. 231, § 6C. Dahua filed this action on May 31,

2018, App'x 5, and judgment was entered on entered on March 12, 2024, Add. 48, so there are 2,112 days of pre-judgment interest at $223.56 per day ($680,000 times 12% divided by 365), which totals $472,158.72.

## CONCLUSION

The district court's judgment should be reversed and this Court should render judgment either reforming or interpreting paragraph 1 of the Release Agreement to be as follows:

> 1.    <u>Payments</u>. In consideration for your execution, non-revocation and compliance with this Agreement, the Company agrees to make sixteen (16) monthly severance payments to you, each in the amount of $42,500 for a total of $680,000, following the offer termination Date (the "***Severance Period***"), payable subject to standard payroll deductions and withholdings on the Company's ordinary payroll dates over the Severance Period, beginning no later than the Company's second payroll date that occurs after the Effective Date (as defined below), provided the Company received the executed Agreement from you by such date, with the remaining installments after that occurring on the Company's regularly scheduled payroll dates. Such payment can be accelerated upon your request, and you will be responsible for any tax associated with the payment, including any tax required under Section 409A of the Internal Revenue Code, as amended, and the regulations and other guidance thereunder and any state law of similar effect.

The Court should also: (1) render judgment in favor of Dahua and against Zhang on (a) Dahua's claim for declaratory judgment of contract enforceability; (b) Dahua's claim for declaratory judgment of contract reformation; (c) Dahua's claim for breach of the implied warranty of good faith and fair dealing; and (d) Zhang's counterclaim for breach of contract; (2) award Dahua contract damages

in the amount of $680,000; and (3) award Dahua pre-judgment interest of $472,158.72. Alternatively, this Court should exercise its equitable powers and, as the Massachusetts Court of Appeals did in *Torrao*, direct the district court to enter the judgment described above if Zhang does not elect to rescind the Agreements within 30 days after remand.

Dated: June 10, 2024            Respectfully submitted,

Dahua Technology USA, Inc.,
*Plaintiff - Appellant*

By its Attorneys,

*/s/ Daron L. Janis*
Daron L. Janis, 1st Cir. # 1183105
Daryl J. Lapp, 1st Cir. # 31763
Locke Lord LLP
111 Huntington Avenue, 9th Floor
Boston, MA 02199
(617) 239-0100
djanis@lockelord.com
daryl.lapp@lockelord.com

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,184 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface in Times New Roman 14-point font.

*/s/ Daron L. Janis*
Daron L. Janis


## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2024, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

Philip J. Gordon, Esq.
Benjamin Flam, Esq.
*Counsel for Feng Zhang*

*/s/ Daron L. Janis*
Daron L. Janis

# ADDENDUM

| No. | Document | Page |
|---|---|---|
| 1. | Findings of Fact and Conclusions of Law (Doc. 194) | 2 |
| 2. | Memorandum & Order (Doc. 208) | 34 |
| 3. | Judgment (Doc. 209) | 48 |
| 4. | Amended Judgment (Doc. 214) | 49 |
| 5. | Release Agreement, dated August 28, 2017 (Trial Ex. 1) | 50 |
| 6. | 2017 Employment Agreement, dated August 28, 2017 (Trial Ex. 13) | 55 |
| 7. | 2015 Employment Agreement, dated November 5, 2015 (Trial Ex. 17) | 60 |
| 8. | Restatement (Second) of Contracts § 155 (excerpts) | 61 |
| 9. | Restatement (Second) of Contracts § 157 (excerpts) | 63 |
| 10. | Restatement (Second) of Contracts § 158 (excerpts) | 64 |
| 11. | Restatement (Second) of Contracts § 161 (excerpts) | 67 |
| 12. | Restatement (Second) of Contracts § 166 (excerpts) | 69 |
| 13. | Restatement (Second) of Contracts § 172 (excerpts) | 71 |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DAHUA TEHCHNOLOGY USA INC., | * | |
| | * | |
| Plaintiff and Counterclaim Defendant, | * | |
| | * | |
| v. | * | Civil Action No. 1:18-cv-11147-IT |
| | * | |
| FENG ZHANG, | * | |
| | * | |
| Defendant and Counterclaim Plaintiff. | * | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

October 21, 2022

TALWANI, D.J.

Dahua Technology USA Inc. ("Dahua"), a subsidiary of Zhejiang Dahua Technology
Co., Ltd. ("Zhejiang"), brought this action against Feng Zhang to reform an agreement
terminating Zhang's executive-level position at Zhejiang (the "Release Agreement"). Dahua
alleged that either mutual or unilateral mistake warranted reformation of the severance amount
provided by the Release Agreement and that Zhang's attempt to enforce the mistaken term
breached the contract's implied covenant of good faith and fair dealing. Zhang counterclaimed
that Dahua's failure to pay him the stated severance amount breached the Release Agreement.

The district court granted Dahua's motion for summary judgment, denied Zhang's cross-
motion for summary judgment, reformed the agreement, and entered judgment for Dahua. On
appeal, the First Circuit affirmed the district court's determination that Massachusetts rather than
Virginia law applied, and the denial of Zhang's motion for summary judgment, but reversed
entry of summary judgment for Dahua. Dahua Tech. USA Inc. v. Feng Zhang, 988 F.3d 531 (1st
Cir. 2021). The First Circuit found that, on the record before it, "there are at least three triable
issues of fact: whether Dahua made a mistake (informing whether any mistake defense is viable),

whether Zhang made a mistake (informing whether a mutual mistake defense is viable), and, if only Dahua was mistaken, whether Zhang knew or should have known of Dahua's mistake (informing whether a unilateral mistake defense is viable)." Id. at 540-41.

On remand, the case was reassigned to this session. The court considered Zhang's <u>Motion to Amend to Add a Counterclaim</u> [Doc. No. 27] against Zhejiang (which Zhang had filed before summary judgment briefing and Dahua had opposed) and denied the motion as untimely. Mem. & Order [Doc. No. 98]. Following an eleven-day bench trial[1] and post-trial briefings and argument, the court makes the following findings of fact and conclusions of law.

## I.   Findings of Fact

### A.   Zhang's Position at Zhejiang

Zhejiang is a publicly listed Chinese surveillance technology company with its headquarters in Hangzhou, China. Liquan Fu founded Zhejiang and serves as its Chairman. He is also the sole director of its subsidiary, Dahua.

In 2015, Zhejiang recruited Feng ("Frank") Zhang for an executive level position overseeing Zhejiang's North American operations as "Chief Strategy Officer, Vice President and President of North American and Enterprise Sales." Zhejiang initially offered Zhang an annual salary between $200,000 and $300,000 and some amount of stock appreciation, but Zhang negotiated for far better terms with several executives, including Fu and Lin ("Tim") Wang, then-head of Zhejiang's subsidiary Dahua. Zhang ultimately signed an employment agreement with Zhejiang (the "2015 Employment Agreement"), that provided for an annual base salary of $510,000, bonuses and incentives based on his "contribution, company performance and

---

[1] Under the Release Agreement, the parties waived their rights to a trial by jury and consented to a bench trial. Tr. Ex. 1, Release Agreement 5 [Doc. No. 49-1].

company policy," and a one-time grant of 100,000 shares of Zhejiang stock. The 2015

Employment Agreement was terminable during its three-year term only for cause (and then still

requiring base salary continuation for the remaining term of the contract), and contained no non-

compete restrictions, confidentiality requirements, or non-disparagement clauses. Pursuant to the

2015 Employment Agreement, Zhang was employed by Zhejiang but was based in the United

States and Dahua paid Zhang's salary and made available to him the standard benefits offered to

Dahua employees. Although the 2015 Employment Agreement stated that the agreement

"represent[ed] the entire agreement between [Zhang] and Zhejiang," Ex. 17, Offer Letter [Doc.

No. 49-17], Wang openly noted during the negotiations that Dahua could only show his salary as

"200 – 300K us dollars."

Zhang's employment with Zhejiang began on January 1, 2016. In 2016, Dahua paid

Zhang only $193,165.34 of his $510,000 annual salary. Assured by the signed contract that

guaranteed him $510,000 per year, Zhang did not complain to management about the

underpayment. Day 8, 41:25-42:4 ("we already signed the contract, it's something there. It's not

going anywhere. Eventually they're probably going to pay."). Consistent with Zhang's

expectations, Zhang received the balance of his 2016 salary by February 2017. Around the same

time, Zhang also received a $400,000 performance bonus for his work in 2016, totaling $910,000

in compensation for the first year of the three-year contract.

Despite evidence that Zhejiang was experiencing negative growth in the North American

market in 2017, Zhejiang did not communicate to Zhang any dissatisfaction with his

ADDENDUM 04

performance. Day 8, 26:21-27:4; 45:5-21, 46:14-18, 47:14-21.[2] As late as summer 2017, Zhang construed Zhejiang's communications as affirming his performance. For example, in June 2017, Zhejiang informed Zhang that he had been nominated for enrollment in the company's stock ownership plan, an incentive program that allocates a set amount of phantom stock to participants based on a combination of factors including the employee's "past performance" and department contributions entitling them to any appreciation on the value of the stock over time. Through this program, Zhang was awarded the value of 3,000,000 Yuan of Zhejiang stock. Likewise, when Zhang traveled to the company headquarters in China for his semiannual review in July 2017, Zhejiang gave no indication that his termination was imminent. Following Zhang's presentation to Zhejiang board members on his ongoing initiatives and strategic vision for expanding Zhejiang's North American market share, Fu told Zhang to "carry out the plan" and Zhejiang CEO Kei Li instructed Zhang "to accelerate the merger acquisition, strategic initiative stuff." Day 8, 35:18-36:5.

One such strategic initiative was Zhejiang's planned acquisition of Lorex Technology Inc. ("Lorex"), referred to internally as Project Mohawk. Lorex had an existing retail business with significant revenue that Zhejiang was looking to capitalize on to develop a critical foothold in the retail consumer market for surveillance technology. Zhejiang considered the Lorex acquisition strategically important to remain competitive with its peers. Zhang began discussing

---

[2] Fu testified that Zhejiang did express to Zhang its dissatisfaction with his performance, see, e.g., Day 2, 27:24-28:10, but the court does not find Fu's testimony persuasive where it was not supported by any documentary evidence of such communications, was devoid of details as to time or place, and did not address the bonuses that Zhang received or the invitation that he interview for the Dahua CEO position.

Project Mohawk in 2016 and Zhang's leadership driving the Lorex acquisition continued through July and August of 2017.

B. *Zhejiang's Preparations for Zhang's Termination*

By the midway point of 2017, Fu and the Zhejiang board had decided to remove Zhang from the day-to-day management of Zhejiang's North American business. Zhejiang was deliberate in how it approached Zhang's termination and Fu involved others in Zhejiang leadership in developing the company's termination strategy.

Zhejiang's general counsel appointed in house attorney Haiyan Yue to liaise with outside counsel, Cathryn Le Regulski. While Yue had no employment law background, she was versed in the American legal system (having graduated from the University of Michigan School of Law and having passed the New York State Bar Exam) and spoke fluent English. Le Regulski was Of Counsel in DLA Piper's Virginia office where she specialized in employment law. Yue and Le Regulski worked at the direction of Fu and Zhejiang leadership. They were not privy to internal Zhejiang deliberations and were provided only the information that Fu deemed necessary for them to execute their limited role. A third attorney involved in the termination preparation was Qiang Li, a DLA Piper partner based in Asia.

Yue and Le Regulski collaborated on an internal strategy memo that outlined legal options for Zhang's termination, the associated risks, and any available mitigation measures. Despite the strategy memo centering on the terms in Zhang's 2015 Employment Agreement, the copy of the agreement provided to them had Zhang's annual base salary redacted.

The version of the strategy memo entered into evidence was Yue's draft, with Le Regulski's additions marked with underlines and her deletions with a strike-out line. Tr. Ex. 127 at 957. It read, in part, as follows:

5

According to Frank's offer letter, the term of employment is 3 years. <u>Typically, when an employment agreement in the US provides for a specified term of employment, the contract also specifies the events that permit an early termination and the termination pay required in each such event. Frank's offer letter states that his employment can be "terminated by Dahua for cause" and, in that case, Dahua will pay Frank's full base salary for the remainder of the 3-year term. Dahua may also terminate Frank's employment if he engages in illegal conduct or company misconduct (such as embezzlement or policy violations) and, in such event, Dahua only needs to compensate Frank through the last day worked. Of course, Frank may always elect to resign his employment. Therefore, unless Dahua has a basis to terminate Frank for cause or due to illegal conduct or misconduct, t</u>~~To~~ terminate the employment contract earlier constitutes breach of contract and Dahua will need to pay for Frank's damages. The amount of damages would be one that make[s] Frank whole if we did not breach it. Therefore, it would include not only his compensation for 3 years, but also all the benefits, such as health and retirement benefits<u>, that he would have enjoyed had his employment not been terminated, and any other actual damages that he suffered as a result of not being employed for the promised period,</u> ~~the satisfactory feeling of having such a job, the advantage of getting the next job while employed, etc~~.

<u>Id.</u>

Among the risks posed by termination articulated in the strategy memo was Zhang bringing a claim for breach of contract and Zhang's possible use of insider knowledge to disparage the company or "act as a whistleblower and blow the whistle on vulnerability of [Zhejiang] products or operations." <u>Id.</u> at 957-58; <u>see</u> Ex. 12, internal email from Yue to Le Regulski [Doc. No. 49-12] (stating that new offer letter needs to include that Zhang will "keep confidential the information of the Company" and "agree that he will not hurt the Company in the future"). Specifically, the memo articulated a concern that Zhang could publicize certain serious product-related security issues the company had been concealing.[3] Ultimately, Yue and Le Regulski concluded that the "[b]aseline of the severance package" would require: (1) salary, bonus and other benefits from the date of termination through the end of the three-year term and

---

[3] The court finds that this security issue (detailed in sealed testimony) was a significant issue that Zhejiang was able to keep secret until it was resolved.

(2) "[a]dditional compensation to entice him to release all claims against Dahua." Tr. Ex. 127 at 958-59 [Doc. No. 46-11]. Yue and Le Regulski did not weigh in as to the amount of such compensation and the strategy memo includes no information as to why Zhejiang wanted to terminate Zhang.

On August 23, 2017, in further preparation for Zhang's termination, Yue asked Le Regulski to "help [] draft a separation agreement with Frank Zhang." Tr. Ex. 7, at 1024-25. On August 24, 2017, Qiang Li reported that Le Regulski would make herself available for Fu's negotiation with Zhang and that DLA Piper would prepare a termination agreement for Yue's review. He also suggested "a strategy call . . . to make sure we are on the same page re strategy and the full picture." Id. The next day, Yue followed up with "some updates," telling Li and Le Regulski that Fu and "the new head of American Region" would fly to Boston and speak with Frank privately. Id.

On August 27, 2017, following their strategy call that morning, Le Regulski wrote to Yue that she "neglected to reiterate a strategy point . . . . In [Fu's] discussion with Frank, it would be helpful for Frank to believe that the company has the basis to terminate his employment for misconduct due to his failure to follow corporate policies but, rather than go that route, we are willing to allow him to remain with the company in a different capacity." Ex. 134 [Doc. No. 65-3]. Le Regulski acknowledged that she didn't know "how strong of a case the company has to terminate for misconduct, but I think we should try to take this position for now." Id. She also advised Yue to "start collecting evidence on the types of actions that Frank has taken that we could use to support a termination for misconduct in the event Frank does not want to cooperate." Id. Nothing in the record at trial suggests that Zhang had engaged in any misconduct.

Also on August 27, 2017, Le Regulski circulated a form consulting agreement to Yue and they exchanged comments. Later that night, Le Regulski sent Yue a draft separation agreement.[4]

### C.  Zhang and Fu's Conversation at the Hotel

As planned, Fu traveled to Waltham to conduct the exit negotiations and oversee the subsequent transition in leadership. Other members of the Zhejiang team who traveled to Waltham to support Fu included Yue, another in house lawyer Bo Li, Wang (who by now was Zhejiang's Vice Chairman), Finance Director Jason Zhu, HR Representative Lynette Lv, and incoming leader of North American operations William Chou. Fu continued to be supported by outside employment counsel Le Regulski (from Virginia) and Qiang Li (from Asia).

Just before boarding his flight from China and without revealing the purpose of his visit, Fu informed Zhang he was traveling to the Waltham office. Zhang met Fu when he arrived at the airport on the evening of August 27, 2017, and drove him to his hotel. During the drive, they chatted about their families, and Fu told Zhang that he was "considering asking . . . young guys to run the business." Day 8, 51:9-17. But it was late, so they agreed to talk more in the morning.

---

[4] The draft separation agreement contained a term for the continuation of Zhang's salary for an unstated number of months. Tr. Ex. 7 at 1037. The continuation of salary concept reflected what Yue and Le Regulski understood "under Massachusetts law, what should be owed to [Zhang]" because Yue had not yet "talked to the top management about their decision" regarding the severance amount. Day 4, 53:2-24. Le Regulski commented in a footnote to the separation benefits provision that "[t]his paragraph is currently drafted to provide a cash severance payment in the event [that] Frank declines to become a consultant. However, even if Frank decides to become a consultant, we should consider having Frank sign this separation agreement in addition to the consulting agreement so that Dahua can get the benefit of the release of claims but, in lieu of the cash severance payment, we will revise this section to have the consulting agreement serve as consideration for the release." Ex. 7 at 1037 n.1.

