# No. 24-1350

IN THE

# United States Court of Appeals

## FOR THE FIRST CIRCUIT

DAHUA TECHNOLOGY USA INC.,

*Plaintiff-Appellant,*

---v.---

FENG ZHANG,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
No. 1:18-cv-11147-IT (The Honorable Indira Talwani)

**BRIEF OF AMICUS CURIAE CONTRACT LAW SCHOLARS IN
SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL**

JEFFREY M. LIPSHAW (1211876)
SUFFOLK UNIVERSITY LAW
SCHOOL
120 TREMONT STREET
ROOM 250F
BOSTON, MA 02108
(317) 694-4976
jlipshaw@gmail.com
*Attorney for Amicus Curiae Contract
Law Scholars*

# DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Contract Law Scholars ("Contract Law Scholars") as *Amicus Curiae* hereby certify that none of them are corporations and that no corporation has any interest in them.

*/s/ Jeffrey M. Lipshaw*
JEFFREY M. LIPSHAW (1211876**)**
*Attorney for Contract Law Scholars*

# TABLE OF CONTENTS

DISCLOSURE STATEMENT     i

TABLE OF AUTHORITIES     iii

STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY     1

SUMMARY OF ARGUMENT     2

ARGUMENT     3

I.    The District Court erred in treating a mistake, whereby an agreement worth $680,000 was executed as one worth almost $11 million, as one of extrinsic fact subject to risk allocation rather than of expression of the agreement.     3

    A.    The Second Restatement is accepted in Massachusetts as the modern articulation of the law of mistake.     3

    B.    The Second Restatement distinguishes between a mistake of extrinsic fact governed by §§152 and 153 and a mistake of expression of the agreement governed by §155.     8

    C.    The District Court's factual findings established that the mistake was understood by both parties to be of expression, and hence governed by §155.     11

    D.    The District Court erred in applying the risk allocation provision in §154, which §§ 152 and 153 expressly cross-reference, to what correctly should have been deemed a mistake of expression under §155, which has no equivalent cross-reference.     18

CONCLUSION     24

ADDENDUM     25

CERTIFICATE OF COMPLIANCE     27

# TABLE OF AUTHORITIES

**Cases**

*ArcelorMittal Cleveland, Inc. v. Jewell Coke Co., L.P.,* 750 ........................ 17
F.Supp.2d 839 (N.D. Ohio 2010)

*Caron v. Horace Mann Ins. Co.,* 466 Mass. 218, 933 N.E. 2d ............. 7, 12, 16
708 (2013)

*Dahua Technology USA, Inc. v. Zhang*, 988 F.3d 531 (1st Cir. ......................... 4
2020)

*Dahua Technology USA, Inc. v. Zhang*, 433 F.Supp.3d 41 (D. ........................ 4
Mass. 2020)

*German American Ins. Co. v. Davis*, 131 Mass. 316 (1881) .................... 7, 12

*John Beaudette, Inc. v. Sentry Insurance A Mutual Co.,* 94 ............. 6, 22, 23
F.Supp.2d 77 (D. Mass. 1999)

*Lenawee County Board of Health v. Messerly*, 417 Mich. 17, ........................ 6
331 N.W.2d 203 (1982)

*OneBeacon America Insurance Co. v. Travelers Indemnity Co.*, .... 5, 6, 10, 12, 13
465 F.3d 38 (1st Cir. 2006)

*Patton v. Mid-Continent Systems, Inc*., 841 F.2d 742 (7th Cir. .................. 16, 17
1988)

*Sherwood v. Walker*, 66 Mich. 568, 33 N.W. 919 (1887) ......................... 6

*S.T.S. Transport Service, Inc. v. Volvo White Truck Corp*., 766 ........................ 22
F.2d 1089 (7th Cir. 1985)

*Thomas v. Del Biaggio*, 527 B.R. 33 (N.D. Cal. 2014) ...... 18, 19, 20, 21

*Wood v. Lucy, Lady Duff-Gordon,* 222 N.Y. 88, 118 N.E. 214 ........................ 7 (1917)

**Other Authorities**

BLUM, BRIAN A., CONTRACTS (8th ed. 2021) ........................ 10

Eisenberg, Melvin A., *Mistake in Contract Law*, 91 CALIF. L. .............. 9, 21, 22 REV. (2003)

FULLER, LON L., ET AL., BASIC CONTRACT LAW (9th ed. 2013) ........................ 9

Restatement (Second) of Contracts, §151 ........................ 8

Restatement (Second) of Contracts, §152 ................. passim

Restatement (Second) of Contracts, §153 ................. passim

Restatement (Second) of Contracts, §154 ................. passim

Restatement (Second) of Contracts, §155 ................. passim

Restatement (Second) of Contracts, §157 ........................ 23

## STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY

Contract Law Scholars listed in the Addendum are professors and researchers of law at universities in Massachusetts and throughout the United States. They have no personal interest in the outcome of this case.[3] They have a professional interest in having the law of mistake of expression per §155 of the Restatement (Second) of Contracts ("Second Restatement") correctly stated: (a) the standard for finding the existence of a prior agreement, and (b), the non-applicability of "risk allocation" or attribution of fault to one party or the other in connection with the mistake.

Contract Law Scholars file this brief pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure. Plaintiff-Appellant has consented to the submission per a June 3, 2024 email request to all counsel of record; as of this filing, Defendant-Appellee has not.