Zhang returned to Fu's hotel the next morning to discuss the details of Fu's planned changes to the company's North American leadership.[5] There, Fu informed Zhang that he wanted to transition Zhang to a different position within Zhejiang. He first asked Zhang if he would be interested in a "senior management" position at Zhejiang's headquarters in China. Zhang declined, telling Fu that he did not want to move to China while his children were in school in the United States. Zhang understood Fu to be offering as an alternative that Zhang serve as a senior corporate advisor to "keep running Project Mohawk." Day 9, 53:6-20. Fu also assured Zhang that in the new role "there's other things [he] could help with" "in mainly [the] USA," including helping the young person who would take over running Dahua. Id. at 53:7-23. Zhang told Fu he would be happy to take on this role, but first wanted to know how Zhejiang would resolve the remaining terms of the 2015 Employment Agreement. Fu told him, "we will follow whatever the agreement says" and Zhang responded "if he can take care of the agreement, I'm ok." Day 8, 54:21, 55:2-3. Zhang also asked Fu about his outstanding interest in Zhejiang stock. Fu assured Zhang that they would "take care" of the shares of Zhejiang stock but gave no specifics. Day 9, 46:18-19.

Zhang asked what Fu would ask him to sign in connection with these changes, and Fu said that the company would "make sure you're comfortable, treat you well." Day 8, 56:5-6. Zhang "thanked him for that." Id. at 55:22-56:6.

---

[5] Fu and Zhang's recollection of this conversation differed in numerous respects. Those differences were compounded by Fu conflating when different events occurred. For example, in describing the agreement purportedly reached that morning at the hotel, Fu referenced conversations that had purportedly occurred later that day in the office in Waltham, months later when Zhang travelled to China, and at some indeterminable "end." Day 2, 45:6-7; id. at 47:8-10. Where the testimony directly conflicted, the court generally found Zhang's version more credible.

When their discussion at the hotel concluded, Zhang believed that he had an agreement with Fu to transition within Zhejiang from his position as Chief Strategy Officer, Vice President and President of North American and Enterprise Sales to a senior corporate adviser role for a guaranteed two-year term, with a $240,000 annual salary in addition to his salary under the 2015 Employment Agreement. In Zhang's view, "we're both very happy" because "[Fu] said he's going to take care of the contract [and] I'm going to keep working with the company." Day 9, 55:14-19.[6] Understanding the impetus for the transition to be, at least in part, Fu's desire to move Zhang into a role dedicated to the company's high priority strategic retail initiatives, Zhang did not consider the change to be a demotion.

The negotiation at the hotel, described above, was Zhang's only substantive discussion with Fu concerning the termination of his 2015 Employment Agreement and the terms of a new agreement.

Upon concluding their conversation at the hotel, Fu stepped away to make a phone call. The content of that call is not in the record. Upon his return, he told Zhang, "we're all set." Day 8, 56:20-24. Zhang then drove Fu the short distance to the Waltham office where they spent the rest of the day.

D. *Events at the Dahua Office*

At the office, Yue presented Zhang and Fu with several sets of draft separation documents, all prepared exclusively in English. Fu cannot read English and did not have any of the separation documents translated into Mandarin, though he did sign off on all of them.

_____

[6] At one point during his testimony, Zhang relayed the following conversation: "Mr. Fu asked me to work on headquarter [sic], I said no. He asked me to work on consultant. I said okay." Day 8, 62:1-2. The court understands the term "consultant" in context to mean someone providing expert advice, and not to mean an independent contractor.

ADDENDUM 11

1.  The First Set of Documents Presented to Zhang

Yue emailed Le Regulski her understanding of Zhang's separation terms, presumably based on what Fu conveyed to Yue or someone else during the phone call from the hotel. She wrote "[i]t's been decided: Frank will serve as a consultant. Dahua will pay him the remaining 16 month salary plus a monthly consulting fee. The consulting period is 2 years." Tr. Ex. 8 at 1064. Le Regulski told Yue she would incorporate these points into the draft agreements. But the revised agreements did not fully incorporate Yue's points (let alone what Fu had said to Zhang).

The draft consulting agreement Le Regulski had forwarded to Yue before the negotiation provided that Zhang would contribute consulting services "upon the request of the President of Dahua," for a term to be filled in, but that the consulting arrangement could be terminated "for any reason or no reason upon thirty (30) days' advance written notice." Tr. Ex. 7 at 1028-33. After receiving the email from Yue, Le Regulski added a "twenty-four (24) month[]" term into the draft consulting agreement, but did not eliminate language permitting termination "for any reason or no reason." Tr. Ex. 8 at 1081. She also did not add salary continuation to the separation agreement. Rather, as she had suggested in the footnote to the original draft agreement, she described the consideration for the separation agreement to be the consulting agreement.[7] The separation agreement was thus drafted to terminate Zhang's employment at Zhejiang, release Dahua and Zhejiang of liability, and bind Zhang to confidentiality and non-disparagement clauses, and in exchange give Zhang the opportunity to consult as an independent contractor on ad hoc projects for an hourly fee and on an at-will basis. Instead of an employment agreement for a two-year term with Zhejiang and continuation of his existing rights and benefits, the consulting

---

[7] Le Regulski explained to Yue later that day that she had been under the mistaken impression that severance would be paid out as the consulting fees.

agreement included no guarantee of work, or entitlement to any of the rights or employee benefits he had under the 2015 Employment Agreement.

2.  Zhang's Rejection of the First Written Offer

Zhang believed that he and Fu had reached an agreement on the material terms of his role change within Zhejiang, and that Zhejiang would provide a written agreement reflecting those terms for him to sign. The terms of the proposed separation and consulting agreements prepared by Le Regulski and Yue and presented to Zhang at the office were entirely at odds with what Zhang understood Fu had offered him that morning. Rather than transferring Zhang to a new executive role at Zhejiang with additional salary and continuation of his employment benefits and protections, the separation and consulting agreements, if accepted by Zhang, would have ended his employment with Zhejiang entirely and left him with only a terminable at will outside consultant position with Dahua. Day 4, 28:1-5 ("Frank . . . read the agreements, and he pointed out the wording of 'outside consultant.' And he said to Mr. [Fu], he would rather be an inside consultant."). Zhang was particularly unhappy about the "at-will" arrangement. Day 9, 58:5-25 (Zhang "point[ed] out the at-will portion, which is supposed to be two years, senior corporate advisor employment contract, not at-will"), 59:1-5 (Zhang testified "[t]hat's the moment I'm not very happy with the company, because what we discussed, agreed on, in the morning, is not reflected in the first version."). Moreover, the documents failed to include the compensation Fu promised Zhang for his new role and to compensate him for his 2015 Employment Agreement.

When Zhang realized the proposed contracts fell far short of what Fu had discussed, Zhang rejected them, telling Yue to "[g]o sync up with Mr. Fu" because "[t]his is not what I discussed with Mr. Fu. And, also, this is not what Fu said, treat me well." Day 8, 62:11-19; Day

ADDENDUM 13

9, 58:5-25 ("This is not what I discussed with Mr. Fu in the morning at the hotel. Please sync up with him.").

Frustrated with what he viewed as bad faith bargaining, Zhang looked for leverage he could assert to regain footing in the negotiation. He spoke with HR director Lynette Lv and told her that he believed he could "publish books, business cases" based on his experience at Zhejiang to "make millions of dollars." Day 8, 66:3-18. When Lv asked if he was serious, Zhang said "why not? As far as [I'm] not violating the confidentiality agreement, I should be fine" and only "if the company [can] prove it." Id. at 66:20-25. These concerns hit on the same fears expressed in the strategy memo drafted in preparation for Zhang's termination.

### 3. Zhejiang's Internal Deliberations and Preparation of New Offer Documents

After Zhang rejected the first written offer, members of the Zhejiang board deliberated over next steps. Terminating Zhang's 2015 Employment Agreement was an essential point of their deliberations. Zhejiang's board sought to do so in a way that imposed confidentiality and other restrictions on Zhang, left Zhang willing to "keep confidential the information of the company," and disincentivized Zhang from "hurt[ing] the company in the future."[8]

While Fu may have viewed the two year arrangement he had verbally offered Zhang to be necessary to induce Zhang to leave his leadership position at Zhejiang while still believing it was in his interest to protect the company, "[some] people objected to the [employee] arrangement." Tr. Ex. 11 at 1271.

---

[8] But Zhejiang's concerns about Zhang's ability to harm the company were time limited. Zhejiang needed to prevent Zhang from revealing the security flaw before it was resolved and interfering with the Lorex acquisition closing within the next few months.

While Zhejiang leadership was debating these issues, Le Regulski prepared different versions of the agreements. In an email to Le Regulski, Yue wrote:

> So let me repeat what we discussed over the phone just to make sure that there is no misunderstanding:
>
> 1. Frank reviewed the separation agreement and he doesn't like it.
>
> 2. He and the boss decided on the spot that he will remain an employee of the Company, and his new title is senior corporate advisor
>
> 3. In the new offer letter, please make sure to include the following provisions (and all others that you normally have in such type of agreements);
>
>> a) The original offer letter is terminated.
>>
>> b) Keep confidential the information of the Company
>>
>> c) Because he was the CEO before and he knew much of the inside information of the Company, he needs to agree that he will not hurt the Company in the future.

Tr. Ex. 12 at 1312.

Yue also told Le Regulski that "things are not certain" as to Zhang's continuing employment, so they continued to work on two sets of contracts. Tr. Ex. 11 at 1271. In one email to Le Regulski Yue stated that she had "added the 16 month payment provision to the separation agreement." Id. The email included no information as to the amounts of the payment or Zhang's salary (under either the 2015 Employment Agreement or the new offer). At another point, "top management" sent Yue a revised separation benefits term for the separation agreement that provided for severance payments "in the amount of USD$680,000" and "the value of the appreciation of 100,000 shares of common stock of Zhejiang Dahua Technology Co. Ltd. from January 1, 2017 to August 28, 2017," with "[p]ayment arrangement of the separation benefits . . . decided later by mutual agreement." Tr. Ex. 25 at 1227; Compare Tr. Ex. 11 at 1279 with Ex. 69 at 1628. But nothing in this communication suggested that the $680,000 had any relationship to

14

Zhang's salary, and this paragraph, with the "appreciation of 100,000 shares" and separate payment arrangements for the separation benefits, was not included in the release agreement.[9]

Ultimately, the Zhejiang board decided to offer Zhang a senior corporate advisor position at Dahua, contingent on Zhang's termination of the 2015 Employment Agreement with Zhejiang and acceptance of the confidentiality and non-compete restrictions and releases presented in the earlier offer.

Le Regulski advised Yue that to present the new offer to Zhang, the prepared agreements would need to be modified. Accordingly, in lieu of the consulting agreement and separation agreement, Le Regulski prepared a new employment agreement and a release agreement. Le Regulski's draft of the new employment agreement provided that Zhang would hold the position of "Senior Corporate Advisor," and described the role as "performing such duties as are assigned to you from time to time, subject to the oversight and direction of the President of Dahua or his designee." See Tr. Ex. 48 at 1378, 1381-82. The agreement also included restrictions on information sharing and limitations on the solicitation of customers and employees. Her draft included no term of employment and expressly provided that the position would be at will, terminable without advance notice, with or without cause. It also had a blank for the salary amount.

The draft release agreement terminated Zhang's 2015 Employment Agreement rather than terminating his employment at Zhejiang or Dahua altogether. It listed "monthly severance payments to [Zhang] in the amount of $_____ for sixteen (16) months following the

---

[9] At the advice of Zhejiang's tax counsel, all references to Zhang's interest in Zhejiang stock were ultimately removed from the agreements and were replaced with a waiver of his right to any interest in stock. Zhang and Fu entered into a separate oral agreement concerning the resolution of Zhang's outstanding stock interests. See infra Section I(E).

Separation Date . . . ," subject to the same conditions and releases in the earlier separation agreement. Tr. Ex. 12 at 1313. As Le Regulski explained, "I typically prefer to pay over time . . . so that you can buy good behavior from him, such as nondisparagement." Tr. Ex. 39 at 1227. Because Zhejiang did not disclose Zhang's salary to Le Regulski (or Yue), Le Regulski did not calculate the monthly amounts to be paid under the Release Agreement and left the monthly payment amount blank in the version she sent to Yue.

Further changes were made to Le Regulski's drafts by Yue (or others on her team) before they were presented to Zhang. The final version of the new employment agreement ("2017 Employment Agreement") eliminated any reference to the position being "at-will," and provided that "the term of employment is (2) years." Tr. Ex. 13.[10] The final version also had a modified reporting structure. Where the first offer had Zhang reporting to and "subject to the oversight and direction of the President of Dahua," Tr. Ex. 48 at 1378, the final version had Zhang "subject to the oversight and direction of the sole director of the Company," which was Fu. Tr. Ex. 13. This version also had the salary filled in, specifying an "initial salary" at the rate of "$10,000 biweekly, which equates to $240,000 on an annualized basis." Id.

The final version of the Release Agreement also had a few changes from the version Le Regulski sent to Yue, including the addition of a dollar amount for the separation payment. The final version provides: "[t]his letter agreement (the *"Agreement"*) memorializes the terms we have agreed to with respect to the termination of your Offer of Employment dated November 5, 2015, with Dahua Technology USA Inc. (the *"Company")* and its parent, Zhejiang Dahua Technology Co. Ltd. *("Parent")*." Tr. Ex. 1. It continues:

---

[10] This two-year term did not include the robust protection against early termination contained in the 2015 Employment Agreement.

1. Payments. In consideration for your execution, non-revocation and compliance with this Agreement, the Company agrees to make monthly severance payments to you in the amount of $680,000 for sixteen (16) months following the offer termination Date (the "Severance Period"), payable subject to standard payroll deductions and withholdings on the Company's ordinary payroll dates over the Severance Period, beginning no later than the Company's second payroll date that occurs after the Effective Date (as defined below), provided the Company received the executed Agreement from you by such date, with the remaining installments after that occurring on the Company's regularly scheduled payroll dates. Such payment can be accelerated upon your request, and you will be responsible for any tax associated with the payment, including any tax required under Section 409A of the Internal Revenue Code, as amended, and the regulations and other guidance thereunder and any state law of similar effect.

Id. In addition to the payment provision, the final version contains: (i) a general release of all claims against Dahua and Zhejiang arising out of his employment, but excluding inter alia, "any claims for breach of [the Release] Agreement;" (ii) a non-competition clause applicable while Zhang is receiving severance payments that bars work with a Dahua or Zhejiang competitor doing business in the United States or China; (iii) a mutual non-disparagement clause; (iv) a confidentiality clause as to the "contents and all information pertaining to [the] negotiations" and the agreement;  (v) contingent separation benefits that require Zhang's compliance with the agreement's terms to receive and retain the severance payments; and (vi) acknowledgments that (a) the agreement "relinquish[es] any or all rights [Zhang] ha[d] or may have [had] with regard to the stocks of Parent or the Company as defined in the offer letter dated November 5, 2015" and constitutes a "waiver and release" of claims "to anything of value to which [Zhang] [was] already entitled" and that (b) "this Agreement is a full and accurate embodiment of the understanding between you and the Company, and that it supersedes any prior agreements or understandings made by the parties, including the Offer of Employment between you and Dahua dated November 5, 2015, which shall be terminated in all respects, but excluding the offer letter entered into by the parties of even date." Id.

Both documents expressly supersede the 2015 Employment Agreement and cross reference each other. Though drafted in two separate documents, Dahua considered the agreements to be integrated. See, e.g., Compl. [Doc. No. 1]; Tr. Ex. 15 (summarizing agreements' terms "[a]fter confirming the two agreements are considered together . . .").

4.   Execution of the Final Agreements

After finalizing the Release Agreement and 2017 Employment Agreement, Yue brought them to Zhang and Fu.

Yue asked Zhang to review the 2017 Employment Agreement "with [the Release Agreement] going together," Day 8, 99:15-16, 101:2-13, and informed him he had the right to engage counsel, which he declined.

Following a ten to fifteen minute review, Fu and Zhang signed both agreements. Day 8, 68:20-22, 92:11 ("Mr. Fu signed it next to me first. I signed it second."). The agreements were drafted in English, and despite his inability to read or understand them, Fu signed the documents without having them translated.

E.   *Zhang's Employment as Senior Corporate Advisor*

Over the next few months, Dahua did not pay $680,000 per month as set forth in the Release Agreement but "continued to pay [Zhang] the same amount that had been paid under the prior [2015 employment] agreement . . . at the rate of USD $510,000 a year." Day 9, 83:2-13. Beginning in September 2017, Zhang also began receiving a salary in the amount of $20,000 per month for his work as a Senior Corporate Advisor pursuant to his 2017 Employment Agreement.

In November 2017, Fu called Zhang and asked him to travel to China to collect a payment for the stock appreciation. Zhang then traveled to Zhejiang's headquarters in China where he met with Fu at his office before Fu's secretary "handed [Zhang a] bag of the money."

18

Day 8, 103:8-11. The bag contained the equivalent of $240,000 in Yuan, which Fu represented to

Zhang was a cash payment for the amount owed in connection with the stock-related

compensation promised in Zhang's 2015 Employment Agreement.