---

[3]     No party's counsel authored this brief in whole or in part. On November 2, 2022, before having any communication with any party to this case, and shortly after having seen an October 27, 2022 *Massachusetts Lawyers Weekly* article, Professor Lipshaw published a critique of the District Court's opinion (https://lawprofessors.typepad.com/contractsprof_blog/2022/11/jeff-lipshaw-on-scriveners-errors-.html). Appellant, through Appellant's Counsel, contributed money intended to fund Professor Lipshaw's preparation and submission of this brief, which reflects that same critique for this Court's benefit. No other Contract Law Scholar has been compensated by any party.

## SUMMARY OF ARGUMENT

This Court should reverse the District Court's judgment because it erred in treating a mistake of expression, whereby a drafting error turned an agreement worth $680,000 into one worth almost $11 million, as one of extrinsic fact on which the contract was based, and therefore subject to risk allocation. Sections 152 and 153, respectively, of the Restatement (Second) of Contracts ("Second Restatement") govern mutual and unilateral mistakes of extrinsic fact, namely, mistaken beliefs about the factual circumstances to which the contract applies that were basic assumptions on which the parties made the contract. When there has been a such a mistake, §§152 and 153 require a determination of whether the parties allocated the risk of the mistake, expressly cross-referencing §154. This case does not present such a mistake of extrinsic fact.

In contrast, where, as here, the writing fails to express an agreement because both parties were mistaken as to the contents or effect of the writing itself, Section 155 controls. Section 155 has no provision for risk allocation and no cross-reference to §154. The District Court found there had been a mistake of expression. Hence the outcome should have been governed by §155. Nevertheless, the District Court erred as a matter of law, generating an absurd result in light of its own findings, by (1) applying the risk allocation provision in §154 to a mistake of expression under

§155, and (2) disregarding the modern standard for the finding existence of a prior agreement under §155.

## ARGUMENT

**I.    The District Court erred in treating a mistake, whereby an agreement worth $680,000 was executed as one worth almost $11 million, as one of extrinsic fact subject to risk allocation rather than of expression of the agreement.**

### A.    The Second Restatement is accepted in Massachusetts as the modern articulation of the law of mistake.

This is a story of a mistake of expression. The parties, Dahua Technology USA, and its executive, Feng Zhang, were well into an employee severance negotiation, by which point, as the District Court found, "[t]he sticking point in the negotiations between the parties was not the amount of severance pay." (ADD, 28).[4] Embarrassingly, even negligently, but mistakenly, an in-house lawyer for Dahua inserted the total remaining base salary understood to be paid over sixteen months, $680,000, into a blank for monthly payment in the draft agreement outside counsel had prepared, creating a putative total obligation of $10,880,000. (ADD, 27.) None of the Dahua lawyers or executives caught it.  For several months, Dahua made monthly payments, not of $680,000, but an amount reflecting Zhang's monthly salary. (ADD, 18.) When Dahua later proposed a lump sum payout, Zhang

---

[4] "ADD, [number]" refers to the page or pages in the Addendum filed with Appellant's Brief.

demanded over $11,000,000. (ADD, 19-20.) Litigation ensued. Ultimately, the District Court rendered a judgment in favor of Zhang, reflecting that inflated amount, the rationale for which it stated in its October 21, 2022 Findings of Fact and Conclusions of Law ("Opinion"). (ADD, 2-33.) Its Memorandum and Opinion of March 12, 2024 ("Memorandum"), addressing issues of equitable remedies, incorporated and reaffirmed the errors in the Opinion. (ADD, 33-47.)[5]

The District Court found as a matter of fact that both Dahua and Zhang understood the expression in the executed writing did not conform to the agreement they had reached to that point. (ADD, 27-29.) That finding was sufficient, in the District Court's judgment, to conclude that Dahua had established the parties executed a mistaken writing about the terms of the transaction. (ADD, 27.) But the District Court classified the mistakes as falling under Second Restatement §152 for mutual mistake and §153 for actionable unilateral mistake, as though the mistakes related to basic assumptions on which the contract had been made. The District Court then concluded, as a matter of law, that Dahua bore the risk of the erroneous

---

[5] Judge Zobel originally found for Dahua on motion for summary judgment. *Dahua Technology USA, Inc. v. Zhang*, 433 F.Supp.3d 41 (D. Mass. 2020). This court vacated and remanded on the question whether both or either of the parties had made a mistake, and whether Zhang knew or should have known. *Dahua Technology USA, Inc. v. Zhang*, 988 F.3d 531 (1st Cir. 2020. On remand, Judge Talwani found as a matter of fact that there was a mistake and Zhang knew or should have known about it. (ADD, 27.) But neither Judge Zobel nor this Court previously ruled in this case on the matters addressed in this brief on the correct application and interplay of §§152, 153, 154, and 155 of the Second Restatement.

expression under §154, based upon the circumstances under which the contract was drafted and executed. (ADD, 29-31.)