### F.  Zhang's Separation from Dahua

Less than five months into Zhang's two-year term as a Senior Corporate Advisor, Dahua

terminated his employment. On January 10, 2018, Dahua's VP of Human Resources Yong Ying

informed Zhang by email that he was being terminated and enclosed a "Confidential Separation

Agreement and Release" for Zhang's consideration and signature. The proposed separation

agreement sought the "terminat[ion] in all respects" of "the Offer of Employment between

[Zhang] and Dahua dated August 28, 2017," and a complete separation from Dahua. Tr. Ex. 23.

It included a release of all claims against Dahua and Zhejiang, a new non-competition agreement

barring any work with a Dahua or Zhejiang competitor doing business in the United States or

China for two years, and a mutual non-disparagement clause. It also tied Dahua's severance

obligation to Zhang's ongoing compliance with the agreement's terms. Id. ("In consideration for

[Zhang's] execution, non-revocation, and compliance with this Agreement, the Company

[offered] to make severance payments to [Zhang] in the amount of $910,000"). Zhang did not

sign the separation agreement, reporting that his attorney would be reviewing and negotiating the

terms of his separation, and "formally request[ed] the payment acceleration of the agreed to

severance amount defined in the first term" of the 2017 Employment Agreement. Tr. Ex. 16,

email from Zhang to Ying. On January 29, 2018, Zhang's attorney formally rejected Dahua's

severance offer. She wrote:

> We have had an opportunity to review the Confidential Separation Agreement the
> Company proposed to Mr. Zhang on or about January 10, 2018 ("January 2018
> Separation Agreement"). In connection with our review of that document, we have
> also reviewed certain of Mr. Zhang's prior agreements with the Company,

including, without limitation, two agreements dated August 28, 2017.

> Based on our review, we have concluded that, pursuant to existing and enforceable contracts between the parties, . . . the Company is already contractually obligated to pay Mr. Zhang over $11,000,000; the Company has failed to honor its contractual obligations to pay him certain amounts pursuant to these contracts[.]

Tr. Ex. 18 at 1.

Le Regulski responded in a letter dated February 5, 2018. Tr. Ex. 19. She wrote that Dahua had

> just learned that there is a scrivener's error in the Release Agreement, such that the wording of the agreement with respect to the severance amount does not comport with the intention of the parties. Specifically, the Release Agreement on its face provides for a monthly severance payment of $680,000 for 16 months, rather than what the parties intended, which was a monthly severance payment of $42,000 for 16 months, totaling $680,000.

Id. at 1. She denied that Dahua had any obligation to Zhang under the Release Agreement over $680,000 and asked that the Release Agreement be reformed through amendment, which she provided for Zhang's signature. Zhang's counsel refused reformation on his behalf and a series of letter correspondence between counsel ensued with escalating contention, ultimately culminating in this action.

The parties agree that since August 28, 2017, Dahua has paid Zhang $680,000 in severance in connection with the Release Agreement and $480,000 in salary promised in the 2017 Employment Agreement.

## II.    Conclusions of Law

Dahua raises mistake both in its affirmative claim for reformation of the Release Agreement and in its defense to Zhang's counterclaim for breach of the Release Agreement. The elements of the affirmative claim for reformation and the contract defense are similar, but not

20

identical, and accordingly, the court addresses Dahua's claims first and then Zhang's counterclaim.

    *A.   Dahua' Claims*

       1.   Reformation

Reformation of a contract serves "to effectuate the agreement intended by the parties to a contract where the contract language fails to capture that agreement." <u>Caron v. Horace Mann Ins. Co.</u>, 466 Mass. 218, 223, 993 N.E.2d 708(2013); <u>Polaroid Corp. v. Travelers Indem. Co.</u>, 414 Mass. 747, 756, 610 N.E.2d 912, 917 (1993). "Central to this doctrine is the fundamental underpinning that the parties had reached an agreement on a point which they intended to enshrine in the written contract but which, for some reason, was mistakenly omitted from that written contract." <u>Caron</u>, 466 Mass. at 223 (citing <u>Sancta Maria Hosp. v. Cambridge</u>, 369 Mass. 586, 595-96, 341 N.E.2d 674 (1976) and <u>German Am. Ins. Co. v. Davis</u>, 131 Mass. 316, 317 (1881)). "The mistake that [the plaintiff] must demonstrate—to a high degree of certainty—is not that the outcome of its agreement differed from its expectations, but rather that the contract language did not express the agreement as originally intended. <u>OneBeacon Am. Ins. Co. v. Travelers Indem. Co. of IL</u>, 465 F.3d 38, 42 (1st Cir. 2006); <u>see also</u> Restatement (Second) of Contracts § 155 cmt. a ("The province of reformation is to make a writing express the agreement that the parties intended it should"). To reform a contract, the court must therefore find "that the precise terms of a contract had been orally agreed upon between the parties, and that the written instrument afterwards signed fails to be, as it was intended, an execution of the previous agreement." <u>German Am.</u>, 131 Mass at 317.

Dahua contends that both parties entered into the Release Agreement with the understanding that Dahua would pay Zhang a total of $680,000 in severance—not $680,000 *per*

21

*month* for sixteen months as written—and that reformation is therefore warranted based on mutual mistake. At a minimum, Dahua argues that the company mistakenly listed $680,000 as the monthly payment, and that even if Zhang was not mistaken, he knew or should have known it was a drafting mistake by Dahua and thus reformation of the severance amount based on unilateral mistake is available.

Although Dahua argues that there was a verbal agreement for $680,000 in severance, it points to no specific oral agreement. Negotiations between the parties at the Waltham office consisted only of presentation and rejections of written drafts, and accordingly, the court considers whether the discussions between Fu and Zhang at the hotel amounted to an oral agreement that Zhang and Dahua intended to enshrine in the written agreement.[11]

When Zhang and Fu concluded those discussions, Zhang believed Fu had proposed that Zhang would give up his role as Chief Strategy Officer and Vice President and President of North American and Enterprise Sales and would instead serve as a senior corporate advisor for Zhejiang, focusing on the parent company's high priority retail-based strategic initiatives. It was in connection with this transition within Zhejiang that he would be paid an additional $240,000 per year for two years while continuing to receive the salary and benefits for the remaining sixteen months of the contract. But Dahua does not seek to reform the Release Agreement and the 2017 Employment Agreement to conform to any such agreement of continued employment with Zhejiang.

---

[11] Because a party seeking reformation of a contract "is not asking the court to interpret the contract but rather to change it to conform to the parties' intent," "the usual restrictions on contract interpretation, such as the parol evidence rule, do not apply to [the] court's inquiry. OneBeacon Am. Ins., 465 F.3d at 41. Accordingly, even where a contract is unambiguous on its face, "[a] court still will accept extrinsic evidence in evaluating a claim that both parties to the contract intended it to say something else." Id.

The agreement Dahua seeks to enforce concerns Zhang's release of claims and acceptance of new restrictions in connection with the termination of the 2015 Employment Agreement with Zhejiang and his new position with Dahua. But Zhang and Fu had no discussion about Zhang separating from Zhejiang or agreeing to these restrictions. Fu first suggested that Zhang continue working for Zhejiang at its headquarters in China, and then suggested that he serve as a senior corporate advisor. They did not discuss terminating Zhang's employment with Zhejiang and did not discuss a Release Agreement at all. Where Zhang's separation of employment from Zhejiang and the additional restrictions were not discussed at all, the court finds no prior oral agreement to which the Release Agreement can be reformed to reflect.

Dahua focuses on Fu's promise that Zhang would continue to receive what he was entitled to under the 2015 Employment Agreement. Dahua translates this promise as equal to the remaining salary under that agreement, which totaled $680,000. But what Zhang was entitled to under the 2015 Employment Agreement was not just his salary, but a position with the parent company rather than its subsidiary, and 16 months of protection from termination of his employment (compensable with additional damages if he was terminated early).

In any event, if there was any prior oral agreement, the agreement would be with Zhejiang, not Dahua. While Fu served as both the sole director of Dahua and Chairman of Zhejiang, when he made his offer for Zhang to continue in a different role at Zhejiang, the offer was necessarily on behalf of the parent company, as the subsidiary would have no authority to offer Zhang a position with the parent. It may well be that Fu did not have authority to offer Zhang a different position at Zhejiang, where the Board had made the decision to terminate

Zhang. But that possibility does not mean that Fu made an offer for a position at Dahua or that Zhang had agreed to end his employment with Zhejiang.[12]

In sum, the court finds that there was no prior oral agreement with Dahua concerning Zhang's separation of employment from Zhejiang. The court "will not decree reformation unless [it] is convinced that the parties expressed agreement and an intention to be bound in accordance with the terms that [it is] asked to establish and enforce." Sancta Maria Hosp., 369 Mass. at 595. Accordingly, the court is unable to reform the written agreement to a prior agreement of the parties here and thus will enter judgment for Zhang and against Dahua on Dahua's claim for reformation.

2.   Covenant of Good Faith and Fair Dealing

Dahua alleges that Zhang breached the Release Agreement's implied covenant of good faith and fair dealing by seeking to enforce a term he knew or should have known was included

---

[12] Dahua and Zhejiang are not interchangeable. Only Dahua, and not Zhejiang, brought this suit, and Dahua opposed Zhang's motion to amend his counterclaim to add Zhejiang as a counterdefendant. As the court explained in connection with that motion:

> As early as 2015, Zhang either knew or should have known that Dahua was a separate entity from its parent company as the 2015 employment agreement makes this distinction clear. See Complaint, Exhibit 2 [#1-2] (stating that Zhang would be employed by Zhejiang but paid by Dahua). Nor can Zhang plausibly contend that he was reasonably proceeding in this action under the presumption that Dahua was standing in for Zhejiang. For one, Dahua's Complaint [#1] and Zhang's Answer [#18] acknowledge that Dahua and Zhejiang are separate entities and specifically identify only Dahua as the party to this action. Moreover, throughout discovery, Dahua made plain that Dahua was the party to this action whereas Zhejiang was the party's parent company. See Dahua Opp'n, Ex. C [#34-3] (Dahua noting, in its initial disclosures, that some of the disclosed individuals worked for Dahua and others for Zhejiang); Dahua Opp'n, Exs. F and G [#34-6], [#34-7] (Dahua objecting to Zhang's definition of "Dahua and You" since it included non-party Zhejiang).

Mem. & Order 7 [Doc. No. 98].

in error, thereby entitling Dahua to damages in the form of its attorney's fees. But the implied

covenant may not "be invoked to create rights and duties not otherwise provided for in the

existing contractual relationship." Uno Rests. V. Bos. Kenmore Realty Corp., 441 Mass. 376,

385, 805 N.E.2d 957 (2004). Accordingly, the claim for attorney's fees is denied.

The court notes further that Dahua's claim is misplaced here. In every contract there is an

implied covenant of good faith and fair dealing, which provides "that neither party shall do

anything which will have the effect of destroying or injuring the right of the other party to

receive the fruits of the contract." Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451,

471, 583 N.E.2d 806  (1991). To demonstrate a breach of the covenant of good faith and fair

dealing, one must show that a party to the contract did not deal "honestly and in good faith in

both the performance and enforcement of the terms of their contract." Hawthorne's, Inc. v.

Warrenton Realty, Inc., 414 Mass. 200, 211, 606 N.E.2d 908 (1993).

Here, there is no suggestion that Zhang failed to abide by the contract terms: he

maintained the confidentiality of company information, did not compete, and performed his

obligations as requested. Only after Dahua terminated Zhang without cause less than five months

into the 2017 Employment Agreement's two year term, did Zhang seek to enforce the Release

Agreement. Dahua's claim that Zhang violated his covenant of good faith and fair dealing after

Dahua terminated him falls flat.

### B.  Dahua's Defense

In his counterclaim, Zhang asks the court to find Dahua breached the Release Agreement

by not paying him the $680,000 per month severance set forth in the document. Dahua raises

affirmative defenses of mutual or unilateral mistake, contending that Dahua's last offer – made

in the form of the Release Agreement and the 2017 Employment Agreement – contained a

mistake and that Zhang was either also mistaken or knew or should have known it was a mistake when he accepted the offer.

If successful, this defense does not support reformation of the contract but rescission. "Where there has been a mistake between the parties as to the subject matter of a contract, there has been no 'meeting of the minds,' and the contract is voidable at the election of the party adversely affected." LaFleur v. C.C. Pierce Co., 398 Mass. 254, 257-58, 496 N.E.2d 827 (1986). Because the result is no contract, rather than a reformed contract, the elements are somewhat different. No prior oral agreement is needed. Instead, "[t]o assert a mutual mistake defense, a party must show that (1) the contract contained a mistake when it was made; (2) the mistake is shared by both parties; (3) the mistake relates to an essential element of the bargain; and (4) the party raising the defense did not bear the risk of mistake." Dahua Tech., 988 F.3d at 539 (citing LaFleur, 496 N.E.2d at 830-31 and Restatement (Second) of Contracts § 152 (Am. Law Inst. 1981)).[13] For a unilateral mistake defense, a party must show "that (1) the contract contained a mistake when it was made; (2) one party made the mistake; (3) the mistake relates to an essential element of the bargain; (4) the party raising the defense did not bear the risk of mistake; and either (5)(a) the effect of the mistake makes the contract unconscionable or (5)(b) the party not raising the defense had reason to know of the mistake or caused the mistake." Id. (citing Nissan Automobiles of Marlborough, Inc. v. Glick, 62 Mass. App. Ct. 302, 307, 816 N.E.2d 161 (2004) and Restatement (Second) of Contracts § 153 (Am. Law Inst. 1981)).

---

[13] Massachusetts law adopts the principles set out in the Restatement (Second) of Contracts for the recission of contracts. See Covich v. Chambers, 8 Mass. App. Ct. 740, 749, 397 N.E.2d 1115 (1979).

Dahua has established that it made a mistake when setting forth the severance payment as $680,000 per month for sixteen months rather than $680,000 payable over sixteen months. The first set of documents Zhejiang prepared included no payment at all for Zhang's separation (offering him only the opportunity to consult). The second set of documents contemplated compensation payable under the consulting agreement only. Le Regulski then acknowledged her misunderstanding and redrafted the documents to reflect Zhejiang's intent to provide for severance payments for the balance of the term of the 2015 Employment Agreement. Contemporaneous e-mail communications between Yue and Le Regulski corroborate this view: while the draft did not include any dollar amounts, it did specify that Zhang would receive "the 16 months of his salary as severance, regardless of whether he provides consulting services, and then he will get a separate consulting fee for his consulting services." Tr. Ex. 11 at 1270.

The discrepancy between $10,880,000 (the amount in the agreement) and the initial zero dollar offer, with no discussions of intermediate offers, supports Dahua's claim of mistake. It also is apparent how that mistake occurred. Le Regulski (and likely Yue) did not know the amount of Zhang's salary in the 2015 Employment Agreement. Zhejiang management relayed to Yue the $680,000 figure, without explaining that this was the total amount, and not the monthly salary remaining under Zhang's employment contract.

Dahua has also established that the mistake was mutual or that Zhang had reason to know of the mistake. First, the sticking point in the negotiations between the parties was not the amount of severance pay but the termination of Zhang's employment.[14] While Zhang could have

---

[14] Any dispute about the Zhejiang stock was a nonissue. The parties had an unwritten agreement to take care of the outstanding stock compensation separately and through a cash transfer in China.

anticipated that Dahua would sweeten its offer slightly to resolve the negotiations, Zhang had no reason to think that Dahua would increase the severance from zero to $10,880,000. Second, while the evidence supports Zhang's claim that keeping him quiet while Zhejiang or Dahua closed the Lorex deal and resolved the matters around a security flaw benefitted Zhejiang and Dahua by more than that amount, it does not support the notion that Zhejiang and Dahua – which had a sizable team working hard to get what the company exactly what it wanted -- would have offered the large sum, rather than a much smaller amount, to buy Zhang's silence and cooperation.

Zhang's further argument that he would not have accepted the deal for $680,000 because it amounted to less, rather than more, than he was entitled to under the 2015 Employment Agreement has some appeal. As the strategy memo had noted, absent misconduct (of which there was no evidence presented at trial) Zhang was entitled to not only the $680,000 if he was terminated during the contract term but also damages, including those he would suffer on the job market looking for work as a candidate who had been terminated from his last job. And Zhejiang had no non-disclosure or no-compete provisions in the 2015 Employment Agreement to limit Zhang's post-termination activities. But, read together with the 2017 Employment Agreement, the answer is apparent: Dahua had convinced Zhang that he retained that protection in the form of a new employment agreement with a two-year term, plus additional compensation for his new role. This assurance was false, for without the protective language in the 2015 Employment Agreement, Dahua was free to terminate him, with payment of the balance of the two year term, but without additional damages, and Zhang was locked into a non-compete. And that is what Dahua did as soon as he no longer posed a risk to closing the Lorex deal. But Zhang's mistaken belief that he had obtained meaningful protections in the 2017 Employment Agreement explains

ADDENDUM 29

why it was not illogical for him to accept the Release with all its new restrictions for only the $680,000 that he would have been entitled to regardless. And if Zhang realized that the Release Agreement, as written, provided for $680,000 per month, he had reason to know of the mistake. While his silence and cooperation may well have been of significant value to Zhejiang, Zhang had reason to know, from his own prior experience dealing with Fu and Zhejiang, that the company would not jump to such a large number without first trying to buy his silence and cooperation for some lesser amount.

Dahua's defense fails, however, because recission of a contract is available only to a contracting party that did not bear the risk of mistake. Covich, 8 Mass. App. Ct. at 749; Dahua Tech., 988 F.3d at 542.