The correct provision for dealing with mistakes of expression, however, is §155, which permits reformation of the contract. Section 155, unlike §§152 and 153, does not contemplate risk allocation as an element of a mistake of expression. Paradoxically, despite having found that the writing was mistaken as to the amount of severance, the District Court rejected reformation under §155 on the grounds that there was no prior agreement. Hence, the District garbled (a) the appropriate Second Restatement analysis as between mistakes of facts the parties evaluate for making the contract, for which risk allocation is an element, and mistakes of expression, for which it is not; and (b) the modern Second Restatement standard for determining whether there is a prior agreement to which a mistake of expression can be reformed. As to issue (b), it effectively reached back to a harsh artifact of pre-Second Restatement case law, even though modern Massachusetts courts recognize the Second Restatement as the articulation of mistake law generally. Hence, the District entered a judgment that, counter-intuitively and against all notions of common sense, transformed a deal into a windfall sixteen times anything either of the parties had ever actually contemplated.

Courts applying Massachusetts law have endorsed the Second Restatement's general approach to mistake doctrine. In *OneBeacon America Insurance Co. v.*

*Travelers Indemnity Co.*, 465 F.3d 38, 41 (1ˢᵗ Cir. 2006), this Court stated, in reforming a contract under §155, "Massachusetts courts have referenced the approach to mutual mistake articulated in the Restatement (Second) of Contracts." Id., at 41. The court in *John Beaudette, Inc. v. Sentry Insurance A Mutual Co.,* 94 F.Supp.2d 77, 143-144 (D. Mass. 1999), catalogued the extensive incorporation of the Second Restatement into the law of mistake in Massachusetts:

> Indeed, numerous Massachusetts cases cite or rely on the *Restatement (Second) of Contracts,* albeit prior editions or tentative drafts to the current edition. *See, e.g., Massachusetts Municipal Wholesale Electric Company v. Town of Danvers,* 411 Mass. 39, 577 N.E.2d 283, 291 n. 8 (1991) (citing *Restatement (Second) of Contracts* § 152 (1981)); *LaFleur v. C. C. Pierce Company, Inc.,* 496 N.E.2d at 830 (citing *Restatement (Second) of Contracts* § 152 (1975)); *Howell v. Glassman,* 33 Mass. App.Ct. 349, 600 N.E.2d 173, 175 (1992) (citing *Restatement (Second) of Contracts* § 155 (1979)); *First Safety Fund National Bank v. Friel,* 504 N.E.2d at 667 (citing *Restatement (Second) of Contracts* §§ 152–154 (1979)); *Covich v. Chambers,* 397 N.E.2d at 1121 (citing *Restatement (Second) of Contracts* §§ 293–295 (Tent. Draft No. 10 1975)).

Hence, not only should courts applying Massachusetts law use the correct Second Restatement provisions; they should also be suspicious of artifacts of case authority long predating the adoption of the Second Restatement.[6]

---

[6]    Even Michigan has rejected the iconic "barren cow" mistake case, *Sherwood v. Walker*, 66 Mich. 568, 33 N.W. 919 (1887), in favor of the modern Second Restatement articulation. *Lenawee County Board of Health v. Messerly*, 417 Mich. 17, 331 N.W.2d 203 (1982).

The prime example of this anachronism is the District Court's citation, via *Caron v. Horace Mann Ins. Co.,* 466 Mass. 218, 933 N.E. 2d 708 (2013), to *German American Ins. Co. v. Davis*, 131 Mass. 316 (1881), as to how choate the prior agreement must have been, under Massachusetts law, to support reformation. *German American* long predates the promulgation of either the First or Second Restatement, despite its citation in more recent cases like *Caron* (which could have been decided under the modern Second Restatement standard). Hence, the District Court permitted the simple and often harsh formalism, common in 19th century case law, to prevail over the Second Restatement's modern articulation of mistake doctrine, as otherwise adopted by the Massachusetts courts.[7]

Accordingly, the District Court should have applied to its own factual findings the law of mistake as it stands in 2024, not pre-Restatement artifacts. That requires an exposition of Chapter 6 of the Second Restatement, dealing respectively with

---

[7] Other substantive areas of American contract law doctrine have evolved away from strict formalism over the last 150 years. For example, the rules for parol evidence rule and interpretation have long since shed unwavering adherence to the words as written in favor of allowing extrinsic evidence beyond the written document in appropriate cases. Similarly, where the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, modern courts will supply terms that are reasonable in the circumstances. As Judge Cardozo noted famously, "The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal." *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 118 N.E. 214, 214 (1917).

mutual mistake, unilateral mistake, allocation of the risk of mistake, and mistakes of expression in the written document.

**B.** **The Second Restatement distinguishes between a mistake of extrinsic fact governed by §§152 and 153 and a mistake of expression of the agreement governed by §155.**

Chapter 6 of the Second Restatement, dealing with the legal consequence of mistake, begins by defining a mistake Section 151 as "[a] belief that is not in accord with the facts." Comment a makes clear that a mistake is not an improvident act, but rather an erroneous belief relating a fact that existed at the time of the making of the contract. But "[m]istake alone ... has no legal consequences. [Those] are determined by the rules stated in the rest of this Chapter."

There is a crucial distinction as to legal consequence of a mistake in the next four sections of the Chapter. Sections 152 and 153, respectively, govern mutual and unilateral mistakes "as to basic assumptions on which the contract was made" and, by express cross-reference to §154, the possible allocation of risk between the parties as to those mistakes. Comment a to Section 152 for mutual mistake states, in relevant part, the rationale for the provision:

> *Before making a contract, a party ordinarily evaluates the proposed exchange of performances on the basis of a variety of assumptions with respect to existing facts....* Relief is only appropriate in situations where a mistake of both parties [as to those factual assumptions] has such a material effect on the agreed exchange of performances as to upset the very basis for the contract.