Under Massachusetts law, "[a] party bears the risk of a mistake when . . . he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient . . . ." Greene, 794 F.3d at 148 (1st Cir. 2015) (quoting Restatement (Second) of Contracts § 154); Dover Pool & Racquet Club, Inc. v. Brooking, 366 Mass. 629, 633, 322 N.E.2d 168 (1975) (where the contract has no risk assignment then the question is whether the party entered into the contract with "conscious ignorance or deliberate risk-taking"). And where the mistake relates to a term ascertainable from the written agreement, a party to a contract is "required to read or assume the risk of not reading" the contract. Greene, 794 F.3d at 146 (finding that despite "facial similarity between contracts," employee assumed the risk of mistake where subsequent employment agreement referred to different set of policies than previous agreements). Moreover, a party bears the risk of a mistake when "the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so." Restatement (second) of Contracts § 154(c) (1981); see also Lawton v.

Dracousis, 14 Mass.App.Ct. 164, 172-73, 437 N.E.2d 543 (1982) ("Considering all the circumstances of the controversy, especially the absence of any wrongdoing by [the party not raising the defense], we see no justification for allocating the risk of the mistake to [the party not raising the defense] by allowing [the party asserting the defense] to rescind the sale"); AECOM Tech. Servs. Inc. v. Mallinckrodt LLC, 117 F. Supp. 3d 98, 111 (D. Mass. 2015). ("[Recission's] equitable character places it in the sound discretion of the court amid the total circumstances of the dispute").

Here, Dahua bore the risk of mistake in the Release Agreement. Dahua drafted the Release Agreement with a full panoply of lawyers. Fu left those lawyers operating without any information as to the dollar amounts to include in the agreement until the very end of the negotiations (as evidenced by the blanks relating to dollar amounts in the earlier drafts), and even then, management offered Yue no context or explanation for the number. It appears that Zhejiang was attempting to keep confidential from the attorneys (and perhaps others on the team) Zhang's salary under the 2015 Employment Agreement. When management then told Yue to insert $680,000 in the contract (where the blank appeared for a monthly payment), she had no reason to know that management intended for her to enter 1/16 of that amount or even that $680,000 was the total salary remaining on the 2015 Employment Agreement. Moreover, Fu's decision to then approve and sign the Release Agreement where it was presented to him in a language he could not read or understand—despite translation being an option—indicates he entered into the agreement with the kind of "deliberate risk taking" that results in assignment of the risk. Dover Pool & Racquet Club, 366 Mass. at 633. Accordingly, Dahua bore the risk of mistake as to the dollar amount in the Release Agreement.

The court finds further that the risk of mistake is properly allocated to Dahua based on the totality of circumstances. "Courts have traditionally applied discretion in affording relief by way of rescission, as they have with most equitable remedies." Worcester Heritage Soc., Inc. v. Trussell, 31 Mass. App. Ct. 343, 346, 577 N.E.2d 1009 (1991); Browning-Ferris Indus., Inc. v. Casella Waste Mgmt. of Massachusetts, Inc., 79 Mass. App. Ct. 300, 313, 945 N.E.2d 964 (2011) (Rescission's "equitable character places it in the sound discretion of the court amid the total circumstances of the dispute"). Zhejiang and Dahua knew that Zhang was entitled to continued employment with job protection and damages for early termination under the 2015 Employment Agreement. The team charged with terminating Zhang spent hours drafting documents to ensure that Zhang lost those protections and contract rights, replacing them with an arrangement that Zhang believed would continue those protections (albeit working for Dahua, rather than Zhejiang) but that Dahua knew would allow it to terminate Zhang a few months later. If the court were to allow Dahua to void the instrument, Dahua and Zhejiang would be unjustly enriched, where they have the benefit of a release for what would have been a wrongful termination under the 2015 Employment Agreement and Zhang's silence, cooperation, and non-competition under the new contracts. Zhang, in turn, would be harmed, where the practical result would be that his employment with Zhejiang will have been terminated without payment of damages due under the 2015 Employment Agreement and he will have provided the benefit of the non-compete and other contract terms to Dahua and Zhejiang without compensation. Accordingly, Dahua's defense fails where at formation it bore the risk of mistake.

However, before entering judgment, the court seeks further briefing from the parties on the following question: Having found that there was no oral agreement in 2017 prior to the signed documents, that the parties were mutually mistaken as to the severance term in the

ADDENDUM 32

Release Agreement,[15] but that Dahua's defense fails because Dahua bore the risk of such mistake, does the court have authority to fashion an appropriate remedy as a matter of equity or must the court enforce the agreement as written as a matter of law?

## III.   Motion for Judgment on Partial Findings

Zhang filed a <u>Motion for Judgment on Partial Findings</u> [Doc. No. 153] at the close of Dahua's case. The court reserved judgment on that motion until trial was complete and post-trial motions briefed. In light of the court's findings as to Dahua's claims, this motion is now denied as moot.

## IV.   Conclusion

For the foregoing reasons, the court will enter judgment against Dahua on its claims for reformation and breach of the implied covenant of good faith and fair dealing. The court reserves judgment as to Zhang's breach of contract counterclaim against pending further briefing from the parties. The parties shall promptly confer and submit a proposed briefing schedule on the question posed by the court.[16]

IT IS SO ORDERED.

October 21, 2022                                    /s/ Indira Talwani
                                                                   United States District Judge

---

[15] Or at a minimum, if Zhang was not mistaken that he knew or should have known that Dahua did not intend for the Release Agreement to provide severance in the amount of $680,000 per month for sixteen months.

[16] The parties may include in their filing a joint request for mediation before a magistrate judge.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAHUA TECHNOLOGY USA INC., | * |
| | * |
| Plaintiff and Counterclaim Defendant, | * |
| | * |
| v. | *   Civil Action No. 1:18-cv-11147-IT |
| | * |
| FENG ZHANG, | * |
| | * |
| Defendant and Counterclaim Plaintiff. | * |

MEMORANDUM & ORDER

March 12, 2024

TALWANI, D.J.

Dahua Technology USA Inc. ("Dahua") brought this action against Feng Zhang to reform a severance term in an agreement (the "Release Agreement") terminating Zhang's executive-level position at Dahua's parent company, Zhejiang Dahua Technology Co., Ltd. ("Zhejiang"). Zhang counterclaimed that Dahua's failure to pay him the stated severance amount breached the Release Agreement.

Following remand of Zhang's successful appeal of an order granting summary judgment to Dahua and an eleven-day bench trial, this court issued its Findings of Fact and Conclusions of Law [Doc. No. 194] ("Findings and Conclusions"). The court stated that it would enter judgment against Dahua on its claims for reformation of the Release Agreement and breach of the covenant of good faith and fair dealing. The court reserved judgment, however, as to Zhang's breach of contract counterclaim pending resolution of a final question relating to the appropriate remedy. The court asked for briefing, based on certain of the court's findings, as to whether the court "ha[s] authority to fashion an appropriate remedy as a matter of equity or must enforce the

ADDENDUM 34

agreement as written as a matter of law." Id. at 31–32. The court received the requested supplemental briefing, see Supp. Brief of Dahua Regarding the Court's Question as to its Equitable Powers ("Dahua's Supp. Br.") [Doc. No. 196], Zhang's Answer to the Court's Post-Trial Question ("Zhang's Supp. Br.") [Doc. No. 197]; Response of Dahua to Zhang's Answer to the Court's Post-Trial Question ("Dahua's Reply Br.") [Doc. No. 198], Zhang's Reply to Dahua's Supp. Brief ("Zhang's Reply Br."), and held a hearing on this narrow question.

Thereafter, and outside of the court's briefing schedule, Dahua filed a Motion for the Court to Supplement its Conclusions of Law [Doc. No. 205] (the "Motion to Supplement") and Memorandum in Support [Doc. No. 206], which Zhang opposed, Opposition to Dahua's Motion [Doc. No. 207].

For the reasons set below, the court denies Dahua's Motion to Supplement [Doc. No. 205] and concludes that the agreement must be enforced as written. Therefore, the court will enter judgment for Zhang and award damages on his breach of contract counterclaim. See Deft's Answer & Counterclaim 7 [Doc. No. 17].

## I.    BACKGROUND

The factual findings and legal conclusions concerning the parties' dispute are addressed in detail in the court's Findings and Conclusions [Doc. No. 194] and incorporated herein. The court highlights the following findings that prompted the court's question as to the proper remedy for Zhang's breach of contract claim.

First, Zhang and Dahua entered into a written contract, the Release Agreement. See Find. & Conc. 18, 21–22 [Doc. No. 194].

2

Second, the Release Agreement provided for the termination of Zhang's 2015 Employment Agreement[1] with Zhejiang and contained the following provision: "[i]n consideration for your execution, non-revocation and compliance with this [Release] Agreement, [Dahua] agrees to make monthly severance payments to you in the amount of $680,000 for sixteen (16) months following the offer termination Date (the 'Severance Period') . . . ." Find. & Conc. 17 [Doc. No. 194].

Third, Zhang and Dahua had no agreement concerning Zhang's separation of employment from Zhejiang or related severance prior to Zhang and Dahua entering into the written Release Agreement. See id. at 22–23. The "sticking points in the negotiations between the parties was . . . the termination of Zhang's employment." Id. at 27.

Fourth, Liquan Fu, Dahua's Director and Zhejiang's Chairman, was mistaken as to the severance term when he executed the Release Agreement on Dahua's behalf without reading it, and Zhang was also mistaken, or, if not mistaken, knew or should have known that Dahua did not intend for the Release Agreement to provide severance payments in the amount of $680,000 per month for sixteen months, when he executed the Release Agreement on his own behalf. See id. at 27–29.

Finally, Dahua bore the risk of such mistake and that the risk was properly allocated to Dahua based on the totality of the circumstances. See id. at 29–31.[2]

---

[1] Capitalized terms not defined herein have the same meaning as in the Findings and Conclusions [Doc. No. 194].

[2] Dahua's characterization of the mistake as a "scrivener's error," see Dahua's Supp. Br. 9 [Doc. No. 196], is not consistent with this court's findings as to how the mistake in the severance term arose. Fu's mistake followed Dahua and Zhejiang's deliberate choices in negotiations: to contract around many of the protections and benefits Zhang had secured in his 2015 Employment

## II.    DISCUSSION

### A.    Contract Formation[3]

As set forth above, the parties entered into a written contract. See Find. & Conc. 18, 21–22 [Doc. No. 194]. Dahua's complaint sought reformation of that contract based on mutual mistake and Dahua never previously contended or presented evidence that the contract was void ab initio. Dahua now contends that no contract was formed because there was a mutual mistake as to the severance amount, and, consequently, there was no meeting of the minds. See Dahua Supp. Br. 4–5 [Doc. No. 196]. Dahua's original position as to contract formation was correct, however, because whether a contract was formed is an objective standard under Massachusetts law.

"Although mutual assent is often misleadingly referred to as a 'meeting of the minds,' the formation of a valid contract under Massachusetts law requires objective, not subjective[,] intent." Greene v. Ablon, 794 F.3d 133, 147 (1st Cir. 2015) (citing Nortek, Inc. v. Liberty Mut. Ins. Co., 65 Mass. App. Ct. 764, 772, 843 N.E. 2d 706 (2006)). "Courts determine that mutual assent, not on the basis of what goes on inside the parties' heads, but rather on the basis of what they say and do." Salem Laundry Co. v. New England Teamsters & Trucking Indus. Pension Fund, 829 F.2d 278, 280 (1st Cir. 1987). Intent is "what a reasonable man in the position of the

---

Agreement with Zhejiang while leading Zhang to believe those protections would continue; to maintain secrecy even from Dahua's team of attorneys as to Zhang's salary; and to decline to have the final agreement translated into a language Fu could read or understand before signing the agreement. See Find. of Fact & Conc. of Law 4, 12–17, 27 [Doc. No. 194].

[3] Dahua states that it "is not asking the Court to amend or supplement any of the Court's findings of fact, nor is Dahua asking the Court to amend any of its conclusions of law." Mot. to Supplement 1, n.1 [Doc. No. 205]. Dahua nonetheless attempts to relitigate the court's conclusions of law as to contract formation. See Dahua Supp. Br. 4–5 [Doc. No. 196].

other party would conclude his objective manifestations to be." <u>Greene</u>, 794 F.3d at 147 (quotations omitted); <u>Klauber v. VMware, Inc.</u>, 80 F.4th 1, 9–10 (1st Cir. 2023) (citing <u>Greene</u> in rejecting evidence of subjective intent).

Here, the parties' objective manifestation of their intent was that they entered into a contract by signing the written Release Agreement. As this court has found already, Dahua worked with its counsel to draft the contract, its counsel asked Zhang to review the contract, and its Director and Zhang signed the contract. <u>See</u> Find. & Conc. 15–18 [Doc. No. 194]. Dahua now inappropriately conducts an inquiry into the subjective intent of the parties to inquire if there was a "meeting of the minds," as opposed to what the parties said and did. <u>Salem Laundry Co.</u>, 829 F.2d at 280.

The First Circuit's decision in <u>Greene v. Ablon</u>, 794 F.3d 133 (1st Cir. 2015), supports this court's conclusion. In <u>Greene</u>, a doctor sued the hospital that was his former employer and his co-author alleging violations of trademark and copyright infringement pertaining to a book that Greene co-authored while employed by the hospital. <u>See id.</u> at 140–41. The hospital filed a counterclaim alleging <u>inter</u> <u>alia</u> that the doctor had violated the hospital's intellectual property policy, which had been incorporated into numerous employment agreements signed by Greene. <u>See id.</u> at 142. Greene, relying on numerous contract defenses, argued that the hospital's policy did not apply. <u>See id</u>. As relevant here, Greene alleged that "a valid contract was not formed at all because there was no 'meeting of the minds[,]' [s]ince he did not know the IP policy existed." <u>Id.</u> at 147. The <u>Greene</u> court rejected this argument, relying on the objective standard in Massachusetts for contract formation, and concluding that Greene manifested the objective intent to be bound because he signed employment agreements incorporating the intellectual property policy by reference. <u>See id.</u>

Dahua argued at the post-trial hearing that <u>Greene</u> is distinguishable because the dispute here over the Release Agreement involves a material term. That distinction finds no support in <u>Greene</u>, which did not justify its enforcement of the intellectual property policy on the materiality of the term. Dahua also offers case law for the propositions that (1) a binding contract does not follow unless there is agreement as to all material terms, and (2) the severance amount is a material term in a severance agreement. <u>See</u> Dahua's Supp. Br. 5 [Doc. No. 196]. But none of Dahua's offered cases speak to the circumstance here, where there is a written agreement with no missing terms. Accordingly, Dahua's new argument that no contract was formed fails.[4]

### B.   Ambiguity

In its <u>Motion to Supplement</u> [Doc. No. 205], Dahua argues that the court should now find the severance provision of the Release Agreement ambiguous. <u>See</u> Mem. ISO Mot. to Supp. 4–8

---

[4] Whether a contract that has been formed is voidable on the ground that there is no meeting of the mind presents a different question, but one that has previously been addressed by this court. A mutual mistake defense does not support reformation of the contract—as Dahua sought here—but voiding the contract altogether:

> "Where there has been a mistake between the parties as to the subject matter of a contract, there has been no 'meeting of the minds,' and the contract is voidable at the election of the party adversely affected." <u>LaFleur v. C.C. Pierce Co.</u>, 398 Mass. 254, 257–58, 496 N.E.2d 827 (1986). Because the result is no contract, rather than a reformed contract, the elements are somewhat different [than for reformation]. No prior oral agreement is needed. Instead, "[t]o assert a mutual mistake defense, a party must show that (1) the contract contained a mistake when it was made; (2) the mistake is shared by both parties; (3) the mistake relates to an essential element of the bargain; <u>and (4) the party raising the defense did not bear the risk of mistake.</u>" <u>Dahua Tech.</u>, 988 F.3d at 539 (citing <u>LaFleur</u>, 496 N.E.2d at 830–31 and Restatement (Second) of Contracts § 152 (Am. Law Inst. 1981)) (emphasis added).

Find. & Conc. 26 [Doc. No. 194]. As the court previously concluded, Dahua is not entitled to a mutual mistake defense and the resultant voiding of the contract because Dahua bore the risk of the mistake. <u>See id.</u> at 29–31.

ADDENDUM 39

[Doc. No. 206]. First, Dahua waived any argument of ambiguity long ago. Dahua did not raise ambiguity in its Answer to Amended Counterclaim [Doc. No. 19] or at any later stage of this proceeding, and expressly disclaimed such an argument as recently as its briefing in connection with this court's post-trial question. In its Reply Brief [Doc. No. 198], Dahua asserted that Zhang's citation to a case involving ambiguous language was not probative as "neither Dahua nor Zhang claim [ambiguity] here." Dahua's Reply Br. 2 [Doc. No. 198]. In light of Dahua's express rejection of ambiguity, any such argument has been waived.