This Section applies to such situations.

(Emphasis added.)  Section 153, dealing with unilateral mistakes, incorporates the same elements of "basic assumption" and "material effect" as Section 152.  *See* §153, comment b.

Section 155, on the other hand, deals with a particular variant of the kind of error scholars have categorized as "mechanical" – a mistranscription or error in expressing the agreement.

> Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement....

This is in contrast to the kind of "evaluative" errors noted in the comment to Section 152.

The iconic Fuller & Eisenberg contract law casebook distinguishes mechanical errors, which include mistakes of expressions, from the "type of mistake in contract law [that] consists of a mistaken factual assumption about the present state of the world outside the mind of the actor who holds the assumption." LON L. FULLER, ET AL., BASIC CONTRACT LAW 858 (9th ed. 2013).  *See also* Melvin A. Eisenberg, *Mistake in Contract Law*, 91 CALIF. L. REV. 1575, 1581-85, 1610 (2003) (distinguishing between "evaluative" mistakes, which should not provide a basis for relief, and "mechanical" mistakes, which should).[8]  This Court has articulated the

---

[8] To be clear, not every mistake Professor Eisenberg classifies as mechanical would constitute a mistake of expression under §155.  Some, such as mistaken payments or

same distinction "between a contract that does not accurately reflect (hence misrepresents) the agreement of the parties and a contract that accurately reflects the intent of the parties but is premised on some mistaken fact." *OneBeacon America Insurance Co. v. Travelers Indemnity Co.*, 465 F.3d 38, 42 (1st Cir. 2006).

In his influential text, Professor Brian Blum makes the same point as this Court did in *OneBeacon*:

> A mistake may relate not to a factual premise of the agreement but to the way in which the agreement is expressed in writing. For example, a memorandum of agreement reflects the price of a piece of land as $280,000. The buyer contends that the parties had orally agreed to a price of $250,000, and that the written price is a typographical error not noticed by the parties when signing the document.... However, the party who benefits from the error may claim (whether genuinely or disingenuously) that the writing is correct....
>
> A mistake in transcription is completely different in nature from a mistake of fact, discussed in the prior sections....

BRIAN A. BLUM, CONTRACTS (8th ed. 2021), §15.6.1 "Reformation to Correct Mistakes in Transcription," at 549-550. Professor Blum's explanation is apropos in light of the District Court's factual finding that Zhang knew or should have known of the mistake; Zhang was a "party who benefits from the error [claiming] (whether genuinely or disingenuously) that the writing is correct."

---

miscalculations as might occur in bidding on construction contracts might best be assessed as unilateral mistakes under §153 for which relief is nevertheless appropriate (as reflected in comment b to §153).

Significantly, as we will discuss below, §155, the embodiment of the rule on mistakes of expression, contains no cross-reference to §154 nor any reference at all to the risk of such mistake being allocated to the parties. Indeed courts, including those applying Massachusetts law, have long held that even negligence in the drafting process will not bar a reformation remedy under §155.

C. **The District Court's factual findings established that the mistake was understood by both parties to be of expression, and hence governed by §155.**

This case presents an opportunity to clarify the modern standard under §155 for the existence of an agreement to which the writing may be reformed. The comments to §155 suggest, consistent with a century-long relaxation of strict formalism in contract law, that for §155 to apply:

> there must have been some agreement between the parties prior to the writing. *The prior agreement need not, however, be complete and certain enough to be a contract*.... If the parties reach agreement as to only part of a prospective bargain, and if they are later mistaken in their attempt to put in writing this agreement together with such other terms as will make a contract, reformation is still an appropriate remedy. The agreement must be certain enough to permit a court to frame relief in terms of reformation.

Restatement §155, comment a (emphasis added).

What does it mean, under the Second Restatement in 2024, for the prior agreement to be "certain enough?" The District Court's Opinion incorporates a pre-Restatement anachronistic standard, even though courts in Massachusetts and elsewhere have otherwise adopted the Restatement treatment of mistake in toto. In

contrast to the modern standard of "certain enough," the source of the District Court's rule was *German American Ins. Co. v. Davis*, 131 Mass. 316, 317 (1881), itself citing even earlier 19th century cases for the proposition that "[i]t must appear beyond reasonable doubt that the precise terms of a contract had been orally agreed upon between the parties...." When recent cases like *Caron v. Horace Mann Ins. Co.,* 466 Mass. 218, 933 N.E. 2d 708 (2013), have cited the pre-Restatement *German American* rule, it turns out to have been dictum in the nature of overkill. In those cases, typically there was no evidence whatsoever of any prior agreement on the point at issue, much less one that was something less than complete and certain. In *Caron*, for example, the claimed basis for reformation was that the insured on an insurance policy "silently harbored an assumption" about the extent of the policy's liability coverage. The "certain enough" standard, which is the modern expression of the law, would have been enough to decide *Caron* and similar cases.