In any event, the severance provision is not ambiguous. The provision reads: "In consideration for your execution, non-revocation and compliance with this [Release] Agreement, [Dahua] agrees to make monthly severance payments to you in the amount of $680,000 for sixteen (16) months following the offer termination Date (the '**Severance Period**') . . . ." Find. & Conc. 17 [Doc. No. 194]. Dahua argues that the language of the settlement provision is unusual and susceptible to at least two interpretations: one providing for sixteen monthly payments, each in the amount of $680,000, and one providing for a total severance amount of $680,000, divided into sixteen monthly payments. See Mem. ISO Mot. 4–6 [Doc. No. 206]. Dahua contends that the former—Zhang's preferred reading—would be the correct interpretation *only if* the provision at issue read "[Dahua] agrees to make monthly severance payments to you in the amount of $680,000 [per month]." Id. at 7.

Dahua's arguments strain the contractual text and are otherwise unpersuasive. "[W]hen the language of a contract is clear, it alone determines the contract's meaning." James B. Nutter & Co. v. Estate of Murphy, 478 Mass. 664, 669, 88 N.E.3d 1133 (2018) (alteration in original). The provision as drafted states that Dahua will make "monthly severance payments to [Zhang] in the amount of $680,000," and that these "monthly severance payments" will be made for the

"**Severance Period**" of "sixteen (16) months." Doc. No. 1-1 at 2 (emphasis in original). Dahua's

reading would require the court to ignore the word "monthly" in "monthly severance payments."

But courts "interpret a contract so that every word is given effect," <u>DeWolfe v. Hingham Ctr.,</u>

<u>Ltd.</u>, 464 Mass. 795, 804, 985 N.E.2d 1187 (2013), and for that reason alone Dahua's argument

fails. Moreover, even if this court were to find the contract ambiguous, that ambiguity would be

construed against the drafter—in this case Dahua. <u>See</u> <u>Nadherny v. Roseland Prop. Co., Inc.</u>, 390

F.3d 44, 49 (1st Cir. 2004).

Finally, the Restatement (Second) of Contracts does not lead to a different result. Dahua

points to Section 155 of the Restatement for the proposition that "[i]n a borderline case a court

may avoid the necessity of reforming the writing by viewing the issue as one of interpretation."

Restatement (Second) of Contracts § 155 cmt. b (1981) (quoted in Mem. ISO Mot. to Supp. 4

[Doc. No. 206]). First, this is not a borderline case as the severance provision has a plain and

unambiguous meaning. Second, comment b of Section 155 refers to situations where "both

parties are mistaken with respect to *the reduction to writing of a prior agreement*," <u>id.</u> (emphasis

added), whereas this court has already found that "there was no prior agreement" between the

parties concerning Zhang's separation of employment from Zhejiang, <u>see</u> Find. & Conc. 24

[Doc. No. 194].

Given the lack of any contractual remedies, the court now considers whether there are

any equitable theories to justify relief in favor of Dahua.

### C.     Unjust Enrichment

In its post-trial brief, Dahua argues that Zhang's receipt of $10.2 million under the

Release Agreement beyond what Dahua "intended to offer him" would be "quintessential unjust

enrichment." <u>See</u> Dahua's Supp. Br. 10–11 [Doc. No. 196] (citing <u>Fernandes v. Havkin</u>, 731 F.

8

Supp. 2d 103, 114 (D. Mass. 2010)). Dahua urges the court to use its equitable powers to impose a quasi-contract where Zhang conferred benefits to Dahua and Dahua has already compensated Zhang for such benefits—and the court need only determine whether this compensation was appropriate. See id. at 6–7.

However, "Massachusetts law does not allow litigants to override an express contract by arguing unjust enrichment." Platten v. HG Bermuda Exempted Ltd., 437 F. 3d 118, 130 (1st Cir. 2006). Dahua's cited cases do not hold otherwise. In Fernandes v. Havkin, 731 F. Supp. 2d 103 (D. Mass. 2010), the court denied the unjust enrichment claim after finding it "unnecessary to determine the relative degree of enrichment and detriment between plaintiff and defendant" because there was a "fully integrated and express contract" between the parties. Id. at 115. In Corcoran Mgmt. Co. v. Town of Framingham, 2003 WL 21960676 (Mass. Super. July 3, 2003), the court considered a claim of unjust enrichment due to the *absence* of an express contract. See id. at *8–9.

Accordingly, the court finds a claim of unjust enrichment is unavailable here because there is a valid and enforceable contract between the parties.

### D.   The Court's Inherent Equitable Powers

Finally, this court's inherent equitable powers do not support rewriting the contract or otherwise granting Dahua relief. Under Massachusetts law, "a written agreement made from an arm's-length deal can't be undone just because one party later claims she thought the deal was something other than what the signed contract reduced to ink." Guldseth v. Fam. Med. Assocs. LLC, 45 F.4th 526, 539 (1st Cir. 2022). Even when faced with indefinite contracts, "[t]he court may not rewrite the language of a claim to make sense of it." Am. Med. Sys., Inc. v. Biolitec, Inc., 666 F. Supp. 2d 216, 223–24 (D. Mass. 2019). Here, Dahua is a sophisticated business

entity that entered into an arm's length deal; its Director signed a contract that the company's counsel had drafted; and it now asks the court to set the contract aside and impose the court's vision of an equitable term. But courts "*should not* attempt to 'accomplish by judicial fiat what [a party] neglected to achieve contractually.'" Gen. Hosp. Corp. v. Esoterix Genetic Labs., LLC, 16 F.4th 304, 313 (1st Cir. 2021) (emphasis added) (citation omitted)).

Dahua contends that the court has "inherent flexibility" and "substantial equitable powers" to prevent the allegedly unjust result of an extra $10.2 million in compensation being awarded to Zhang. Dahua Supp. Br. 9 [Doc. No. 196]. However, in none of the cases that Dahua cites did a court exercise equitable powers to override an express and unambiguous contract so that it could impose a remedy when the pleading party was not entitled to reformation or rescission. For instance, Dahua quotes Demoulas v. Demoulas, 428 Mass. 555, 703 N.E.2d 1149 (1998), for the proposition that "equitable remedies are flexible tools to be applied with a focus on fairness and justice." Dahua's Supp. Br. 9 (quoting Demoulas, 428 Mass. at 580). But the Demoulas court also listed circumstances where such relief would be appropriate: "a violation of fiduciary duty and fraud." Demoulas, 428 Mass. at 581–82 (quotations omitted). Zhang did not violate any fiduciary duty that he owed to Dahua and Dahua does not allege or show that he committed any fraud. Dahua also cites PHL Variable Insurance Company v. The P. Bowie 2008 Irrevocable Trust, 718 F.3d 1 (1st Cir. 2013), but in that case, the court imposed an equitable award of special damages under Rhode Island law only after concluding that *the plaintiff* did not

have an adequate remedy at law, id. at 11. In contrast, Dahua, the counterclaim *defendant*, is

seeking to limit Zhang's remedy at law.[5]

There are no special circumstances here that justify the court fashioning equitable relief

to reform an express contract. Dahua points to Borden v. Paul Revere Life Insurance Company,

935 F.2d 370 (1st Cir. 1990), where the First Circuit affirmed a district court's exercise of

equitable powers to rescind an express insurance policy contract. See id. at 377. However,

Borden involved claims of material misrepresentation, and the district court turned to equity in

that context. See id. at 376–77. Dahua does not allege—and it cannot—that Zhang made any

misrepresentations in negotiations over the Release Agreement. In Kansas v. Nebraska, 574 U.S.

445 (2015), the Supreme Court recognized a court's flexibility to craft equitable remedies, id. at

472, but its holding was limited to circumstances where the Supreme Court has original

jurisdiction (disputes between two states) and the Kansas Court expressly stated that its role in

such disputes "significantly differs from the one the Court undertakes in suits between private

parties," id. at 453—which is what this court faces.

Finally, Dahua has not persuaded the court that an exercise of discretion under Section

158 of the Restatement (Second) of Contracts is appropriate here. Section 158 states:

> In any case governed by the rules stated in this Chapter [6 Mistake], if those rules
> together with the rules stated in Chapter 16 [Remedies] will not avoid injustice,
> the court may grant relief on such terms as justice requires including protection of
> the parties' reliance interests.

Restatement (Second) of Contracts § 158(2). Dahua has not demonstrated that payment of nearly

$11 million would be an injustice sufficient to invoke this Restatement provision and has not

---

[5] Holmberg v. Ambrecht, 327 U.S. 392 (1946), involved a suit *in equity* over certain land rights,
far removed from the breach of contract dispute before the court. See id. at 393.

11

suggested any remedy that would avoid injustice to Zhang and protect his reliance interests. As this court has already found, Zhejiang needed to prevent Zhang from revealing "significant" and serious product-related security issues until they were resolved, and until the company completed an acquisition. See Find. & Conc. 6, 13 n.8 [Doc. No. 194]. The Release Agreement Dahua obtained for Zhejiang prohibited Zhang from competing with the company, disparaging the company, disclosing confidential information, or making any claims based on his 2015 Employment Agreement—and required him to comply with the Release Agreement in order to receive any Severance Payments. See id. at 16–17. Zhang complied with the terms of the Release Agreement and provided the benefit of the non-compete, non-disparagement, and other contractual terms to Dahua and Zhejiang. See id. at 31.

Much like a party seeking restitution bears the burden of showing the "injustice of the [other party's] enrichment" and its entitlement to said restitution, Metro. Life Ins. Co. v. Cotter, 464 Mass. 623, 644, 984 N.E.2d 835 (2013), where Dahua seeks relief on grounds of injustice, it bears the burden of showing the injustice of Zhang's enrichment and its entitlement to restitution. Dahua merely argues that Zhang could not have reasonably expected to receive nearly $11 million in severance payments, Dahua's Supp. Br. 11 [Doc. No. 196], but ignores the evidence that both Dahua and Zhejiang received the benefit of Zhang's performance of his obligations under the contract, and the absence of evidence that those benefits were not of substantial value to Dahua and Zhejiang.

The court thus rejects Dahua's proposal to reduce Zhang's payments for performance *after* he has already finished performance. Instead, the enforcement of the Severance Provision as written does not constitute injustice such that the court should craft an equitable remedy overriding the contract. See Armstrong v. Rohm & Haas Co., 349 F. Supp. 2d 71, 80 (D. Mass.

2004) ("The law strongly favors certainty and precision of contracts, even at the expense of occasional injustice, on the theory that a contrary rule would lead to even greater injustices.").

The Massachusetts Court of Appeals' decision in Torrao v. Cox, 26 Mass. App. Ct 247, 525 N.E.2d 1349 (1988), relying on this Restatement provision is inapt because Torrao is materially different from the facts here. In Torrao, the Appeals Court considered a seller's claim for reformation of a deed after the seller discovered that the final deed as negotiated by his counsel conveyed to the buyers more land than he had intended—or authorized his counsel to convey. See id. at 249–52. The Appeals Court invoked the Restatement in holding that the seller could not be bound to modifications he had not assented to, and ordered equitable relief, allowing the buyers to elect either to reformation of the deed or rescission of the purchase agreement. See id. at 252. Here, there was no agency problem as Dahua's Director signed the agreement (and declined to review it), and Dahua as the agreement's drafter bore the risk of mistake. More importantly, the Torrao court had the option of allowing rescission of the contract, which is not available here, where Dahua and Zhejiang have received the full benefit of Zhang's performance of the contract.

Accordingly, Dahua has not offered any authority from which the court may fashion an equitable remedy to override express contract terms here.

### III.   CONCLUSION

For the foregoing reasons, Dahua's Motion to Supplement the Court's Findings of Fact and Conclusions of Law [Doc. No. 205] is DENIED.

The court further finds that, where it is without the equitable authority to reform the parties' Release Agreement, the terms of the Release Agreement control, including the severance

13

provision in its entirety. Accordingly, the court enters judgment in Zhang's favor as to his breach of contract counterclaim.

IT IS SO ORDERED.

March 12, 2024                                    /s/ Indira Talwani
                                                 United States District Judge

ADDENDUM 47

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DAHUA TECHNOLOGY USA INC.,                    *
                                              *
    Plaintiff and Counterclaim Defendant,     *
                                              *
                    v.                        *     Civil Action No. 1:18-cv-11147-IT
                                              *
FENG ZHANG,                                   *
                                              *
    Defendant and Counterclaim Plaintiff.     *

JUDGMENT

March 12, 2024

TALWANI, D.J.

On the claims of Dahua Technology USA Inc. ("Dahua") against Feng Zhang for

declaratory judgment of contract unenforceability, declaratory judgment of contract reformation,

and breach of the covenant of good faith and fair dealing, judgment is entered against Dahua and

in favor of Zhang. On the Counterclaim of Zhang against Dahua for breach of contract, judgment

is entered in favor of Zhang against Dahua in the amount of $10,200,000.00, with post-judgment

interest as provided by law.

    IT IS SO ORDERED.

                                              /s/ _Indira Talwani_
                                              United States District Judge

ADDENDUM 48

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DAHUA TECHNOLOGY USA INC., | * | |
| | * | |
| Plaintiff and Counterclaim Defendant, | * | |
| | * | |
| v. | * | Civil Action No. 1:18-cv-11147-IT |
| | * | |
| FENG ZHANG, | * | |
| | * | |
| Defendant and Counterclaim Plaintiff. | * | |

AMENDED JUDGMENT

March 28, 2024

TALWANI, D.J.

On the claims of Dahua Technology USA Inc. ("Dahua") against Feng Zhang for

declaratory judgment of contract unenforceability, declaratory judgment of contract reformation,

and breach of the covenant of good faith and fair dealing, judgment is entered against Dahua and

in favor of Zhang. On the Counterclaim of Zhang against Dahua for breach of contract, judgment

is entered in favor of Zhang against Dahua in the amount of $10,200,000.00, with pre-judgment

interest in the amount of $6,753,787.88, for a total award of **$16,953,787.88**, and post-judgment

interest as provided by law.

IT IS SO ORDERED.

/s/ Indira Talwani
United States District Judge

ADDENDUM 49

August 28, 2017

**Exhibit**

**1**

<u>Via Hand Delivery</u>

*CONFIDENTIAL*

Feng Zhang
40 Cider Hill Lane
Sherborn, MA 01770

Dear Frank:

      This letter agreement (the "***Agreement***") memorializes the terms we have agreed to with respect to the termination of your Offer of Employment dated November 5, 2015, with Dahua Technology USA Inc. (the "***Company***") and its parent, Zhejiang Dahua Technology Co. Ltd. ("***Parent***").

      1.   <u>Payments</u>.  In consideration for your execution, non-revocation and compliance with this Agreement, the Company agrees to make monthly severance payments to you in the amount of $680,000 for sixteen (16) months following the offer termination Date (the "***Severance Period***"), payable subject to standard payroll deductions and withholdings on the Company's ordinary payroll dates over the Severance Period, beginning no later than the Company's second payroll date that occurs after the Effective Date (as defined below), provided the Company received the executed Agreement from you by such date, with the remaining installments after that occurring on the Company's regularly scheduled payroll dates.  Such payment can be accelerated upon your request, and you will be responsible for any tax associated with the payment, including any tax required under Section 409A of the Internal Revenue Code, as amended, and the regulations and other guidance thereunder and any state law of similar effect.

      2.   <u>General Release of All Claims.</u>

         a.   <u>General Release</u>. In exchange for the consideration provided to you under this Agreement to which you would not otherwise be entitled, and except as otherwise set forth in this Agreement, you, on behalf of yourself and, to the extent permitted by law, on behalf of your spouse, heirs, executors, administrators, assigns, and other persons or entities acting or purporting to act on your behalf, hereby generally and completely release, acquit and forever discharge the Company, Parent, and its and their current and former directors, officers, employees, shareholders, agents, successors, affiliates, and assigns (collectively, the "***Released Parties***") of and from any and all claims, liabilities and obligations, both known and unknown, that arise out of or are in any way related to events, acts, conduct, or omissions occurring prior to or on the date you sign this Agreement (collectively, the "***Released Claims***").  Without limiting the generality of the general release, the Released Claims include but are not limited to: (i) all claims arising out of or in any way related to your employment with the Company, or the termination of that employment; (ii) all claims related to your compensation or benefits from the Company, including salary, incentive compensation, expense reimbursements, severance, fringe benefits, stock, stock options, or any other ownership interests; (iii) all contract claims; (iv) all

ADDENDUM 50

tort claims, including claims for defamation, fraud, emotional distress, and negligence; and (v) all claims for discrimination, harassment, retaliation, other claims arising under any local, state or federal law, constitution, ordinance, or regulation, including but not limited to, Title VII of the Civil Rights Act of 1964 (as amended), the National Labor Relations Act ("*NLRA*"), the Americans With Disabilities Act, the Massachusetts Fair Employment Practices Act, the Age Discrimination in Employment Act (the "*ADEA*") and the Older Workers Benefit Protection Act which, among other things, amends provisions of the ADEA.

      b.    ADEA Waiver and Effective Date.  You acknowledge that you are knowingly and voluntarily waiving and releasing any rights you may have under the ADEA, and that the consideration given to you for the waiver and release in this Agreement is in addition to anything of value to which you were already entitled.  You further acknowledge that you have been advised by this writing, as required by the ADEA and the Older Workers Benefit Protection Act, that: (a) your waiver and release does not apply to any rights or claims that may arise after the date you sign this Agreement; (b) you should consult with an attorney prior to signing this Agreement (although you may voluntarily decide not to do so); (c) you have twenty-one (21) days to consider this Agreement (although you may choose voluntarily to sign this Agreement sooner); (d) you have seven (7) days following the date you sign this Agreement to revoke this Agreement; (e) this Agreement will not be effective until the date upon which the revocation period has expired unexercised, which will be the eighth day after you sign this Agreement provided that you do not revoke it (the "*Effective Date*").  If this Agreement is revoked, you will not be entitled to the benefits set forth in Sections 3-4 of this Agreement.  Nothing in this Agreement prevents or precludes you from challenging or seeking a determination in good faith of the validity of this waiver under the ADEA, nor does it impose any condition precedent, penalties, or costs for doing so, unless specifically authorized by federal law.

      c.    Excluded Claims.  Notwithstanding the broad scope of the general release, the following are not included in the Released Claims (the "*Excluded Claims*"): (i) any rights or claims for indemnification you may have pursuant to any written indemnification agreement with the Company to which you are a party, the charter, bylaws, or operating agreements of the Company, or under applicable law; (ii) any rights that, as a matter of law, whether by statute or otherwise, may not be waived, such as claims for workers' compensation benefits or unemployment insurance benefits; and (iii) any claims for breach of this Agreement.  In addition, nothing in this Agreement prevents you from filing a charge or complaint, reporting to, cooperating with, communicating with, or participating in any proceeding before the Securities and Exchange Commission, the Equal Employment Opportunity Commission, the Occupational Safety and Health Administration, the United States Department of Labor, the National Labor Relations Board, or other similar state or local agency (the "*Government Agencies*"), or from exercising any rights pursuant to Section 7 of the NLRA, or from taking any action protected under the whistleblower provisions of any federal securities law ("*Protected Activities*"), none of which activities shall constitute a breach of the release, non-disparagement or confidentiality clauses of this Agreement.  Notwithstanding the foregoing, you agree to take all reasonable precautions to prevent any unauthorized use or disclosure of any Company confidential information to any parties other than the Government Agencies.