Indeed, in *OneBeacon America Insurance Co. v. Travelers Indemnity Co.*, 465 F.3d 38 (1st Cir. 2006), this Court addressed the evidentiary hurdle for reformation of a mistake of expression under §155. The correct modern standard is *not* that the court find a prior agreement beyond reasonable doubt", but that "full, clear, and decisive proof of mistake" exists. *Id*., at 42. LAI leased cars and trucks to businesses. OneBeacon issued an insurance policy for LAI's vehicles. It defined an "insured" as including "Anyone else while using with your permission a covered

auto you own."  Lessees were, however, supposed to have their own insurance coverage.  One of LAI's lessees, Capform, insured its leased vehicles with Travelers.  Capform's employee injured a pedestrian, and Travelers paid the claim.  Later, Travelers became aware of OneBeacon's policy and, subrogated to Capform's claim, sued OneBeacon on the LAI policy, claiming that it was entitled, on Capform's behalf, to indemnity as an "insured."  OneBeacon claimed the policy language was a mistake; that it never intended to insure any vehicles other than LAI's; and that the policy should be reformed to reflect that intent.  Reciting the "full, clear, and decisive proof" standard, this Court reversed the trial court, stating:

> OneBeacon submitted various forms of evidence, including affidavits, the Agreement for Judgment, and lease documents that reflected the course of conduct between LAI and its lessees. Together, they paint a consistent picture showing that LAI intended to shift responsibility for liability coverage on its vehicles to the long-term lessees of those vehicles and that OneBeacon also operated on the assumption that it provided such coverage only when a lessee individually applied and was approved.

*Id.*, at 42-43.  In short, this Court was satisfied with the proof of the mistake of expression even without the showing the "precise terms" of a complete prior agreement.

Hence, the fundamental problem with the District Court's opinion is a logical inconsistency.  On one hand, the District Court concluded, as a matter of law, there was an insufficient prior agreement for reformation, citing, via *Caron*, the strict *German American* standard.  On the other hand, as to the issue on which this Court

13

remanded on the first appeal – whether, as a matter of fact, there had been mutual or unilateral mistake – the District Court found full, clear, and decisive evidence of mistake; indeed, the agreement on the amount of the severance up to the point of drafting was sufficiently concrete such that Zhang would have had to know there was a drafting error. Effectively in transactions like this, a contract is a map of the transaction, analogous to a Boston city map. If one is going to claim that the Boston city map is mistaken, one must necessarily have some idea of what the actual city looks like. For someone to conclude that the written document incorporated a mistake, they must have some idea from the agreements reached to that point of what it was a mistake from!

And, in connection with mutual and unilateral mistake, that is precisely what the District Court found as a matter of fact before erroneously applying the risk allocation standard from §154. Zhang knew or should have known there was a drafting error, when comparing the written document to the extant understanding on severance, for at least the following reasons catalogued in the District Court opinion:

- "Dahua has established that it made a mistake when setting forth the severance payment as $680,000 for sixteen months rather than $680,000 over sixteen months." (ADD, 28.)

- "The discrepancy between $10,800,000 (the amount in the agreement) and the initial zero dollar offer, with no discussion of intermediate offers, supports Dahua's claim of mistake." (ADD, 28.)

- "Dahua has also established that the mistake was mutual or that Zhang had reason to know of the mistake. The sticking point in the

14

negotiations between the parties was not the amount of severance pay but the termination of Zhang's employment. While Zhang could have anticipated that Dahua would sweeten its offer slightly to resolve the negotiations, Zhang had no reason to think that Dahua would increase the severance from zero to $10,800,000." (ADD, 28-29.)

- "[The evidence] does not support the notion that Zhejiang [Dahua's Chinese corporate parent] and Dahua – which had a sizable team working hard to get what the company exactly what it wanted -- would have offered the large sum, rather than a much smaller amount, to buy Zhang's silence and cooperation." (ADD, 29.)

- "But Zhang's mistaken belief that he had obtained meaningful protections in the 2017 Employment Agreement explains why it was not illogical for him to accept the Release with all its new restrictions for only the $680,000 that he would have been entitled to regardless. And if Zhang realized that the Release Agreement, as written, provided for $680,000 per month, he had reason to know of the mistake. While his silence and cooperation may well have been of significant value to Zhejiang, Zhang had reason to know, from his own prior experience dealing with Fu and Zhejiang, that the company would not jump to such a large number without first trying to buy his silence and cooperation for some lesser amount." (ADD, 29-30.)[9]

---

[9] In its Memorandum, issued after its Opinion, dealing the court's equitable authority to fashion a remedy, the District Court simply repeated the same logical inconsistency as to the sufficiency of an agreement as to which there had been a drafting mistake. In consecutive paragraphs, the District Court stated (a) that "Zhang and Dahua had no agreement concerning ... related severance prior to ... entering into the written Release Agreement"; (b) but that both Dahua and Zhang were both mistaken (or, if Zhang was not mistaken, should have known that Dahua was mistaken) as to the $680,000 per month inserted in the written document. (ADD, 36). Thus, the District Court found that the negotiations had progressed to the point Zhang knew or should have known that he was not supposed to receive $680,000 per month.

This is hardly a case like *Caron* in which the basis for reformation lay in the unexpressed subjective mind of one of the parties. To the contrary, the District Court itself found, albeit when doing the analysis under §§152 and 153, a prior agreement that (a) might well not have been complete and certain to be a contract, (b) might have reflected agreement only as to only part of a prospective bargain, but still (c) per the comments to §155, "certain enough to permit a court to frame relief in terms of reformation."