    3.    Acknowledgement.  By your signature below, you agree to relinquish any or all rights you have or may have with regard to the stocks of Parent or the Company defined in the

ADDENDUM 51

offer letter dated November 5, 2015. In addition, you represent that: (a) the consideration given to you in exchange for the waiver and release in this Agreement is in addition to anything of value to which you were already entitled; (b) you have been provided by the Company all wages, severance, vacation, benefits, commissions, bonuses, expense reimbursements, or other amounts owed to you by the Company, other than the Accrued Benefits and consulting fees set forth in the Consulting Agreement; (c) you have not been denied any request for leave to which you believe you were legally entitled; (d) you are knowingly and voluntarily executing this Agreement waiving and releasing any claims you may have as of the date you execute it; and (e) you have not assigned or transferred, or purported to assign or transfer, to any person, entity, or individual whatsoever, any of the Released Claims. You affirm that you have not filed or caused to be filed, and are not presently a party to, a Released Claim against any of the Released Parties. You further affirm that you have no known workplace injuries or occupational diseases for which you have not already filed a claim.

4. <u>Non-Competition</u>. In exchange for the valuable consideration provided in this Agreement, you agree that you will not, during the Severance Period, whether directly or indirectly, either on his own account or for any other person or entity: (a) become a sole proprietor, owner, partner, principal, investor, joint venturer, shareholder, member, officer, director, executive or manager of a Competing Business in the Restricted Area; provided, however, that with respect to the equity of any such entity which is or becomes publicly traded, your ownership as a passive investor of less than 1% of the outstanding publicly traded stock of such entity shall not be deemed a violation of this Section 10; or (ii) provide services to (whether as an officer, director, employee, consultant, contractor, or in any other capacity) any Competing Business in the Restricted Area that involves the performance of services that are similar to those you performed for Dahua during your employment or that otherwise competes with the Company. The term "***Competing Business***" shall mean any entity that competes with the Company with respect to any product or service offered, to be offered, or under development by the Company with which you had involvement while employed by the Company (unless the Company is no longer engaged in or planning to engage in that line of business). The term "***Restricted Area***" shall mean the United States and China. Your breach of any of the above obligations will result in irreparable and continuing damage to the Company. The Company will be entitled to injunctive relief and/or a decree for specific performance, without the necessity of showing any actual damages or that money damages would not afford an adequate remedy, and without the necessity of posting any bond or other security. Any equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages or other available forms of relief. You agree that if the Company is successful in whole or part in any legal or equitable action against you under this Section, you agree to pay all of the costs, including reasonable attorney's fees, incurred by the Company in enforcing the terms of this Section.

5. <u>Mutual Non-Disparagement.</u> Both you and the Company agree not to disparage the other party, and the other party's officers, directors, managers, partners, employees, agents, attorneys, shareholders, successors, assigns and affiliates, in any manner likely to be harmful to them or their business, business reputation or personal reputation, provided that you and the Company may respond accurately and fully to any question, inquiry or request for information when required by legal process and may otherwise engage in Protected Activities. The Company's non-disparagement obligations under this Section are limited to the Company's representatives with knowledge of this provision.

ADDENDUM 52

6.      <u>Confidentiality of Agreement</u>.  This Agreement, its contents and all information pertaining to its negotiations shall remain confidential.  You and the Company agree not to disclose this Agreement or its contents to any person, provided that (a) you may make disclosure to your spouse or significant other, (b) the parties may make disclosures to their legal or tax advisor, accountants, auditors and financial advisors, and as may otherwise be required by law, or as may be necessary to engage in Protected Activities or to challenge an alleged breach of this Agreement in a court of competent jurisdiction, and (c) the Company may make disclosures as necessary to fulfill standard or legally required corporate reporting or disclosure requirements.

7.      <u>No Admission</u>.  This Agreement does not constitute an admission by the parties of any wrongful action or violation of any federal, state, or local statute, or common law rights, including those relating to the provisions of any law or statute concerning employment actions, or of any other possible or claimed violation of law or rights.

8.      <u>Contingent Separation Benefits</u>.  The Company's continuing obligations under this Agreement are contingent upon your compliance with all terms and conditions provided for in this Agreement.  In the event that you breach any of your obligations under this Agreement, you agree that the Company may cease making any payments due under this Agreement, and recover all payments already made under this Agreement, in addition to all other available legal remedies.

9.      <u>Section 409A</u>.  It is intended that all payments to you under this Agreement satisfy, to the greatest extent possible, the exemptions from the application of Section 409A of the Internal Revenue Code, as amended, and the regulations and other guidance thereunder and any state law of similar effect (collectively, "***Section 409A***"), and this Agreement will be construed to the greatest extent possible as consistent with those provisions.  If not so exempt, this Agreement (and any definitions hereunder) will be construed in a manner that complies with Section 409A, and incorporates by reference all required definitions and payment terms.  Any payments made in reliance on Treasury Regulation Section 1.409A-1(b)(4) will be made not later than March 15 of the year following the year in which your "separation from service" (as defined under Treasury Regulation Section 1.409A-1(h)) occurred.  For purposes of Section 409A, your right to receive any installment payments under this Agreement (whether severance payments, reimbursements or otherwise) shall be treated as a right to receive a series of separate payments and, accordingly, each installment payment hereunder shall at all times be considered a separate and distinct payment.

10.      <u>Miscellaneous</u>.  You acknowledge that this Agreement is a full and accurate embodiment of the understanding between you and the Company, and that it supersedes any prior agreements or understandings made by the parties, including the Offer of Employment between you and Dahua dated November 5, 2015, which shall be terminated in all respects, but excluding the offer letter entered into by the parties of even date.  The terms of this Agreement may not be modified, except pursuant to a signed written agreement between you and Parent's Chairman or by a court of competent jurisdiction.  If any provision of this Agreement is determined to be invalid or unenforceable, in whole or in part, this determination will not affect any other provision of this Agreement and the provision in question will be modified by the court so as to be rendered enforceable.  This Agreement will bind the heirs, personal representatives, successors and assigns of both you and the Company, and inure to the benefit of both you and

ADDENDUM 53

the Company, their heirs, successors and assigns. Executed originals transmitted by electronically as PDF files (or their equivalent) shall have the same force and effect as a signed original.

11.  Governing Law; Venue.  This Agreement shall be deemed to be made under, and shall be construed solely in accordance with the laws of the Commonwealth of Virginia, without giving effect to any state or federal principles of conflicts of law.  The parties agree that any action brought by either party to interpret or enforce any provision of this Agreement shall be brought in, and each party agrees to, and does hereby, submit to the jurisdiction and venue of, the appropriate state or federal court for the district encompassing Boston, Massachusetts.  THE PARTIES TO THIS AGREEMENT HEREBY WAIVE THEIR RIGHT TO A TRIAL BY JURY WITH RESPECT TO DISPUTES ARISING UNDER THIS AGREEMENT AND THE RELATED AGREEMENTS AND CONSENT TO A BENCH TRIAL WITH THE APPROPRIATE JUDGE ACTING AS THE FINDER OF FACT.

12.  Acknowledgment of Full Understanding.  YOU ACKNOWLEDGE AND AGREE THAT YOU HAVE FULLY READ, UNDERSTAND AND VOLUNTARILY ENTERED INTO THIS AGREEMENT.  YOU ACKNOWLEDGE AND AGREE THAT YOU HAVE BEEN ADVISED TO ASK QUESTIONS AND CONSULT WITH AN ATTORNEY OF YOUR CHOICE BEFORE SIGNING THIS AGREEMENT.  YOU FURTHER ACKNOWLEDGE THAT YOUR SIGNATURE BELOW IS AN AGREEMENT TO RELEASE THE COMPANY FROM ANY AND ALL CLAIMS.

If this Agreement is acceptable to you, please sign below and return it to me within twenty-one (21) days of the date you receive it.

Sincerely,

DAHUA TECHNOLOGY USA INC.

By: _____
Liquan Fu
Sole Director

**I HAVE READ THE FOREGOING AGREEMENT, AND I FULLY UNDERSTAND ITS TERMS.  I AM SIGNING THIS AGREEMENT FREELY AND VOLUNTARILY, HAVING BEEN GIVEN A FULL AND FAIR OPPORTUNITY TO CONSIDER IT AND AFTER HAVING BEEN ADVISED TO CONSULT WITH LEGAL ADVISORS OF MY CHOICE.**

AGREED AND ACCEPTED:

_____      8/28/2017
Feng Zhang                                               Date

ADDENDUM 54

Exhibit

13

August 28, 2017

<u>Via Hand Delivery</u>

*CONFIDENTIAL*

Feng Zhang
40 Cider Hill Lane
Sherborn, MA 01770

Dear Frank:

 On behalf of Dahua Technology USA Inc. (the "Company"), I am pleased to offer you the new position of Senior Corporate Advisor, performing such duties as are assigned to you from time to time, subject to the oversight and direction of the sole director of the Company or his designee.  You will be participating in forward looking projects but will not be involved in the day-to-day business operations of the Company.  The term of this employment is two (2) years.

 This letter summarizes the terms of your employment with the Company.

 1. <u>Starting Date</u>.  You will commence your new position with the Company effective as of August 29, 2017.

 2. <u>Base Salary</u>.  Your initial salary will be at the rate of $10,000 bi-weekly, which equates to $240,000 on an annualized basis, payable subject to standard federal and state payroll withholding requirements in accordance with the Company's standard payroll practices.  As a salaried, exempt employee, you will be expected to work your normal business hours and additional hours as required by your job duties, and you will not be paid overtime pay.

 3. <u>Benefits</u>.  You will be eligible to participate on the same basis as similarly situated employees in the Company's benefit plans in effect from time to time during your employment.  All matters of eligibility for coverage or benefits under any benefit plan shall be determined in accordance with the provisions of such plan.  In the event your employment with the Company ends for any reason, you will not be paid for any accrued but unused vacation or paid time off except as required by applicable state law or the Company's policies.  The Company reserves the right to change, alter, or terminate any benefit plan in its sole discretion.

 4. <u>Company Policies, Confidential Information and Employee Covenants</u>.  As an employee of the Company, you will be subject to such practices, procedures and policies as the Company may adopt or modify from time to time.

 A. ***Proprietary Information***.  You shall not, at any time either during the term of employment with the Company or thereafter, divulge, use, publish or in any other manner reveal to any person or entity any Confidential Information, except as may be necessary in the ordinary course of performing your duties as an employee of the Company or as expressly authorized by

ADDENDUM 55

the President of the Company. "Confidential Information" as used in this Agreement shall mean any and all knowledge, data or information belonging to the Company or its affiliates (collectively, referred to as "***Dahua Group***") that has value in or to the Company's business and is not generally known, whether having existed, now existing, or to be developed during your employment, including information developed by you. By way of illustration but not limitation, Confidential Information includes (a) corporate information, including plans, strategies, forecasts, or methods; (b) marketing information, including strategies, methods, customer identities or other non-public information about customers, prospect identities or other non-public information about prospects, or market analyses or projections; (c) financial information, including cost and performance data, debt arrangements, equity structure, investors and holdings, purchasing and sales data and price lists; and (d) operational and technological information, including information that is related to any product plans, product prototypes, the results of product testing, research data, market intelligence, technical designs and specifications, secret methods, the content of unpublished patent applications, internal cost data, the terms of contracts with customers, vendors, suppliers and business partners; provided, however, that "Confidential Information" does not include information that becomes generally available to and known by the public other than as a result of a disclosure by you, or becomes available to you on a non-confidential basis from a source other than the Dahua Group, other than as a result of a breach of any obligation of confidentiality. "Confidential Information" also includes proprietary or confidential information of any third party who may disclose such information to the Company or you in the course of the Company's business. Notwithstanding anything to the contrary in paragraph, you acknowledge that nothing in paragraph shall be construed to prohibit you from (a) reporting possible violations of federal securities laws to the appropriate government enforcing agency and make such other disclosures that are expressly protected under such laws, or (b) responding to inquiries from, or otherwise cooperate with, any governmental or regulatory investigation. All Confidential Information is the sole and exclusive property of the Company or the third party to which it belongs.

B. ***Defend Trade Secrets Act.*** Pursuant to the Defend Trade Secrets Act of 2016, you acknowledge that you will not have criminal or civil liability under any Federal or State trade secret law for the disclosure of a trade secret that (a) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. In addition, if you file a lawsuit for retaliation by the Company for reporting a suspected violation of law, you may disclose the trade secret to your attorney and may use the trade secret information in the court proceeding, if you (x) file any document containing the trade secret under seal and (y) do not disclose the trade secret, except pursuant to court order.

C. ***Assignment of Inventions.*** You do hereby and will irrevocably assign to the Company or its designee your entire right, title and interest now existing or that may exist in the future in and to any document, development, work product, know-how, design, processes, invention, technique, trade secret, or idea, and all intellectual property rights related thereto, that you, solely or jointly with others, create, derive, conceive, develop, make or reduce to practice during your employment with the Company (the "Inventions"), including all copyrights, trademarks and other intellectual property rights (including but not limited to patent rights)

relating thereto. You agree that any and all Inventions shall be and remain the property of the Company or its designee. You will immediately disclose to the Company all Inventions. You agree to execute, at the Company's request and expense, all documents and other instruments necessary or desirable to confirm such assignment. In the event that you do not, for any reason, execute such documents within a reasonable time of the Company's request, you hereby irrevocably appoint the Company as your attorney-in-fact for the purpose of executing such documents on your behalf, which appointment is coupled with an interest. You shall not attempt to register any works created by you pursuant to this Agreement at the U.S. Copyright Office, the U.S. Patent & Trademark Office, or any foreign copyright, patent, or trademark registry. You retain no rights in the Inventions and agree not to challenge the Company's ownership of the rights embodied in the Inventions. You further agree to assist the Company in every proper way to enforce the Company's rights relating to the Inventions in any and all countries, including, but not limited to, executing, verifying and delivering such documents and performing such other acts (including appearing as a witness) as the Company may reasonably request for use in obtaining, perfecting, evidencing, sustaining and enforcing the Company's rights relating to the Inventions. Notwithstanding the foregoing, you recognize that this Agreement will not be deemed to require assignment of any inventions that you developed entirely on your own time without using the Company's equipment, supplies, facilities, trade secrets, or Confidential Information, except for those inventions that either (i) relate to the actual or anticipated business, research or development of the Dahua Group, or (ii) result from or are connected with work performed by you for the Company.

D. **_Return of Company Property_**. Upon separation from employment with the Company or at any other time upon the Company's request, you will return all materials (including, without limitation, documents, drawings, files, and storage media) containing or disclosing any Confidential Information or Inventions (including all copies thereof), as well as any keys, pass cards, identification cards, computers, printers, pagers, cell phones, smartphones, personal digital assistants or similar items or devices that the Company has provided to you.

E. **_Non-Solicitation of Customers_**. You acknowledge that non-public information relating to the Company's customers and prospects (including their needs or desires with respect to the types of products or services offered by Company, proposals, bids, contracts and their contents, the type and quantity of products and services provided or sought to be provided) is among the Company's confidential information. Accordingly, to protect such confidential information and the Company's customer goodwill, and in exchange for the valuable consideration provided in this Agreement, you agree that during the period of your employment with the Company and for a period of one (1) year after your employment ends (the "Restricted Period"), you will not, either directly or indirectly, separately or in association with others: (a) solicit, induce or attempt to induce any Customer or Potential Customer, to terminate, diminish, or materially alter in a manner harmful to Company its relationship with Company; or (b) solicit or communicate with, or participate in soliciting or communicating with, any Customer or Potential Customer on behalf of a business that competes with the Company. For purposes of this Agreement, "Customer or Potential Customer" is any person or entity who or which, at any time during your employment: (i) was known by you to have contracted for, be billed for, or received from Company any of its products or services; or (ii) was solicited by Company for the

purpose of offering its products or services in an effort in which you were involved or of which you were aware.