A more appropriate explanation and application of the standard comes from Judge Richard Posner, one of the most distinguished scholars of contract law in the 20th Century. In *Patton v. Mid-Continent Systems, Inc.*, 841 F.2d 742 (7th Cir. 1988), Judge Posner affirmed the reformation of a written contract on the basis of mutual mistake of expression. Mid-Continent franchised truck stops to sell fuel under credit cards Mid-Continent would issue to truck drivers. Patton and Hildebrand owned such truck stops along I-94 near the Michigan-Indiana border. Judge Posner observed that "the negotiating history makes perfectly clear that Mid-Continent thought it was franchising two truck stops in the same area, Patton's at Burns Harbor [Indiana] and Hildebrand's at New Buffalo [Michigan]." *Id.*, at 744-45. The problem was that the written franchise agreement recited the place of business only at New Buffalo, without reference to the other location at Burns Harbor. The dispute involved the definition of the franchisee's territory, i.e., whether it included, in

addition to the portion of I-94 in New Buffalo, Michigan, the area across the border in Indiana itself. If the literal terms of the written contract, not referring to Indiana, were taken as indicative of the territory, Mid-Continent would prevail. Judge Posner held that Patton had satisfied the standard for reformation of the written contract:

> [Patton] is merely trying to correct an oversight in drafting—the omission of his place of business.... [Mid-Continent] is merely trying to exploit a conceded mistake—its mistake as the contract drafter—in failing to list Patton's place of business. Commercial life in this country would slow perceptibly if harmless errors in the drafting of contracts were beyond judicial power to correct.
>
> * * *
>
> The party alleging mutual mistake must convince the judge and convince him clearly. That is no problem here; there is no doubt at all that the parties intended to franchise Patton's fuel stop as well as Hildebrand's. This is clear not only from the negotiations leading up to the signing of the franchise agreement and from the inclusion of Patton's name in it but from the parties' conduct afterward—and post-signing evidence is not excluded by the parol evidence rule in any event.

*Id.*, at 746. *See also ArcelorMittal Cleveland, Inc. v. Jewell Coke Co., L.P.,* 750 F.Supp.2d 839, 847 (N.D. Ohio 2010) (holding that plaintiff sufficiently pled "clear and convincing evidence" of a mistake of expression where a numerator and denominator in a formula were inverted during the drafting process).

In sum, the District Court, despite having been clearly convinced of a mistake of expression satisfying both §§152 *and* 153 (i.e., that Zhang knew or had reason to know it was a mistake), nevertheless erred as a matter of law by applying an

antiquated standard to its own findings. The rule Contract Law Scholars urge this Court to adopt is as follows:

> Where the negotiation or agreement has reached the stage both parties knew or should have known, but for a mistake as to the content or effect of the executed writing, that the writing failed to express the agreement as it stood at that point, then the court may so reform the writing.

**D.    The District Court erred in applying the risk allocation provision in §154, which §§152 and 153 expressly cross-reference, to what correctly should have been deemed a mistake of expression under §155, which has no equivalent cross-reference.**

To our knowledge, there is only one reported case directly on point as to the inapplicability of risk allocation under §154 to a mistake that correctly should have been deemed one of expression governed by §155.[10]  In *Thomas v. Del Biaggio*, 527 B.R. 33 (N.D. Cal. 2014), the district court affirmed a bankruptcy court's reformation of a written contract.  Sand Hill (owned by Del Biaggio) was an investment fund. It made working capital loans to its portfolio of startup companies and received warrants to purchase their common stock as part of the consideration

---

[10] As discussed, Sections 152 and 153 do not address the kind of mistake of expression involved here.  Nevertheless, even if the mistake was a basic assumption on which the contract was made, the District Court erred twice.  First, the only basis for risk allocation would have been §154(c), "on the ground that it is reasonable in the circumstances to do so." If, as here, it is not reasonable to allocate the risk, a court should not.  Second, contrary to the District Court's assertion that the defense of mutual mistake "does not support reformation of the contract but rescission," (ADD, 27), §152(b) expressly provides otherwise: "In determining whether the mistake has a material effect on the agreed exchange of performances, account is taken of any relief by way of reformation, restitution, or otherwise."

for the loans. In turn, Sand Hill borrowed money from Thomvest (owned by Thomas) to finance the lending. In the dot-com bust of the early 2000s, Sand Hill's borrowers stopped paying back their loans, and Sand Hill itself became insolvent. The facts are complex, but Sand Hill and Thomvest entered into negotiations under which (a) Thomvest would take over Sand Hill's remaining equities and warrants in the portfolio companies, and apply them to the $10 million Sand Hill owned Thomvest, and (b) in turn, Thomvest would sell back to Del Biaggio its equity interests in Sand Hill, which, at this point, would be a mere shell holding no assets. The written contract provided for Sand Hill to sell the cash, stocks and warrants "listed in Exhibit A," and Sand Hill represented and warranted that all of its cash, stocks, warranted were listed in Exhibit A. It turned out that neither party was aware of an unexpired warrant in a portfolio company called Serengeti and Exhibit A did not list it. Only after bankruptcy did the trustee in bankruptcy and Thomvest discover the Serengeti warrants, and each claimed the right to the funds. The trustee's position was that Thomvest's rights were limited to those set forth on Exhibit A of the contract. After trial, the bankruptcy court found that the state of the negotiations were such that it was clear Sand Hill and Thomvest intended to convey all unexpired warrants, including but not limited to those enumerated in Exhibit A.[11]

---

[11] That finding is instructive, as well, on the issue of "prior agreement." The bankruptcy court in Thomas derived the parties' pre-execution intent from an assessment of the parties' motives and emails back and forth that described the deal

The bankruptcy court held that the written agreement should be reformed to that effect, and, on appeal, the district court affirmed.