F.    ***Non-Solicitation of Employees***.   In exchange for the valuable consideration provided in this Agreement, you agree that, during the Restricted Period, you will not, either directly or indirectly, separately or in association with others: (a) interfere with, impair, disrupt or damage the Company's business by soliciting, encouraging or participating in the solicitation of any person known to you to be an employee, consultant, or independent contractor of Company to terminate his or her relationship with Company, even if you did not initiate the discussion or seek out the contact; (b) solicit, induce, encourage, or participate in soliciting, inducing, or encouraging any person known to you to be an employee, consultant, or independent contractor of Company to terminate his or her relationship with Company to render services to you or any business that competes with the Company; or (c) hire, employ, or attempt to hire or employ, any person then employed by the Company or who has left the employment of the Company within the preceding three (3) months to provide services to any business that competes with the Company.

G.    ***Reasonableness of Restrictions***.   You acknowledge that strict enforcement of the post-employment restrictions contained in Section 4 are necessary for the purpose of ensuring the preservation, protection, and continuity of the business of the Company, and the trade secrets and goodwill of the Company and that, in furtherance of such purpose, the prohibition against competition imposed by Section 4 is narrow, reasonable and fair.   If a court of competent jurisdiction determines that any part of Section 4 is unreasonable in duration, geographic area or scope, then you and the Company agree that Section 4 of this Agreement will be automatically modified to provide the Company with the maximum protection of its business interests allowed by law and you agree to be bound by this Agreement as modified.   You and the Company agree that the applicable period of each of the restrictions in Section 4 shall be tolled during any period of time in which you are in violation of the terms thereof, in order that the Company shall have the agreed-upon temporal protection thereunder.   Your breach of any of the above obligations will result in irreparable and continuing damage to the Company.   The Company will be entitled to injunctive relief and/or a decree for specific performance, without the necessity of showing any actual damages or that money damages would not afford an adequate remedy, and without the necessity of posting any bond or other security.   Any equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages or other available forms of relief.

5.    Miscellaneous.   You acknowledge that this Agreement is a full and accurate embodiment of the understanding between you and the Company, and that it supersedes any prior agreements or understandings made by the parties, including the Offer of Employment between you and Dahua dated November 5, 2015, which shall be terminated in all respects.   The terms of this Agreement may not be modified, except pursuant to a signed written agreement between you and the President of the Company or by a court of competent jurisdiction.   If any provision of this Agreement is determined to be invalid or unenforceable, in whole or in part, this determination will not affect any other provision of this Agreement and the provision in question will be modified by the court so as to be rendered enforceable.   This Agreement will bind the heirs, personal representatives, successors and assigns of both you and the Company, and inure to the benefit of both you and the Company, their heirs, successors and assigns.   Executed

ADDENDUM 58

originals transmitted by electronically as PDF files (or their equivalent) shall have the same force and effect as a signed original.

6.      Governing Law; Venue.  This letter agreement shall be deemed to be made under, and shall be construed solely in accordance with the laws of the Commonwealth of Massachusetts, without giving effect to any state or federal principles of conflicts of law.  The parties agree that any action brought by either party to interpret or enforce any provision of this Agreement shall be brought in, and each party agrees to, and does hereby, submit to the jurisdiction and venue of, the appropriate state or federal court for the district encompassing Boston, Massachusetts.  THE PARTIES TO THIS AGREEMENT HEREBY WAIVE THEIR RIGHT TO A TRIAL BY JURY WITH RESPECT TO DISPUTES ARISING UNDER THIS AGREEMENT AND THE RELATED AGREEMENTS AND CONSENT TO A BENCH TRIAL WITH THE APPROPRIATE JUDGE ACTING AS THE FINDER OF FACT.

Sincerely,

DAHUA TECHNOLOGY USA Inc.

By:_____
Liquan Fu
Sole Director

**AGREED AND ACCEPTED:**

_____        _8/28/2017_____
Feng Zhang                          Date

ADDENDUM 59



Zhejiang Dahua Technology Co., Ltd.
Dahua Technology USA Inc.
23 Hubble, Irvine, California 92618
(949) 679-7777 | 949 679-5760 (Fax)

## Offer of Employment



**Exhibit**

**17**

To: Feng Zhang
40 Cider Hill Ln, Sherborn, MA 01770, USA
+1 774-217-1688
11/5/2015

We are pleased to offer you a position of Chief Strategy Officer, Vice President and President of North American and Enterprise sales with ZhejiangDahua Technology Co.,Ltd. This is an executive level position. Your annual base salary will be $ 510,000 US dollars. Your base salary will be paid bi-monthly   The length of your employment will be for three years from your start date, renewable solely at the discretion of Zhejiang Dahua Technology Co., Ltd.   You will be employed as an employee of Zhejiang Dahua Technology Co., Ltd. while your salary will come from Dahua Technology USA Inc.   Your annual base salary is conditionally guaranteed throughout the length of your employment as set forth below.

You will be provided with a company phone andyou will receive 20 personal days off per calendar year along with 5 days of paid sick leave.   Additionally, you will be enrolled in the company health insurance plan effective your start date.

You will also receive a one-time grant of 100,000 share of Dahua's common stock at your starting date. Your bonus and incentive package will be based on your contribution, company's performance and company policy.

If your employment shall be terminated by Dahua for cause, Dahua shall pay your full base salary through the length of your employment as set forth above.   Payment, if any, will be made at the notice of termination.If you choose to voluntarily dismiss yourself from your employment or retire, you will only be compensated for the duration of your employment and not receive any additional compensation.   If you are terminated due to illegal conduct or company misconduct, you will only be compensated for the duration of your employment and not receive any additional compensation.

You have agreed to start your employment on 1/1/2016.

You acknowledge that this employment offer letter represents the entire agreement between you and Zhejiang Dahua Technology Co., Ltd.   Any other agreement, verbal or written, that is not specifically stated in this employment offer letter, will not be binding.

If you agree with the above employment offer details, please sign below and return this employment offer to the company. This employment offer is in effect for five business days.

Signatures:
The Company Printed Name:      Zhejiang Dahua Technology Co., Ltd.
The Company's signature:
Date:

The Candidate's Printed Name      Feng Zhang
The Candidate's Signature:

00001
ZHANG

ADDENDUM 60

**Restatement (Second) of Contracts § 155 (1981)**

Restatement of the Law - Contracts   |   October 2022 Update

Restatement (Second) of Contracts

Chapter 6. Mistake

# § 155 When Mistake of Both Parties as to Written Expression Justifies Reformation

Comment:
Reporter's Note
Case Citations - by Jurisdiction

---

> **Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement, except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected.**

---

**Comment:**

*a. Scope.* The province of reformation is to make a writing express the agreement that the parties intended it should. Under the rule stated in this Section, reformation is available when the parties, having reached an agreement and having then attempted to reduce it to writing, fail to express it correctly in the writing. Their mistake is one as to expression—one that relates to the contents or effect of the writing that is intended to express their agreement—and the appropriate remedy is reformation of that writing properly to reflect their agreement. For the rule stated in this Section to be invoked, therefore, there must have been some agreement between the parties prior to the writing. The prior agreement need not, however, be complete and certain enough to be a contract. Compare § 1 with § 3; see § 33. If the parties reach agreement as to only part of a prospective bargain, and if they are later mistaken in their attempt to put in writing this agreement together with such other terms as will make a contract, reformation is still an appropriate remedy. The agreement must, of course, be certain enough to permit a court to frame relief in terms of reformation. The writing that is reformed may purport to embody their entire agreement (i.e., a completely integrated agreement under § 210(1)), or only part of their agreement (i.e., a partially integrated agreement under § 210(2)), since the parol evidence rule does not preclude such a showing of mistake. See § 214(d). It may be a writing evidencing a contract within the Statute of Frauds, since the Statute does not bar reformation. See § 156. (If neither the parol evidence rule nor the Statute of Frauds applies, the writing itself will not ordinarily have sufficient legal significance for its reformation to be necessary.) The error in expressing the agreement may consist in the omission or erroneous reduction to writing of a term agreed upon or the inclusion of a term not agreed upon. If the parties are mistaken with respect to the legal effect of the language that they have used, the writing may be reformed to reflect the intended effect. Reformation is available even though the effect of the error is to make it appear from the writing that there is no enforceable agreement. See Illustration 2 and Comment *a* and Illustration 3 to § 156. Reformation is not precluded by the mere fact that the party who seeks it failed to exercise reasonable care in reading

the writing, but the right to reformation is subject to the rule on fault stated in § 157. With the merger of law and equity under modern codes of procedure, it is generally unnecessary to seek reformation as a condition to enforcing the true contract, and a party may be granted both reformation and enforcement in a single suit.

---

**Illustrations:**

1. A and B agree that A will sell and B will buy a tract of land for $100,000 and that B will assume an existing mortgage of $50,000. In reducing the agreement to writing, B's lawyer erroneously omits the provision for assumption, and neither A nor B notices the omission. At the request of either A or B, the court will reform the writing to add the provision for assumption.

2. A and B agree that A will sell and B will buy all the coal that B shall require in his business during a five year period. In reducing the agreement to writing, B mistakenly provides that he will buy all the coal that he shall desire to buy during that period, and A fails to notice the error. At the request of either A or B, the court will reform the writing to provide that B will buy all the coal that he shall require rather than all that he shall desire to buy.

3. A agrees with B to guarantee the collectibility of a debt owed by C to B. In reducing the agreement to writing, the parties mistakenly choose words that, unknown to both of them, have the effect of making A an ordinary guarantor rather than a guarantor of collectibility only. At the request of either A or B, the court will reform the writing to limit A's obligation to that of a guarantor of collectibility.

---

*b. Relation to other rules.* The rule stated in this Section applies only where both parties are mistaken with respect to the reduction to writing. (In the case of a promise under seal to make a gift, since the intention of only one party is involved, his mistake alone will entitle him to reformation, at least if there has been no reliance by the donee that cannot be compensated for. See Comment *d.*) A mistake as to expression is a mistake as to a basic assumption, but the contract is not voidable unless reformation is unavailable to protect the interests of the parties. See § 152. One party may, therefore, seek reformation in order to prevent avoidance by the other. See Comment *e* to this Section and Illustration 10 to § 152. If, however, the parties make a written agreement that they would not otherwise have made because of a mistake other than one as to expression, the court will not reform a writing to reflect the agreement that it thinks they would have made. The remedy in that case is avoidance. See Illustrations 4 and 5. The discretionary relief authorized under the rule stated in § 158 may involve some reshaping of the contract duties by the court but is different from reformation.

Several other related cases must also be distinguished. If one party sends to the other an offer which, because of a mistake, does not reflect the offeror's intention, the rule stated in this Section does not apply both because only one party is mistaken and because there was no prior agreement. The mistaken party's remedy, if any, in that case is not reformation but avoidance under the rule stated in § 153. See Illustration 6 to § 153. Similarly, when the parties to a bargain, sufficiently certain to be a contract, are silent with respect to a term that is essential to a determination of their rights and duties, the court will not decree reformation but will supply a term under the rule stated in § 204. See Illustration 6. Furthermore, even where there is a prior agreement that is not properly expressed in the writing, if only one party is mistaken and the other actually knows this, the mistaken party's right to reformation is governed by the rule on fraudulent misrepresentation stated in § 166.

In some instances where it might appear that both parties are mistaken with respect to the reduction to writing of a prior agreement, interpretation of the writing will show that the mistake is only apparent and not real. Where, for example, the parties use language in the writing in an unusual way, interpretation of the writing in accord with the meaning attached by the parties will protect their expectations, and reformation is unnecessary. See Illustration 7. In a borderline case a court may avoid the necessity of reforming the writing by viewing the issue as one of interpretation. Finally, in the case of a standardized agreement,

**Restatement (Second) of Contracts § 157 (1981)**

**Restatement of the Law - Contracts** │ October 2022 Update

**Restatement (Second) of Contracts**

**Chapter 6. Mistake**

# § 157 Effect of Fault of Party Seeking Relief

Comments:

Reporter's Note

Case Citations - by Jurisdiction

> A mistaken party's fault in failing to know or discover the facts before making the contract does not bar him from avoidance or reformation under the rules stated in this Chapter, unless his fault amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.

**Comments:**

*a. Rationale.* The mere fact that a mistaken party could have avoided the mistake by the exercise of reasonable care does not preclude either avoidance (§§ 152, 153) or reformation (§ 155). Indeed, since a party can often avoid a mistake by the exercise of such care, the availability of relief would be severely circumscribed if he were to be barred by his negligence. Nevertheless, in extreme cases the mistaken party's fault is a proper ground for denying him relief for a mistake that he otherwise could have avoided. Although the critical degree of fault is sometimes described as "gross" negligence, that term is not well defined and is avoided in this Section as it is in the Restatement, Second, of Torts. Instead, the rule is stated in terms of good faith and fair dealing. The general duty of good faith and fair dealing, imposed under the rule stated in § 205, extends only to the performance and enforcement of a contract and does not apply to the negotiation stage prior to the formation of the contract. See Comment *c* to § 205. Therefore, a failure to act in good faith and in accordance with reasonable standards of fair dealing during pre-contractual negotiations does not amount to a breach. Nevertheless, under the rule stated in this Section, the failure bars a mistaken party from relief based on a mistake that otherwise would not have been made. During the negotiation stage each party is held to a degree of responsibility appropriate to the justifiable expectations of the other. The terms "good faith" and "fair dealing" are used, in this context, in much the same sense as in § 205 and Uniform Commercial Code § 1-203.

> **Illustrations:**
>> 1. The facts being otherwise as stated in Illustration 1 to § 153, A's mistake is caused by his failure to exercise reasonable care in totalling and verifying his figures. A's negligence does not amount to a failure

**Restatement (Second) of Contracts § 158 (1981)**

Restatement of the Law - Contracts  |  October 2022 Update

Restatement (Second) of Contracts

Chapter 6. Mistake

# § 158 Relief Including Restitution

Comment:
Reporter's Note
Case Citations - by Jurisdiction

*Note: The current position of the American Law Institute concerning every form of restitution in a contractual context is set forth in Restatement Third, Restitution and Unjust Enrichment (R3RUE), formally adopted in 2010 and published in 2011. On the topic of this section, see especially R3RUE § 34.*

---

**(1) In any case governed by the rules stated in this Chapter, either party may have a claim for relief including restitution under the rules stated in §§ 240 and 376.**

**(2) In any case governed by the rules stated in this Chapter, if those rules together with the rules stated in Chapter 16 will not avoid injustice, the court may grant relief on such terms as justice requires including protection of the parties' reliance interests.**

---

**Comment:**

*a. Scope.* A court may use several techniques to adjust the rights of the parties after discovery of a mistake. Subsection (1) speaks to claims for relief such as that provided by the rule on part performances as agreed equivalents stated in § 240 and those on restitution and other relief stated in Chapter 16. Subsection (2) speaks to supplying a term to avoid injustice. See the analogous rule stated in § 272.

*b. Relief including restitution.* Avoidance of a contract ideally involves a reversal of any steps that the parties may have taken by way of performance, so that each party returns such benefit as he may have received. This is not, however, possible in all cases. Occasionally a party who has performed may be entitled to recover on the contract for the part that he has performed under the rule on part performances as agreed equivalents (§ 240). Even where this is not so, it may be appropriate to permit avoidance coupled with a money claim for restitution to the extent that one party's performance has benefited the other. Such claims are governed by the rules stated in §§ 370- 77. A party may also have a claim for restitution to the extent that one party's performance has benefited the other. Such claims are governed by the rules stated in §§ 370- 77. A party may also have a claim that goes beyond mere restitution and includes elements of reliance by the claimant. See, e.g., Illustration 8 to § 153.

*c. Supplying a term to avoid injustice.* Under the rule stated in § 204, when the parties have not agreed with respect to a term that is essential to a determination of their rights and duties, the court will supply a term that is reasonable in the circumstances. Ordinarily the rules stated in this Chapter, coupled with those stated in Chapter 16, will be adequate to allow the court to arrive

at a just result. See Subsection (1). If, however, these rules will not suffice to avoid injustice, the court may supply a term just as it may in cases of impracticability of performance and frustration of purpose. See § 272(2) and Comment *c* to that section. Here, as there, a particularly significant application occurs when the just solution is to "sever" the agreement and require that some unexecuted part of it be performed on both sides, rather than to relieve both parties of all their duties. The situation differs from that envisioned in § 240, under which the court merely allows recovery at the contract rate for performance that has already been rendered. The question under this Section is whether the court can salvage a part of the agreement that is still executory on both sides. See Illustration 1.

Sometimes the party who is not adversely affected by a mistake can, by assenting to a modification of the contract, eliminate the effect of the mistake on the agreed exchange. He should generally be allowed to do so and thereby to preclude avoidance by the party who would otherwise be adversely affected. A court may, under Subsection (2), grant the party who has not been adversely affected what is, in effect, an option to enforce the contract on new terms. See Illustration 2.