The district court in *Thomas* rejected, among other things, the trustee's argument "that Restatement of Contracts Section 154's rules regarding assumption of risk act as a bar to reformation under Section 155 allowing for reformation based on a mistake of both parties." *Id*. at 45. The court quoted at length from the Introductory Note to the mistake chapter of Second Restatement. Particularly relevant here is the following:

> The rules governing all of the situations dealt with in this Chapter have traditionally been marked by flexibility and have conferred considerable discretion on the court. In part, this has been due to the protean character of the situations involved and the circumstance that they are almost inevitably unforeseen by the parties. In part it has been due to the fact that the law of mistake was shaped largely by courts of equity which had broad discretionary powers.

*Id.* at 46. In other words, the point is to get to the equitable result and, not as the District Court managed here, to parse one's way to an absurd result.

Hence, the district court in *Thomas* noted that the interplay among §§152, 153, 154, and 155 "can be cleanly delineated." Section 152 and 153 each cross-reference §154; §155 does not. The comments in §154 refer back to §§152 and 153, not to §155. In short,

---

but were by no means a complete and certain contract. Nevertheless, they were certain enough to support reformation. *See Thomas*, 527 B.R. at 37-38.

the risk allocation between the parties is relevant only in determining whether a party should be able to avoid its contractual obligations or whether the party who determined to bear the risk should be held to his burden. The rule does not extend to the instance of mutual mistake where both parties wish to give effect to a contract that fails to embody accurately the terms upon which the contracting parties agreed.

*Id.*, at 46-47.

The distinction between mistakes of evaluation versus expression makes eminent good sense. In his seminal article, Professor Eisenberg called an evaluative mistake one "in which a well-informed and capable actor who made a contract comes to believe that his choice to make the contract was mistaken due to a change in his preferences or a change in the subjective or objective value of the performances due under the contract." Eisenberg*, supra*, at 1582. Such mistakes ought not to be the basis for relief for the very reason that contracts "are motivated by the parties' conflicting determinations of the objective value of the performances due under their contract." *Id.*, at 1583. The whole point of contracting in those cases is to allocate risk, and both economic efficiency and moral considerations are in accord. *Id.*, at 1583-84.

In contrast, there is no economic or moral imperative for allocating the risk of what Professor Eisenberg classified as "mechanical" mistakes, of which mistranscription is simply a special case:

Mistranscriptions are a special case of mechanical errors: A intends the writing to incorporate the bargain, and by virtue of a mechanical error it does not.... Accordingly, the general principle that should be applied

to mistranscriptions is the same general principle that should be applied
to other mechanical errors:  the error should provide a basis for relief.

Eisenberg, *supra*, at 1610.

Mechanical errors are not based on the parties' preferences, nor do the parties

bargain over the risk of such mistakes.  Id., at 1584-85. Moreover, providing for

relief from mechanical mistakes is efficient.  Speaking of miscalculations, Professor

Eisenberg quoted *S.T.S. Transport Service, Inc. v. Volvo White Truck Corp.*, 766

F.2d 1089, 1093 (7th Cir. 1985):

> The reason for the special treatment [of errors that are mathematical or
> "clerical"] is that they are difficult to prevent, and that no useful social
> purpose is served by enforcing the mistaken term. No incentives exist to
> make such mistakes; all the existing incentives work, in fact, in the
> opposite direction. There is every reason for a contractor to use ordinary
> care, and, if errors of this sort-clerical or mathematical-slip through
> anyway, the courts will generally find it more useful to allow the
> contract to be changed or rescinded than to enforce it as it is.

In other words, a "gotcha" approach, even to contracting drafting between

sophisticated parties, wastes resources.  It "provide actors with incentives to take too

much precaution-triple- and quadruple-checking." Eisenberg, *supra*, at 1585.

Finally, blame is not an element when assessing a mistake of expression,

except in the most egregious cases.  In *John Beaudette, Inc. v. Sentry Ins. A Mutual

Co.*, 94 F.Supp.2d 77 (D. Mass. 1999), the court denied a motion for summary

judgment, holding there was sufficient evidence to support a finding of mutual

mistake in the expression of an insurance policy.  The court cited Second

Restatement §157 for the rule that even a mistaken party's inadvertent or negligent fault in knowing of or discovering the mistake would not be bar to reformation unless the fault amounted to a failure to act in good faith or in accordance with reasonable standards of fair dealing. *Id.,* at 144. As the court stated, "As reasoned in the comments [to §157], barring all relief due to an inadvertent, negligent act on the part of the party seeking reformation would sharply circumscribe the reach of the doctrine." *Id.* Dahua's executives may have been negligent in permitting the error to occur or in not discovering it, but the District Court made no finding of bad faith. Accordingly, the uncomfortable, even embarrassing, circumstance of the creation of the error is simply irrelevant to the correct application of the doctrine. Nevertheless, blaming Dahua for the drafting error was precisely the basis for the District Court's inappropriate allocation of the risk of the drafting error to Dahua. (ADD, 29-31; ADD, 36.)