The Court may also exercise its discretion under Subsection (2) where both parties have been responsible for the mistake. It may do so, for example, where a mistake of one party resulted both from his failure to act in good faith and in accordance with reasonable standards of fair dealing (§ 157) and from the fault of the other party (§ 153(b)). See Comment *f* to § 153. Furthermore, for the sake of simplicity, the rules stated in this Chapter have been formulated in terms of the typical contract based on an exchange of consideration by two parties, and it does not, therefore, deal exhaustively with problems of mistake involving several parties (§ 9) including intended beneficiaries (§ 302), promises enforceable because of reliance (§ 90), promises enforceable because under seal (§ 95), and other less typical situations. In such cases, the court will apply rules analogous to those stated in this Chapter. See Comments *b*, *d*, and *e* to § 155. The situations dealt with in Subsection (2) are to be distinguished from those envisioned by § 155, where a writing is reformed to carry out the intentions of the parties.

**Illustrations:**

1. A contracts to sell and B to buy a tract of land, described in the contract as containing 100 acres, at a price of $100,000, calculated from the acreage at $1,000 an acre. In fact the tract contains only 90 acres. Under the rule stated in § 152, the contract would be voidable by B. If, however, the court decides that this rule will not avoid injustice, it is within the discretion of the court to grant relief on such terms as justice requires. The contract is not then voidable by B. See Illustration 11 to § 152.

2. The facts being otherwise as stated in Illustration 1, the tract in fact contains 110 acres. Under the rule stated in § 152, the contract would be voidable by A. If, however, the court decides that this rule will not avoid injustice, it is within the discretion of the court to grant relief on such terms as justice requires. Compare Illustration 2 to § 152.

3. A sends B two different offers of a contract, one with an option for renewal by A and one without such an option. B signs the one with an option, believing that it is the other one. Under the rule stated in § 153, if the court found that enforcement of the contract would be unconscionable, the contract would be voidable by B. If, however, the court decides that this rule will not avoid injustice, it may supply a term, if reasonable, under which B is entitled to avoid the contract only if he accepts the other offer.

**Reporter's Note**

This Section is new. It is similar in form and in purpose to § 272. The statement of substantive rules governing claims under Subsection (1) is deferred to Chapter 16. Subsection (2) is a specific application of the more general rule stated in § 204. See 3 Corbin, Contracts § 604 (1960 & Supp.1980); 13 Williston, Contracts § 1571 (3d ed.1970).

*Comment b.* Examples of courts allowing money judgments in mistake cases include Brecht v. Schramm, 266 N.W.2d 514 (Minn.1978) (contract to care for aging aunt rescinded; niece given restitutionary award for services already performed); Meyer v. Benko, 55 Cal.App.3d 937, 127 Cal.Rptr. 846 (1976) (sellers' defense rejected because of mistake; proper remedy is specific performance plus damages to buyers equal to rental value less interest on purchase price during period of delay); Atchison v. City of Englewood, 193 Colo. 367, 568 P.2d 13 (1977) (former owners of land found to have a right of first refusal despite mistaken inclusion of provision violating rule against perpetuities; contract reformed to strike offending provision; because specific performance would be impracticable, former owners entitled to difference between market price and option price).

*Comment c.* For a discussion of the court's power to shape the remedy according to the circumstances of the case, see National Presto Indus. v. United States, 167 Ct.Cl. 749, 338 F.2d 99 (1964), cert. denied, 380 U.S. 962 (1965). Illustration 1 is based on Illustration 10 to former § 502; cf. Maffet v. Schaar, 89 Kan. 403, 131 P. 589 (1913); Colvin v. Baskett, 407 S.W.2d 19 (Tex.Civ.App.1966); Dlug v. Wooldridge, 189 Colo. 164, 538 P.2d 883 (1975). Compare Hatcher v. Union Trust Co., 174 Minn. 241, 219 N.W. 76 (1928), with Brooks v. Towson Realty, 223 Md. 61, 162 A.2d 431 (1960). Illustration 2 is based on Illustration 9 to former § 504; Biren v. Kluver, 35 Ill.App.3d 692, 342 N.E.2d 325 (1976); Bartlett v. Department of Transp., 40 Md.App. 47, 388 A.2d 930 (1978); cf. Dvorak v. Kuhn, 175 N.W.2d 697 (N.D.1970); Lawrence v. Staigg, 8 R.I. 256 (1866); Brown v. Lamphear, 35 Vt. 252 (1862); see also McMahan v. Terkhorn, 67 Ind.App. 501, 116 N.E. 327 (1917). For cases giving the purchaser the choice of paying for the excess or accepting a conveyance without the excess, see Miller v. Craig, 83 Ky. 623 (1886); o'connell v. Duke, 29 Tex. 299 (1867). Illustration 3 is based on Miller v. Stanich, 202 Wis. 539, 230 N.W. 47 (1930), mod. on reh., 202 Wis. 539, 233 N.W. 753 (1930).

## Case Citations - by Jurisdiction

C.A.1
C.A.2
C.A.Fed.
U.S.Cl.Ct.
Ct.Fed.Cl.
D.Del.
N.D.Iowa Bkrtcy.Ct.
E.D.Pa.
W.D.Pa.
Alaska
Idaho App.
Ill.App.
Mass.App.
N.Y.Sup.Ct.App.Div.
Ohio App.
Pa.Super.
Vt.
W.Va.

## C.A.1

**C.A.1,** 1999. Quot. in disc., com. (b) cit. in headnote and in disc. Mortgagors sued bank that held second mortgages on residential property and undeveloped parcel of land to enjoin foreclosure proceedings against the properties. The district court granted a preliminary injunction barring foreclosure, basing its decision, in part, on the equitable doctrine of mutual mistake. This court remanded for further proceedings, holding that the injunction was flawed by inadequate evidence that the putative mutual mistake caused mortgagors to grant the second mortgages. Bolduc v. Beal Bank, 167 F.3d 667, 669, 674.

**Restatement (Second) of Contracts § 161 (1981)**

**Restatement of the Law - Contracts** | October 2022 Update

**Restatement (Second) of Contracts**

**Chapter 7. Misrepresentation, Duress and Undue Influence**

**Topic 1. Misrepresentation**

# § 161 When Non-Disclosure Is Equivalent to an Assertion

Comment:

Reporter's Note

Case Citations - by Jurisdiction

---

A person's non-disclosure of a fact known to him is equivalent to an assertion that the fact does not exist in the following cases only:

(a) where he knows that disclosure of the fact is necessary to prevent some previous assertion from being a misrepresentation or from being fraudulent or material.

(b) where he knows that disclosure of the fact would correct a mistake of the other party as to a basic assumption on which that party is making the contract and if non-disclosure of the fact amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.

(c) where he knows that disclosure of the fact would correct a mistake of the other party as to the contents or effect of a writing, evidencing or embodying an agreement in whole or in part.

(d) where the other person is entitled to know the fact because of a relation of trust and confidence between them.

---

**Comment:**

*a. Concealment distinguished.* Like concealment, non-disclosure of a fact may be equivalent to a misrepresentation. Concealment necessarily involves an element of non-disclosure, but it is the act of preventing another from learning of a fact that is significant and this act is always equivalent to a misrepresentation (§ 160). Non-disclosure without concealment is equivalent to a misrepresentation only in special situations. A party making a contract is not expected to tell all that he knows to the other party, even if he knows that the other party lacks knowledge on some aspects of the transaction. His nondisclosure, as such, has no legal effect except in the situations enumerated in this Section. He may not, of course, tell half-truths and his assertion of only some of the facts without the inclusion of such additional matters as he knows or believes to be necessary to prevent it from being misleading is itself a misrepresentation. See Comment *a* to § 159. In contrast to the rule applicable to liability in tort for misrepresentation, it is not enough, where disclosure is expected, merely to make reasonable efforts to disclose the relevant facts. Actual disclosure is required. Compare Restatement, Second, Torts § 551, Comment *d*.

makes the contract. A's non-disclosure does not amount to a failure to act in good faith and in accordance with reasonable standards of fair dealing and is therefore not equivalent to an assertion that the land does not contain valuable mineral deposits. The contract is not voidable by B.

11. The facts being otherwise as stated in Illustration 10, A learns of the valuable mineral deposits from trespassing on B's land and not from government surveys. A's non-disclosure is equivalent to an assertion that the land does not contain valuable mineral deposits, and this assertion is a misrepresentation. Whether the contract is voidable by B is determined by the rule stated in § 164.

*e. Known mistake as to a writing.* One party cannot hold the other to a writing if he knew that the other was mistaken as to its contents or as to its legal effect. He is expected to correct such mistakes of the other party and his failure to do so is equivalent to a misrepresentation, which may be grounds either for avoidance under § 164 or for reformation under § 166. (Compare the rule on reformation for mistake of both parties as to their written expression stated in § 155. See Comment *a* to § 155.) The failure of a party to use care in reading the writing so as to discover the mistake may not preclude such relief (§ 172). In the case of standardized agreements, these rules supplement that of § 211(3), which applies, regardless of actual knowledge, if there is reason to believe that the other party would not manifest assent if he knew that the writing contained a particular term. Like the rule stated in Clause (b), that stated in Clause (c) requires actual knowledge and is limited to non-disclosure by a party to the transaction. See Comment *d*.

**Illustration:**

12. A, seeking to induce B to make a contract to sell a tract of land to A for $100,000, makes a written offer to B. A knows that B mistakenly thinks that the offer contains a provision under which A assumes an existing mortgage, and he knows that it does not contain such a provision but does not disclose this to B. B signs the writing, which is an integrated agreement. A's non-disclosure is equivalent to an assertion that the writing contains such a provision, and this assertion is a misrepresentation. Whether the contract is voidable by B is determined by the rule stated in § 164. Whether, at the request of B, the court will decree that the writing be reformed to add the provision for assumption is determined by the rule stated in § 166. See Illustration 4 to § 166.

*f. Relation of trust and confidence.* The rule stated in Clause (d) supplements that stated in § 173 with respect to contracts between parties in a fiduciary relation. Where the latter rule applies, as in the case of a trustee, an agent, a guardian, or an executor or administrator, its more stringent requirements govern. Even where a party is not, strictly speaking, a fiduciary, he may stand in such a relation of trust and confidence to the other as to give the other the right to expect disclosure. Such a relationship normally exists between members of the same family and may arise, in other situations as, for example, between physician and patient. In addition, some types of contracts, such as those of suretyship or guaranty, marine insurance and joint adventure, are recognized as creating in themselves confidential relations and hence as requiring the utmost good faith and full and fair disclosure. As to contracts of suretyship, see Restatement of Security § 124.

The rule stated in Clause (d) is not limited to cases in which the non-disclosure is by a party to the transaction. In contrast, the rule stated in § 173 applies only to non-disclosure by a fiduciary who is a party. Therefore the rule stated in Clause (d) covers the residual case of a fiduciary who is not a party. As to the duty of a trustee to disclose to his beneficiary matters important for

**Restatement (Second) of Contracts § 166 (1981)**

Restatement of the Law - Contracts   |   October 2022 Update

Restatement (Second) of Contracts

Chapter 7. Misrepresentation, Duress
and Undue Influence

Topic 1. Misrepresentation

# § 166 When a Misrepresentation as to a Writing Justifies Reformation

Comment:
Reporter's Note
Case Citations - by Jurisdiction

> **If a party's manifestation of assent is induced by the other party's fraudulent misrepresentation as to the contents or effect of a writing evidencing or embodying in whole or in part an agreement, the court at the request of the recipient may reform the writing to express the terms of the agreement as asserted,**
> > **(a) if the recipient was justified in relying on the misrepresentation, and**
> > **(b) except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected.**

**Comment:**

*a. Scope.* Reformation is more broadly available for fraudulent misrepresentation than for mistake. Compare § 155. Reformation for mistake is limited to the situation in which the parties, having already reached an agreement, later fail to express it correctly in a writing. That limitation, stated in § 155, applies to all cases where both parties are mistaken, including those where one of the mistaken parties has made a non-fraudulent misrepresentation as to the contents or effect of a writing. Where, however, only one party is mistaken and the other has fraudulently misrepresented the writing's contents, or effect, reformation may be granted even though there was no prior agreement. Compare Comment *a* to § 155. The writing must be one that evidences or embodies, at least in part, the agreement of the parties. Otherwise it will not ordinarily have sufficient legal significance for its reformation to be necessary, and the dispute can be resolved simply in accordance with the general rules applicable to offer and acceptance. The rule stated in this Section also applies to the case where only one party is mistaken and the other, although aware of the mistake, says nothing to correct it. In that case his non-disclosure is equivalent to an assertion that the writing is as the other understands it to be (§ 161(c)). (Where only one party is mistaken and the other is not aware of the mistake, the rule stated in § 153, on mistake of only one party, applies.) The misrepresentation must, of course, be certain enough to permit a court to know how the writing should be reformed. Reformation is not precluded by the mere fact that the party who seeks it failed to exercise reasonable care in reading the writing, but his reliance on the misrepresentation must be justified and the right to reformation

is therefore subject to the rule on fault stated in § 172. This Section, like § 155, only states the circumstances in which a court "may" grant reformation, and, since the remedy is equitable, a court has the discretion to withhold it, even if it would otherwise be appropriate, on grounds traditionally considered by courts of equity in exercising their discretion. See Comment *d* to § 155.

---

**Illustrations:**

1. A and B agree that A will buy a tract of land from B for $100,000 and will assume an existing mortgage of $50,000. In reducing the agreement to writing, A intentionally omits the provision for assumption and tells B that the writing correctly expresses their agreement. B does not notice the omission and is induced by A's fraudulent misrepresentation to sign the writing, which is an integrated agreement. At the request of B, the court will reform the writing to add the provision for assumption. Compare Illustration 3 to § 164. See Illustration 1 to § 155.

2. A, seeking to induce B to make a contract to sell a tract of land to A for $100,000, makes a written offer to B and tells B that it includes a provision under which A assumes an existing mortgage. A knows that the writing does not contain such a provision. B does not notice the omission and is induced by A's fraudulent misrepresentation to sign the writing, which is an integrated agreement. At the request of B, the court will reform the writing to add the provision for assumption.

3. A, seeking to induce B to make a contract to sell a tract of land to A for $100,000, makes a written offer to B and tells B that the legal effect of a particular provision is that A assumes an existing mortgage. A, who is a lawyer, knows that this is not the legal effect of the provision. B does not realize that the legal effect of the provision is not as asserted and is induced by A's fraudulent misrepresentation to sign the writing, which is an integrated agreement. See § 170. At the request of B, the court will reform the writing to add the provision for assumption.

4. A, seeking to induce B to make a contract to sell a tract of land to A for $100,000, makes a written offer to B. A knows that B mistakenly thinks that the offer contains a provision under which A assumes an existing mortgage and that it does not contain such a provision, but does not disclose this to B for fear that B will not accept. B is induced by A's non-disclosure to sign the writing, which is an integrated agreement. A's non-disclosure is equivalent to an assertion that the writing contains such a provision (§ 161(e)) and amounts to a fraudulent misrepresentation. At the request of B, the court will reform the writing to add the provision for assumption. See Illustration 13 to § 161.

---

*b. Relation to other rules.* The rule stated in this Section applies only to misrepresentations as to the contents or effect of a writing. If the misrepresentation relates to some other fact, the contract may be voidable under § 164, but reformation is not appropriate. See also § 163. The availability of reformation based on a fraudulent misrepresentation does not, however, preclude the alternative of avoidance, and the recipient has a choice of remedies. See Illustration 12 to § 161 and compare Illustration 3 to § 164 with Illustration 1 to the present Section. This is in contrast to the rule for mutual mistake. See Introductory Note to Chapter 6 and to Comment *d* to § 152. In some instances, however, the problem may be merely one of interpretation of the writing, so that neither reformation nor avoidance is appropriate. See § 20.

---

**Illustration:**

5. A, seeking to induce B to make a contract to buy a tract of land at a price of $100,000, makes a written offer to B and tells B that the tract contains 100 acres. A knows that it contains only 90 acres. B is induced

---

**Restatement (Second) of Contracts § 172 (1981)**

Restatement of the Law - Contracts   |   October 2022 Update

Restatement (Second) of Contracts

Chapter 7. Misrepresentation, Duress
and Undue Influence

Topic 1. Misrepresentation

# § 172 When Fault Makes Reliance Unjustified

Comment:
Reporter's Note
Case Citations - by Jurisdiction

> **A recipient's fault in not knowing or discovering the facts before making the contract does not make his reliance unjustified unless it amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.**

**Comment:**

*a. Rationale.* The recipient's reliance on the misrepresentation must be justified in order to entitle him to avoidance (§ 164) or reformation (§ 166). He is not entitled to relief if his reliance was unreasonable in the light of his particular circumstances. See Comment *b* to § 164. But the mere fact that he could, by the exercise of reasonable care, have avoided the mistake caused by the misrepresentation does not bar him from relief. The rule is similar to that applicable to mistake in general (§ 157), and its justification is particularly strong since here the recipient's mistake is the result of a misrepresentation. However, the recipient's fault will prevent the application of the rule stated in § 163, under which a misrepresentation as to the very nature of a proposed contract makes his apparent manifestation of assent ineffective. That rule applies only if he has neither knowledge nor reasonable opportunity to obtain knowledge of the character or essential terms of the proposed contract. But even in such a case, lack of reasonable care will not preclude the recipient from avoiding or from obtaining reformation. See Illustration 1. The recipient's fault makes his reliance unjustified only in extreme cases where he has failed to act in good faith and in accordance with reasonable standards of fair dealing.

> **Illustration:**
> 1. A and B reach an understanding that they will execute a written contract containing terms on which they have agreed. A prepares a writing containing essential terms different from those agreed upon and induces