There is a reason that the District Court's judgment here made the news. It is precisely the kind of legal reasoning detached from common sense that causes non-lawyers to view law, lawyers, and the legal system cynically. What is particularly galling is that the District Court itself recognized Zhang's own opportunism even while setting up an unwarranted chain of logic that awarded him an absurd windfall.

## CONCLUSION

For the foregoing reasons, this court should reverse the District Court's judgment.

Dated:     June 12, 2024                    Respectfully submitted,


                                            */s/ Jeffrey M. Lipshaw*
                                            Jeffrey M. Lipshaw (1211876)
                                            120 Tremont Street, Room 250F
                                            Boston, MA 02108
                                            (317) 694-4976
                                            jlipshaw@gmail.com
                                            *Attorney for Amicus Curiae Contract Law Scholars*

**Contract Law Scholars:**[12]

**Daniel Barnhizer**, Professor of Law, Bradford Stone Faculty Scholar, Michigan State University College of Law.

**Carter G. Bishop**, Professor of Law, Emeritus, Suffolk University; Visiting Professor, McKinney School of Law, Indiana University.

**Brian H. Bix**, Frederick W. Thomas Professor of Law and Philosophy, University of Minnesota.

**Mark E. Burge,** Professor of Law, Texas A&M University School of Law.

**Eric C. Chaffee,** Professor of Law, Peter M. Gerhart Distinguished Research Scholar, Associate Director, Center for Business Law, Case Western Reserve University School of Law.

**Bruce Frier**, John and Teresa D'Arms Distinguished University Professor Emeritus of Classics and Roman Law, Professor Emeritus of Classical Studies, Professor Emeritus of Law, University of Michigan.

**Tal Kastner**, Assistant Professor of Law, Touro Law Center.

**Juliet P. Kostritsky**, Everett D. and Eugenia S. McCurdy Professor of Law, Director, Center for Business Law, Case Western Reserve University School of Law.

---

[12] This motion and brief reflect the views of the listed individuals and not any institution. Institutions are shown merely for purposes of identification.

**Jeffrey M. Lipshaw**, Professor of Law, Suffolk University. Professor Lipshaw is also acting as attorney for Contract Law Scholars.

**Meredith R. Miller**, Professor of Law, Touro Law Center.

**Michael L. Rustad**, Thomas F. Lambert Jr. Professor of Law, Suffolk University.

**D. A. Jeremy Telman**, Professor of Law, Oklahoma City University School of Law.

**Eric A. Zacks**, Associate Professor of Law, Wayne State University Law School.

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) and 32(a)(7) because it contains 6482 words as calculated by the word count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Mac, Version 16.83 in 14 point font.

Dated:     June 12, 2024          Respectfully submitted,

*/s/ Jeffrey M. Lipshaw*
Jeffrey M. Lipshaw (1211876)
120 Tremont Street, Room 250F
Boston, MA 02108
(317) 694-4976
jlipshaw@gmail.com
*Attorney for Amicus Curiae Contract Law Scholars*

# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

## CERTIFICATE OF SERVICE

Appeal No. 24-1350

I, Jeffrey M. Lipshaw, hereby certify that on June 12, 2024, I electronically filed this Brief of Amicus Curiae Contract Law Scholars in Support of Plaintiff-Appellant and Reversal with the Court using the CM/ECF system. I certify that the following parties or counsel are registered CM/ECF users and will receive service through the CM/ECF system:

| | |
|---|---|
| Daron L. Janis<br>Locke Lord LLP<br>111 Huntington Avenue<br>Boston, MA 02199<br>214-740-8471<br>Email: djanis@lockelord.com<br>Attorney for Dahua Technology USA, Inc. | Benjamin Flam<br>Gordon Law Group, LLP<br>585 Boylston Street<br>Boston, MA 02116<br>617-536-1800<br>Email: bflam@gordonllp.com<br>Attorney for Feng Zhang |
| Daniel E. Rosenfeld<br>Sullivan & Worcester LLP<br>One Post Office Square<br>Boston, MA 02109<br>617-338-2930<br>Fax: 617-338-2880<br>Email: drosenfeld@sullivanlaw.com<br>Attorney for Dahua Technology USA, Inc. | Philip J. Gordon<br>Gordon Law Group, LLP<br>585 Boylston Street<br>Boston, MA 02116<br>617-536-1802<br>Email: pgordon@gordonllp.com<br>Attorney for Feng Zhang |

Daryl J. Lapp
111 Huntington Avenue
Boston, MA 02199
617-239-0174
Fax: 617-316-8272
Email: daryl.lapp@lockelord.com
Attorney for Dahua Technology USA,
Inc.

Erika L. Todd
Sullivan & Worcester LLP
One Post Office Square
Boston, MA 02109
617-338-2825
Email: etodd@sullivanlaw.com
Attorney for Dahua Technology USA,
Inc.

Ryan M. Rosenblatt
Sullivan & Worcester LLP
One Post Office Square
Boston, MA 02109
617-338-2913
Email: rrosenblatt@sullivanlaw.com
Attorney for Dahua Technology USA,
Inc.

Dated:  June 12, 2024

_s/ Jeffrey M. Lipshaw_
Jeffrey M. Lipshaw