# United States Court of Appeals

*for the*

# First Circuit

---

Case No. 24-1350

---

DAHUA TECHNOLOGY USA, INC.,

*Plaintiff-Appellant,*

v.

FENG ZHANG,

*Defendant-Appellee.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT OF THE DISTRICT
OF MASSACHUSETTS, BOSTON, IN CASE NO. 1:18-cv-11147-IT,
HONORABLE INDIRA TALWANI, U.S. DISTRICT JUDGE

## BRIEF OF DEFENDANT-APPELLEE FENG ZHANG

BENJAMIN FLAM
PHILIP J. GORDON
GORDON LAW GROUP LLP
585 Boylston Street, 4th Floor
Boston, Massachusetts 02116
(617) 536-1800
Attorneys for Defendant-Appellee

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ................................. vii

INTRODUCTION ...................................................................... 1

STATEMENT OF THE ISSUES ................................................ 5

STATEMENT OF THE CASE .................................................. 6

   I.    THE DISTRICT COURT'S EVALUATION OF
        DAHUA'S REFORMATION CLAIM ......................................... 6

   II.   THE DISTRICT COURT'S DECISION TO DENY
        DAHUA'S GOOD FAITH AND FAIR DEALING CLAIM ....... 15

   III.  THE DISTRICT COURT'S DECISION TO DENY
        DAHUA EQUITABLE RELIEF .................................................. 15

SUMMARY OF THE ARGUMENT .......................................... 18

ARGUMENT .......................................................................... 23

   I.    THE DISTRICT COURT PROPERLY CONCLUDED
        DAHUA FAILED TO PROVE ITS CONTRACT
        REFORMATION CLAIM .......................................................... 23

       A.  As an initial matter, Dahua waives its argument to its
          defenses under unilateral and mutual mistake ........................ 23

       B.  Standard of review .................................................. 23

       C.  The district court did not misapply Massachusetts law
          or Restatement § 155 .................................................. 24

       D.  Despite Dahua's allegation to the contrary, Judge Talwani
          understands how contract negotiations work ......................... 25

       E.  Dahua continues to ignore this Court's precedent from
          <u>Greene v. Ablon</u>, instead arguing the wrong analysis for
          contract formation .................................................. 30

II.    RESTATEMENT §§161 and 166 DO NOTHING
       FOR DAHUA ................................................................. 31

       A.  Dahua never raised, and therefore waived, any argument
           for equitable relief under §§161 and 166 ............................... 31

       B.  Standard of review .................................................... 31

       C.  Judge Talwani's inherent equitable powers include the
           discretion to deny equitable relief ..................................... 31

       D.  Restatement Sections 161 and 166 are not applicable
           to this case ............................................................ 32

III.   DAHUA'S AMBIGUITY ARGUMENT REMAINS
       INVALID ...................................................................... 35

       A.  Dahua never raised, and instead rejected the ambiguity
           argument ............................................................... 35

       B.  Despite Dahua's waiver, the district court nevertheless
           addressed Dahua's ambiguity argument and found none ..... 36

IV.    THE DISTRICT COURT CORRECTLY DECIDED
       THE EQUITABLE CONSIDERATIONS
       IN ZHANG'S FAVOR ............................................................. 38

V.     DAHUA'S GOOD FAITH AND FAIR DEALING CLAIM
       IS BASELESS AS A MATTER OF FACT AND LAW .............. 43

VI.    RESPONSE TO AMICUS ........................................................... 44

CONCLUSION ........................................................................... 49

CERTIFICATE OF COMPLIANCE .......................................................... 49

CERTIFICATE OF SERVICE .............................................................. 49

**Cases:**

Am. Med. Sys., Inc. v. Biolitec, Inc.,
666 F.Supp.2d 216 (D. Mass. 2019)……………………………………...36, 48

Arch. Ins. Co. v. The Graphic Builders LLC,
36 F.4th 12 (1st Cir. 2022) ........................................................................ 29

Armstrong v. Rohm & Haas Co.,
349 F. Supp. 2d 71 (D. Mass. 2004) …………………………………….40, 48

Balles v. Babcock Power, Inc.,
476 Mass. 565, 571 (2017) ........................................................................ 37

Calvi v. Knox County,
470 F.3d 422 (1st Cir. 2006) ..................................................................... 36

Caron v. Horace Mann Ins. Co.,
466 Mass. 218 (2013) ................................................................................ 26

Ciulla v. Rigny,
89 F.Supp.2d 97 (D. Mass. 2000) ............................................................. 42

Cumpiano v. Banco Santander Puerto Rico,
902 F.2d 148 (1st Cir. 1992) ..................................................................... 24

Dahua Tech. USA Inc. v. Feng Zhang,
988 F.3d 531 (1st Cir. 2021) …………………………………….14, 21, 23, 29

DeWolfe v. Hingham Ctr., Ltd.,
464 Mass. 795 (2013) …………………………………………………….36, 37

Dover Pool & Racquet Club, Inc. v. Brooking,
366 Mass. 629 (1975) ................................................................................ 16

Ferreira da Costa v. Albefaro de Lima,
94 F.4th 174 (1st Cir. 2024) …………………………………………….24, 31, 32

Forbes v BB&S Acquisition Corp.,
22 F.4th 22 (1st Cir. 2021) ........................................................................ 49

General Hosp. Corp. v. Esoterix Genetic Labs, LLC,
16 F.4th 304 (1st Cir. 2021) ........................................................ 38

German Am. Ins. Co. v. Davis,
131 Mass. 316, 317 (1881) .......................................................... 26

Given v. Commerce Ins. Co.,
440 Mass. 207 (2003) ................................................................. 28

Greene v. Ablon,
794 F.3d 133 (1st Cir. 2015) ...................................................... 30

Hawthorne's, Inc. v. Warrenton Realty, Inc.,
414 Mass. 200, 211 (1993) ......................................................... 43

Helmsderfer v. Bobrick Washroom Equip, Inc.,
527 F.3d 1379 (Fed. Cir. 2008) .................................................. 48

James B. Nutter & Co. v. Estate of Murphy,
478 Mass. 664 (2018) ................................................................. 37

Jones v. Secord,
684 F.3d 1 (1st Cir. 2012) ........................................................... 49

K-Mart Corp. v. Oriental Plaza, Inc.,
875 F.2d 907 (1st Cir. 1989) …………………………………..42, 43

Keystone Driller Co. v. Gen. Excavator Co.,
290 U.S. 240 (1933) ................................................................... 42

Lexington Ins. Co. v. Gen. Accident Ins. Co. of Am.,
338 F. 3d 42 (1st Cir. 2003) ....................................................... 48

Martinez v. Petrenko,
792 F.3d 173 (1st. Cir. 2015) ..................................................... 36

Merrimack Valley Nat'l Bank v. Baird,
372 Mass. 721 (1977) ................................................................. 37

Metro. Life Ins. Co. v. Cotter,
464 Mass. 623 (2013) .................................................................. 40

Ober v. National Casualty Co.,
318 Mass. 27 (1945) .................................................................. 28

OneBeacon Am. Ins. Co. v. Travelers Indem. Co.,
465 F.3d 38 (1st Cir. 2006) ……………………………..26, 27, 28, 37, 40

Ortiz v. Gaston Cnty. Dyeing Mach. Co.,
277 F.3d 594 (1st Cir. 2002) …………………………………………..14, 23

Page v. Higgins,
150 Mass. 27 (1889) .................................................................. 48

Patton v. Mid-Continent Systems, Inc.,
841 F.2d 742 (7th Cir. 1988) ………………………………………44, 45, 46

Polaroid Corp. v. Travelers Indem. Co.,
414 Mass. 747 (1993) .................................................................. 26

Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,
324 U.S. 806 (1945) .................................................................. 42

Pride Hyundai, Inc. v. Chrysler Financial Co.,
369 F.3d 603 (1st Cir. 2004) ……………………………………………37, 38

Reyes-Caparros v. Garland,
26 F.4th 516 (1st Cir. 2022) ........................................................ 24

Salem Laundry Co. v. N.E. Teamsters & Trucking Indus. Pension Fund,
829 F.2d 278 (1st Cir. 1987) ........................................................ 30

Sancta Maria Hosp. v. Cambridge,
369 Mass. 586 (1976) .................................................................. 26

St. Eng'g Marine, Ltd. v. Thompson, Maccoll & Bass, LLC, P.A.,
88 F.4th 27 (1st Cir. 2023) …………………………………….……..24, 31, 32

Texaco P.R., Inc. v. Dep't of Consumer Affairs,
60 F.3d 867 (1st Cir. 1995) …………………………………....31, 32, 42, 43

Thomas v. Del Biaggio,
527 B.R. 33 (N.D. Cal. 2014) …………………………………….44, 45, 46

Torrao v. Cox,
26 Mass. App. Ct. 247 (1988) .................................................... 33

Torres-Rios v. LPS Lab.,
152 F.3d 11, 15-16 (1st. Cir. 1998) ........................................... 36

United States v. 15 Bosworth St.,
236 F.3d 50 (1st Cir. 2001) ....................................................... 23

Ward v. Ward,
70 Mass. App. Ct. 366 (2007) .................................................. 48

White v. Fessenden,
358 Fed. Appx. 208 (1st Cir. 2009) .......................................... 48

**Statutes & Other Authorities:**

Fed. R. Civ. P. 52 ...................................................................... 23

Muddy Watters, You Can't Lose What You Ain't Never Had,
The Chess Box (MCA Records 1989) ........................................ 31

Restatement (Second) of Contracts §153 .................................... 40

Restatement (Second) of Contracts §155……………………...24, 25, 26, 29

Restatement (Second) of Contracts §158…………………………21, 39, 48

Restatement (Second) of Contracts §161…………………………31, 32, 33

Restatement (Second) of Contracts §166………..……………..31, 32, 33, 34

## STATEMENT REGARDING ORAL ARGUMENT

This appeal concerns Appellant Dahua Technology USA, Inc.'s restatement of its flawed arguments from trial and their effort to misrepresent the district court's findings of fact. Massachusetts law is well-settled on mutual mistake and reformation jurisprudence. Dahua simply failed to meet its evidentiary burden to prove a prior oral agreement between the parties to a term to which it could ask the court to reform a contract.

The district court was crystal clear in its determination: "Although Dahua argues that there was a verbal agreement for $680,000 in severance, it points to no specific oral agreement"; and again, "the court finds no prior oral agreement to which the Release Agreement can be reformed to reflect." Addendum ("Add.")[1] at 23. The statement by Dahua that the parties had reached agreement on a total payment amount of $680,000 is purely fictional.

The district court further found that given the totality of the circumstances presented, it would not grant Dahua's request for equitable relief in accordance with the law and the Restatements Dahua now misinterprets.

Finally, the district court held correctly that Dahua could not pursue arguments it had waived as a matter of law, raised for the first time after trial.

---

[1]     Our citations to Addendum is a reference to the materials attached to Dahua's Brief as "Addendum" as that is the only place those documents appear in the record to this Court.

In short, at the conclusion of a ten-day bench trial and several rounds of post-trial briefing, the district court determined that Dahua had failed to meet its burden on reformation or its contract defenses, and that the contract must therefore be enforced as written, as a matter of law.

Judge Talwani's finding of facts are clear and well-supported by the record, and her determination on the credibility of the parties her rulings of law are consistent with this Court's jurisprudence and Massachusetts law.

While Appellee would be honored to appear before this Court, Appellee submits that there is no need for oral argument in this matter. Dahua's appeal should be denied on the papers.

# INTRODUCTION

Reforming a contract term in a mutual mistake case works if a party can show a prior agreement to reference. In this case, the district court found none. Without that prior agreement, a party can still seek equitable relief, but it must then show that special circumstances warrant it. After ten days of trial and multiple rounds of briefing and hearings, the district court found Dahua's showing to be deficient and ordered that its severance agreement with Zhang be enforced as written and signed. The district court entered judgment against Dahua, and this Court should affirm that ruling.

By way of background, Appellee Feng Zhang ("Zhang") was recruited by Appellant Dahua Technology USA, Inc. ("Dahua") and its parent company, Zhejiang Dahua Technology Co., Ltd., to leave his job of over fifteen years to come work for them. After much consideration and negotiation, Zhang agreed to take the role of overseeing Zhejiang's North American operations as its Chief Strategy Officer and Vice President, and to serve as President of its North American subsidiary. Zhang would be employed by the parent and paid by the subsidiary, both of which were led by Zhejiang's Chairman, Liquan Fu ("Fu").

The parties negotiated a one-page employment agreement with a guaranteed three-year term and compensation of $510,000 per year, in addition to performance-based bonuses and incentives. Zhang began working in January

2015, and in 2016 he earned both a performance-based bonus of $400,000 and a substantial stock grant.

In August 2017, Fu flew in from China, with a team in tow, including a bilingual lawyer, Hiyan Yue. Fu had come to America to convince Zhang to take a new role at the parent company's headquarters back in China, and they met at Fu's hotel to discuss it. When Zhang declined the move to China because his kids were in school here, Fu offered him a senior advisor role with the parent company that he could perform from Boston, and Fu assured him they would "take care" of his 2015 employment agreement. Taking care of Zhang's 2015 agreement required nothing more than a continuation of his salary and benefits.

Then, Fu and Zhang drove to the company's offices where Fu's lawyer presented Zhang with documents containing an entirely new bargain. Even a superficial read of them showed Dahua had proposed a new arrangement. Dahua had changed the discussion to one about termination of Zhang's employment, with an at-will consulting gig and a raft of new restrictions, including noncompetition requirements, a nondisparagement clause, a confidentiality agreement and releases – all for only $680,000 in total severance, an amount Zhang was already owed free and clear. As the district court found, the new agreements were "entirely at odds" with what Zhang and Fu had discussed at the hotel. Everything had gone back to square one.

There is no dispute that Zhang rejected Dahua's new deal.

What was going on? Dahua's lawyers knew the stakes were incredibly high. They had outlined it all in an internal strategy memo before coming to Boston, and they were determined to get a different deal than what Fu and Zhang discussed at the hotel. They knew that Zhang's speaking out or competing could have upended an acquisition code named "Project Mohawk" (worth $500 million in additional revenue) or caused the company $700-$800 million in losses given their product security problems – none of which Dahua disputed at trial. To satisfy their desire to silence Zhang, they needed a very different bargain.

Fu's lawyer returned hours later with more revisions, and the final version contained a payment provision that read as follows: "monthly payments to [Zhang] in the amount of $680,000 for sixteen (16) months." It was written in English, and although Fu did not speak or read in English, his bilingual lawyer certainly did. However, despite her presence, Fu did not have the contract translated before signing. Both Fu and Zhang signed, and the contract was complete.

Then, in January 2018, after the $500 million Project Mohawk acquisition was complete, Dahua approached Zhang and insisted the August 2017 severance agreement had a scrivener's error in it. Zhang was asked to reform the agreement to say that he would only get $680,000 total. Zhang declined. Just as he had rejected $680,000 total for severance in August 2017, he rejected the new proposal

in January 2018.  Dahua's response?  They sued Zhang in district court and asked the Judge to declare that $680,000 would be all Zhang would get.

During the ten-day bench trial before the district court, Judge Talwani reviewed the evidence, listened to experts, heard testimony from Fu and Zhang, and ultimately determined that when Zhang reached the office, Dahua's new documents were such a departure from the discussion Fu and Zhang had at the hotel, that any understanding from their hotel discussions no longer applied.

Yet, the district court also found that Zhang knew or should have known when he received the final version later at the office, that moving "from zero to $10.8 million" was just too large a jump.  The district court held it was a mistake. But without a prior agreement to reform that number to, the district court inquired into its equitable powers and engaged in a careful, reasoned analysis of whether it should exercise those powers.  Its conclusion?  Given the amounts at issue, the circumstances presented, the fact that Dahua had come to court with unclean hands, the resultant injustice to Zhang (who had detrimentally relied upon and complied with the contract in question's terms), and the improper windfall to Dahua who would keep the benefits without additional compensation, the district court declined Dahua's request for equitable relief.

Did the district court understand the stakes?  Yes.  And with those in mind, it declined to reform the agreement.  Well, what if Dahua's mistake had been for

dramatically more money, or the circumstances dramatically different? Then, perhaps the situation would have caused the district court's equitable analysis to reach a different conclusion. Here, however, the district court found that holding Dahua to the $10.8 million contract amount was the right answer.

Dahua now appeals the district court's judgment to this Court. As set forth herein, Dahua's appeal is based on a misunderstanding of law and a misrepresentation of the facts found by the district court. In short, Dahua's Brief does little to advance its cause, and this Court should not overrule the district court's carefully reasoned and well supported decision.

## STATEMENT OF THE ISSUES

1.    Did the district court err by declining to reform the severance amount, where the facts showed no prior agreement to any severance amount?

2.    Did the district court err by declining to grant equitable relief where it found no injustice to Dahua, where Dahua was found to have acted with unclean hands, and where doing so would cause an improper windfall to Dahua and injustice to Zhang?

3.    Did the district court err by entering judgment against Dahua on its claim for breach of the implied covenant of good faith and fair dealing, where it found as a matter of fact that Zhang had faithfully performed his obligations under the contract?

## STATEMENT OF THE CASE

This Statement of the Case will focus on what Dahua gets wrong in the Statement of the Case.

Cutting straight to the gravamen of Dahua's appeal, Dahua urges this Court to find facts the district court never found, namely that, when Zhang and Fu met at the hotel in the morning, they reached an oral agreement that Dahua would pay Zhang $680,000 in exchange for a severance agreement, releases and substantial restrictions. The district court found no such thing, and thus could not reform the severance contract to that amount. Failing that, Dahua simply urges this Court to do for Dahua now what they could not support below: to exercise equitable powers to just rewrite the contract anyways.

## I.   THE DISTRICT COURT'S EVALUATION OF DAHUA'S REFORMATION CLAIM.

As to the critical facts relating to Dahua's claim for reformation, the district court explicitly addressed the question concerning whether there was an earlier verbal agreement to $680,000 and found that the evidence simply did not bear out Dahua's claim, noting further that even Dahua itself could do no better: "Although Dahua argues that there was a verbal agreement for $680,000 in severance, it points to no specific oral agreement." Add. at 23.

In that regard, the district court specifically addressed both the morning discussions at the hotel and then the agreements presented later at the office, and it

found that the very understanding Zhang thought he had with Fu at the hotel was "<u>entirely at odds</u>" with the deal Dahua sought at the office. Add. at 12 (emphasis added).

First, we explore the findings regarding the discussions Zhang and Fu had at the hotel in the morning. As an initial matter, it is important to understand the parties' mindset, because Dahua had given Zhang no indication that it was terminating him, and in fact had recently given him a substantial performance-based stock award. Add. at 5. At the hotel, Fu explained to Zhang that he "wanted to transition Zhang to a different position within Zhejiang" (the parent company). Add. at 9.

As to Zhang's understanding when he left the conversation with Fu at the hotel, the district court found specifically that:

> Zhang understood Fu to be offering as an alternative that Zhang serve as a senior corporate advisor to "keep running Project Mohawk." Fu also assured Zhang that in the new role "there's other things [he] could help with" "in mainly [the] USA," including helping the young person who would take over running Dahua. <u>Zhang told Fu he would be happy to take on this role, but first wanted to know how Zhejiang would resolve the remaining terms of the 2015 Employment Agreement. Fu told him, "we will follow whatever the agreement says" and Zhang responded "if he can take care of the agreement, I'm ok…"</u>
>
> Zhang asked what Fu would ask him to sign in connection with these changes, and Fu said that the company would "make sure you're comfortable, treat you well." Zhang "thanked him for that."

Add. at 10 (emphasis added) (internal citations omitted).

…

> When Zhang and Fu concluded those discussions, Zhang believed Fu had proposed that Zhang would give up his role as Chief Strategy Officer and Vice President and President of North American and Enterprise Sales and would instead serve as a senior corporate advisor for Zhejiang, focusing on the parent company's high priority retail-based strategic initiatives. It was in connection with this <u>transition</u> within Zhejiang that he would be paid an additional $240,000 per year for two years <u>while continuing to receive the salary and benefits for the remaining sixteen months of the contract</u>.

> Add. at 23 (emphasis added).

The 2015 Employment Contract required nothing more from Zhang other than to simply receive that salary and benefits. [1]  <u>See</u> Appendix (App'x) at 1861 (2015 Employment Agreement).  No mention of any severance agreement, releases, non-competition restrictions, confidentiality clauses, nondisparagement provisions and no discussion of an at-will consulting gig with the subsidiary.  <u>See</u> <u>id</u>.; Add. at 10-14.  Stated otherwise, per the hotel discussions, Zhang would have a new role with new compensation, <u>and</u> the 2015 agreement payments and benefit would just continue on for sixteen months without restriction.  A very simple package.

---

[1]  Dahua's lawyers confirmed that "the '[b]aseline of [Zhang's] severance package' would require: (1) salary, bonus and other benefits from the date of termination through the end of the three-year term and (2) '[a]dditional compensation to entice him to release all claims against Dahua.'"  Add. at 6-7.

Then, at the office, Dahua presented Zhang with paperwork that changed the deal to one "entirely at odds" with what Zhang and Fu had discussed at the hotel. Add. at 13. Not only did the agreements offered at the office fail to track the hotel discussions, they contained a host of new terms – none of which had ever been sought from Zhang, and they dramatically departed from the understanding Zhang had related to the 2015 Employment Agreement and his new position. Id. Dahua had changed the discussion to termination of Zhang's employment with a release and the host of post-employment restrictions. Id. at 12-13.

It turns out there was a reason for the shift, as Dahua purposefully sought more. Dahua's own lawyers had prepared a strategy memo in advance of Fu's trip. Id. at 7. The memo laid out their concerns in detail, along with Dahua's risks and their duplicity. Id. at 7; see also, App'x at 1900-1902 (internal strategy memo). Among their concerns were that Zhang could: sue for breach of contract (id. at 6), "use insider knowledge to disparage the company" (id.), "blow the whistle on vulnerability of [Zhejiang] products or operations" (id.), "publicize serious product-related security issues the company had been concealing" that would have cost the company up to $700-$800 million in damages (id. at 45; see also, Supp. App'x at p. 95:3-21 (sealed testimony)), and jeopardize Zhang's work on the secret acquisition (Project Mohawk) that was expected to result in $500 million in additional revenue for Dahua (id.). Dahua rebutted none of this evidence at trial.

The need to eliminate the risks Zhang posed was so serious that Dahua's lawyers advised in writing that Dahua should trick Zhang:

> In [Fu's] discussion with Frank, it would be helpful for Frank to believe that the company has the basis to terminate his employment for misconduct due to his failure to follow corporate policies but, rather than go that route, we are willing to allow him to remain with the company in a different capacity.

> Add. at 8.

Yet, as the district court found, "Nothing in the record at trial suggests that Zhang had engaged in any misconduct." Id. The duplicity was concerning, and once Zhang reached the office, Dahua unfurled its bait and switch. Id. at 12. To that end, the new agreements presented to Zhang required,

(i)    a general release of all claims against Dahua and Zhejiang arising out of his employment, but excluding inter alia, "any claims for breach of [the Release] Agreement";

(ii)    a non-competition clause applicable while Zhang is receiving severance payments that bars work with a Dahua or Zhejiang competitor doing business in the United States or China;

(iii)    a mutual non-disparagement clause;

(iv)    a confidentiality clause as to the "contents and all information pertaining to [the] negotiations" and the agreement;

(v)    contingent separation benefits that require Zhang's compliance with the agreement's terms to receive and retain the severance payments; and

(vi)    acknowledgments that (a) the agreement "relinquish[es] any or all rights [Zhang] ha[d] or may have [had] with regard to the stocks of Parent or the Company as defined in the offer letter

dated November 5, 2015" and constitutes a "waiver and release" of claims "to anything of value to which [Zhang] [was] already entitled" and that (b) "this Agreement is a full and accurate embodiment of the understanding between you and the Company, and that it supersedes any prior agreements or understandings made by the parties, including the Offer of Employment between you and Dahua dated November 5, 2015, which shall be terminated in all respects, but excluding the offer letter entered into by the parties of even date.

Add. at 18.

The new agreements did <u>not</u> do what Fu told Zhang he would do with his existing 2015 Employment Agreement, which was, "we will follow whatever the agreement says." Add. at 10.[2]

As the district court found, Dahua sought a new bargain at the office:

Instead of an employment agreement for a two-year term, with Zhejiang and continuation of his existing rights and benefits, the consulting agreement included no guarantee of work, or entitlement to any of the rights or employee benefits he had under the 2015 Employment Agreement.

<u>Id</u>. at 12-13.

This departure was further confirmed by Fu's lawyer Yue, who told her outside counsel (LeRegulski) that "'<u>things are not certain</u>' as to Zhang's continuing <u>employment</u>," so the lawyers continued to work on two sets of contracts." <u>Id</u>. at 15 (emphasis added). In other words, although Fu and Zhang discussed continued

---

[2]      As the district court found, "Dahua does not seek to reform the Release Agreement and the 2017 Employment Agreement to conform to any such agreement of continued employment with Zhejiang." Add. at 23.

employment at the hotel, once they reached the office, Dahua changed the game and everyone on the inside knew it, too.

Now, here's where Dahua stretched before the district court: Dahua argued that it could cherry pick from five words from the hotel discussion where Fu promised to "follow whatever the agreement says," and then conclude that Zhang therefore agreed he would get only the sixteen remaining months of salary from his 2015 Employment Agreement as part of the agreements later presented at the office – even though those new agreements presented a fundamentally different deal "entirely at odds" with the one discussed at the hotel. See Add. at 24.

That's not the way contract bargaining works, and the district court saw straight through it, quite explicitly:

- "Although Dahua argues that there was a verbal agreement for $680,000 in severance, it points to no specific oral agreement." Add. at 23.

- At the hotel, Fu and Zhang "did not discuss terminating Zhang's employment with Zhejiang and did not discuss a Release Agreement at all. Where Zhang's separation of employment from Zhejiang and the additional restrictions were not discuss at all, the court finds no prior oral agreement to which the Release Agreement can be reformed to reflect." Id. at 24.

- "In sum, the court finds that there was no prior oral agreement with Dahua concerning Zhang's separation of employment from Zhejiang." Id. at 24.

- "Third, Zhang and Dahua had no agreement concerning

> Zhang's separation of employment from Zhejiang or related severance prior to Zhang and Dahua entering into the written Release Agreement. See <u>id</u>. at 22–23. The 'sticking points in the negotiations between the parties was . . . the termination of Zhang's employment.' Id. at 27." <u>Id</u>. at 36.

The district court also addressed Dahua's cherry picking argument more directly:

> Dahua focuses on Fu's promise that Zhang would continue to receive what he was entitled to under the 2015 Employment Agreement. Dahua translates this promise as equal to the remaining salary under that agreement, which totaled $680,000. But what Zhang was entitled to under the 2015 Employment Agreement was not just his salary, but a position with the parent company rather than its subsidiary, and 16 months of protection from termination of his employment (compensable with additional damages if he was terminated early).

> Add. at 24.

Once at the office, they were back at "zero." The district court confirmed this twice in its Order. <u>Id</u>. at 28, 29. It's also why when Zhang rejected those contracts out of hand, he told Dahua's counsel "this is not what I discussed with Mr. Fu…" <u>Id</u>. at 13, 29.

Dahua's averment in its Statement of the Case to the district court's finding that, "the sticking point in the negotiations between the parties was not the amount of severance pay but termination of Zhang's employment" is right (Dahua Brief at 13), and it does nothing to change the outcome because of the district court's explicit finding that there was no prior oral agreement to any severance number. <u>Id</u>. at 23-24. Dahua's further note in its Statement of the Case that the final version

13

conformed to the understanding at the office (Dahua Brief at 10) falls flat, too, as the district court found that the final agreements were no better – containing all the restrictive covenants and releases that brought everything back to "zero" in the first place. Id. at 17.

As the district court found, while the $10,880,000 severance figure may have been a mistake, Dahua had failed to prove that $680,000 was an agreed upon number the parties in for inclusion in the severance deal the parties eventually signed. Add. at 23-24.

So, why then did the district court find a mistake? Because the district court found that Zhang "had no reason to think that Dahua would increase the severance from zero to $10,880,000." Id. at 28-29. Yet, without a prior agreement to which Dahua could point for reformation in light of the mistake, the district court held it could not reform the agreement. Id. at 25.[3] After all, there was nothing to reform it to. Id.

---

[3] Dahua does not raise any argument in this appeal about its failed mutual and unilateral mistake defenses, and as such, has waived its right to do so. Ortiz v. Gaston Cnty. Dyeing Mach. Co., 277 F.3d 594, 598 (1st Cir. 2002) ("We repeatedly have warned litigants that failure to brief an argument will result in waiver for purposes of appeal."). This comes as no surprise as Dahua accepts the district court's allocation to Dahua of the risk of mistake, which negates both of their mistake defenses. See Dahua Tech. USA Inc. v. Feng Zhang, 988 F.3d 531, 539 (1st Cir. 2021).

## II.  THE DISTRICT COURT'S DECISION TO DENY DAHUA'S GOOD FAITH AND FAIR DEALING CLAIM.

The district court denied Dahua's claim for breach of the covenant of good faith and fair dealing, reasoning that the claim "falls flat" where was "no suggestion that Zhang failed to abide by the contract terms," honestly and in good faith, until after Dahua terminated him, when Zhang then sought to enforce the Agreement.  Id. at 26.

## III.  THE DISTRICT COURT'S DECISION TO DENY DAHUA EQUITABLE RELIEF.

With no briefing before this Court from Dahua on the district court's decision in connection with Dahua's mutual or unilateral mistake defenses, we turn to the district court's decision on equitable relief.

On all fronts, the district court found Dahua's actions troubling, with bad faith efforts to cheat Zhang and with deliberate risk taking.  Add. at 30-31.  The district court described Dahua's bad faith:

> Dahua's counsel wrote a strategy memo advising disingenuously that "In [Fu's] discussion with Frank, it would be helpful for Frank to believe that the company has the basis to terminate his employment for misconduct due to his failure to follow corporate policies but, rather than go that route, we are willing to allow him to remain with the company in a different capacity."

> Add. at 8 (emphasis added) (internal citation omitted); see also, App'x at 1905.

This, even though the district court found "[n]othing in the record at trial

suggests that Zhang had engaged in any misconduct." Id.

The district court further found Dahua's deliberate risk taking to be evident:

> Dahua drafted the Release Agreement with a full panoply of lawyers. Fu left those lawyers operating without any information as to the dollar amounts to include in the agreement until the very end of the negotiations … Moreover, Fu's decision to then approve and sign the Release Agreement where it was presented to him in a language he could not read or understand—despite translation being an option—indicates he entered into the agreement with the kind of "deliberate risk taking" that results in assignment of the risk. Accordingly, Dahua bore the risk of mistake as to the dollar amount in the Release Agreement.

> Add. at 30 (emphasis added), citing Dover Pool & Racquet Club, Inc. v. Brooking, 366 Mass. 629, 633 (1975).

With respect to Zhang, the district court found that awarding equitable relief to Dahua would cause Zhang undue harm where he signed full releases, a noncompetition agreement he ultimately served, and critical confidentiality and nondisparagement provisions he honored. Add. at 32. As the district court held:

> Zhang, in turn, would be harmed, where the practical result would be that his employment with Zhejiang will have been terminated without payment of damages due under the 2015 Employment Agreement and he will have provided the benefit of the non-compete and other contract terms to Dahua and Zhejiang without compensation.

> Id.

With respect to the windfall to Dahua, the district court found that providing equitable relief to Dahua would ignore the evidence that Dahua and Zhejiang both received substantial value from Zhang's performance of his obligations under the

16

agreement without additional compensation.  Add. at 23; Add. at 45 ("The court thus rejects Dahua's proposal to reduce Zhang's payments for performance *after* he has already finished performance.") (emphasis in original).

Further to the inquiry, the district court also evaluated the grave risks Dahua faced at that time, especially those set out in Dahua's own internal strategy memo introduced at trial.  Id. at 6-7 and 45; see also, Supp App'x at p. 94:1 - 95:21.

The district court then invited further briefing and held another oral argument (Add. at 32-33), none of which the court ultimately found persuasive (Add. at 46).

In its further findings of fact, the district court reiterated its point in connection with its equitable considerations:

> Dahua's characterization of the mistake as a "scrivener's error" is not consistent with this court's findings as to how the mistake in the severance term arose. Fu's mistake followed Dahua and Zhejiang's deliberate choices in negotiations: to contract around many of the protections and benefits Zhang had secured in his 2015 Employment Agreement with Zhejiang while leading Zhang to believe those protections would continue; to maintain secrecy even from Dahua's team of attorneys as to Zhang's salary; and to decline to have the final agreement translated into a language Fu could read or understand before signing the agreement.

> Add. at 36 n.2 (internal citations omitted).

In short, the district court found that "Dahua has not demonstrated that payment of nearly $11 million would be an injustice sufficient to [exercise equitable discretion] and has not suggested any remedy that would avoid injustice

17

to Zhang and protect his reliance interests." <u>Id</u>. at 44-45.

Quite clearly, the district court knew the stakes. <u>Id</u>. 44-45. It understood the dollar amounts at issue. <u>Id</u>. If the severance number was indeed far off, the district court's evaluation of the circumstances would have reflected it. <u>Id</u>. In a hypothetical case – perhaps where the numbers were substantially greater – it may have warranted a different outcome. However, the $10.8 million amount was on the district court's mind at the time it found as a matter of fact and law that the amount was not so high under the circumstances that it would compel the court from to grant equitable relief to Dahua. <u>See id</u>. at 44 ("There are no special circumstances here that justify the court fashioning equitable relief to reform an express contract.").

## SUMMARY OF THE ARGUMENT

Dahua's central problem? After ten days of trial testimony, multiple rounds of substantial post-trial briefing and hearings, Dahua failed to answer the critical question the district court had posed over and over again: If you want the court to reform your severance agreement, we must know, what's the severance number that the parties previously agreed upon that was missing from the release agreement they ultimately signed?

The district court understood that in a reformation case, it need not find a fully-integrated prior agreement. But rather that, "[c]entral to this doctrine is the

fundamental underpinning that the parties had reached an agreement <u>on a point</u> which they intended to enshrine in the written contract, but which, for some reason, was mistakenly omitted from that contract." Add. at 22 (emphasis added).

Yet, when the district court examined all of the testimony, the parties' negotiations, course of conduct, historical relationship, existing contracts, internal memos, emails, draft agreements, expert testimony, … in short, everything put in front of it, including time to query the lawyers on multiple occasions and review multiple rounds of briefing, the district court came to the simple conclusion that, "[a]lthough Dahua argues that there was a verbal agreement for $680,000 in severance, it points to no specific oral agreement." <u>Id</u>. at 23. The district court had found a mistake, but no agreed upon term it could point to for reformation, because prior to the agreements at the office there was never any negotiation (let alone agreement) for severance it could look back upon.

The issue boils down to the district court's evaluation of the discussions between Fu and Zhang at the hotel and the negotiations at the office. At the hotel that morning, Fu and Zhang were discussing contract continuation and transitioning to a new role at the parent company. But once at the office the departure was dramatic. Dahua now sought something "entirely at odds" with the hotel discussions. Dahua had changed the discussion to termination of Zhang's employment with a release and a host of post-employment restrictions. And, the

district court recognized the difference.

Any understanding between the parties from the hotel that morning no longer carried over to the office. Yes, the district court found that Zhang knew or should have known that the $10.8 million was a mistake. But it did so because it was too big a jump "from zero" – not because it found a different term to which the parties had agreed. As the district court held in two places during its mistake analysis:

> Zhang had no reason to think that Dahua would increase the severance <u>from zero</u> to $10,880,000. Add. at 29 (emphasis added).

> The discrepancy between $10,880,000 (the amount in the agreement) and the <u>initial zero dollar offer</u>, with no discussions of intermediate offers, supports Dahua's claim of mistake. Add. at 28 (emphasis added).

Showing its cards on this point, Dahua's Brief quotes the same sentence from the district court's order but hides that critical fact from this Court in its papers, using ellipses to replace the two words "from zero." <u>See</u> Dahua Brief at 13 and 26. And they do it three times, never even mentioning the word "zero" anywhere in their Brief:

> Zhang had no reason to think that Dahua would increase the <u>severance … to</u> $10,880,000. Dahua Brief at 13 <u>and</u> 26 (emphasis added).

> The discrepancy between $10,880,000 … and the <u>initial … offer</u>, with no discussions of intermediate offers, supports Dahua's claim of mistake. Dahua Brief at 13 (emphasis added).

Dahua was certainly entitled to change the negotiation parameters and seek a

different deal once Zhang arrived at the office. But when Dahua did that, it was starting anew – as the district court said, "from zero." Add. at 28, 29.

Notably, neither Dahua nor its Amici contest the district court's decision on Dahua's mutual and unilateral mistake defenses, or the tests this Court set out in Dahua Tech. USA Inc. v. Feng Zhang, 988 F.3d 531 (1st Cir. 2021), and with those arguments waived, we move on.

This leaves the district court's question as to whether it could simply fashion its own remedy as Dahua's final lifeline. Ultimately, the court declined, concluding that:

> Dahua has not demonstrated that payment of nearly $11 million would be an injustice sufficient to invoke [Restatement 158(2)] and has not suggested any remedy that would avoid injustice to Zhang to protect his reliance interests. … Dahua merely argues that Zhang could not have reasonably expected to receive nearly $11 million in severance payments, but ignores the evidence that both Dahua and Zhejiang received the benefit of Zhang's performance of his obligations under the contract, and the absence of evidence that those benefits were not of substantial value to Dahua and Zhejiang.

> Add. at 45 (internal citation omitted).

In other words, the district court knew the stakes. It understood the $10.8 million amount well, and it knew that Dahua had been urging it to find that this was just too much money. Add. at 44-45. Yet, the district court heard the testimony and evaluated the equities. Id. If the amount was indeed too far off given the circumstances, the court's evaluation would have reflected it.

21

Rather, as the court found, "There are no special circumstances here that justify the court fashioning equitable relief to reform an express contract." Add. at 44. In a hypothetical case – perhaps where the numbers were substantially greater – it may have warranted a different outcome. Here, however, under these facts and circumstances, the district court disagreed. Add. at 44. The amount was not so high that it would grant equitable relief to Dahua. Id.

In much the same way, the district court also declined Dahua's claim for good faith and fair dealing, which it raises again here. Dahua's claim, in a nutshell, is that, by insisting on payment in accordance with the terms of the contract under these circumstances, Zhang was in breach of his obligations. As Dahua did below, it simply turns the classic legal claim on its head. Of course, refusing to change a contract payment term to one Dahua urges cannot be conduct that qualifies. Brazenly, Dahua now seeks a return of all amounts paid, and it even goes so far as to calculate interest on it.

In reaching its final conclusion, the district court properly considered this Court's earlier decision in this case, as well as the law, the Restatements, and its own findings of fact. In the end, Dahua simply failed to meet its burden of proof for reformation, and its unclean hands and substantial benefit ruined the rest for it. Dahua's briefing to this Court raises nothing to change the outcome.

The district court's judgment should be affirmed.

## **ARGUMENT**

This appeal is as much about what Dahua chooses to argue, as it is about what Dahua chooses to ignore or even hide from this Court. In short, Dahua puts all its eggs into the reformation basket based on their prayer that an agreement on the severance term had been reached. But they got it wrong, and the district court's decision should be affirmed.

## I. THE DISTRICT COURT PROPERLY CONCLUDED DAHUA FAILED TO PROVE ITS CONTRACT REFORMATION CLAIM.

### A. As an initial matter, Dahua waives its argument to its defenses under unilateral and mutual mistake.

As an initial matter, by not raising in its Brief the district court's ruling that Dahua failed to meet its burden of proof on its defenses, namely unilateral and mutual mistake as set forth by this Court in Dahua Tech. USA Inc. v. Feng Zhang, 988 F.3d 531 (1st Cir. 2021), Dahua has waived its right to do so Ortiz v. Gaston Cnty. Dyeing Mach. Co., 277 F.3d 594, 598 (1st Cir. 2002) ("failure to brief an argument will result in waiver for purposes of appeal."). Thus, we focus here on the points Dahua raises in its Brief.

### B. Standard of Review.

Following a bench trial, legal conclusions are reviewed *de novo*, and "factual findings are, of course, reviewed for clear error." See United States v. 15 Bosworth St., 236 F.3d 50, 53 (1st Cir. 2001); Fed. R. Civ. P. 52(a)(6) ("Findings

of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.").  "The clear error standard is deferential and, where it applies, [the First Circuit] will not overturn a factual finding unless — on the whole of the record — we are 'left with the definite and firm conviction that a mistake has been committed.'"  Ferreira da Costa v. Albefaro de Lima, 94 F.4th 174, 181 (1st Cir. 2024) (declining to overturn trial Court's findings of fact, where it "did not weigh the evidence as [appellant] would have preferred – but that hardly amounts to clear error"), quoting St. Eng'g Marine, Ltd.. v. Thompson, Maccoll & Bass, LLC, P.A., 88 F.4th 27, 32 (1st Cir. 2023); Reyes-Caparros v. Garland, 26 F.4th 516, 523 (1st Cir. 2022) (declining to overturn district court's thorough findings of fact, even where the district court rejected an advisory verdict from a jury), citing Cumpiano v. Banco Santander Puerto Rico, 902 F.2d 148, 152 (1st Cir. 1992) (when reviewing for clear error, appellate courts "ought not to upset findings of fact . . . unless, on the whole of the record, [they] form a strong, unyielding belief that a mistake has been made").

**C. The district court did not misapply Massachusetts law or Restatement §155.**

We begin with Dahua's first argument, which concerned §155 of the Restatement (Second) of Contracts.  A close reading of §155 demonstrates Dahua's error here.  Dahua clings to the part which states:

> If the parties reach agreement as to only part of a prospective bargain, and if they are later mistaken in their attempt to put in writing this agreement together with such other terms as will make a contract, reformation is still an appropriate remedy.

> Restatement (Second) of Contracts §155 cmt. a.

However, Dahua ignores the fundamental test under §155, namely that:

> …reformation is available when the parties, <u>having reached an agreement and having then attempted to reduce it to writing, fail to express it correctly in the writing</u>.

> <u>Id</u>. (emphasis in original).

Here, there was no agreement at the hotel which the parties attempted to reduce to writing. Add. at 24, 24, 36. Rather, the parties negotiated a different agreement altogether at the office. The district court addressed §155 explicitly, finding that there was no mistake "with respect to <u>the reduction to writing of a prior agreement</u>" (emphasis in original, citing to §155), as the parties did not have any prior agreement to pay $680,000 as part of a severance deal with post-employment restrictions. <u>See</u> Add. at 41. Dahua's tortured reading of §155 is wrong.

### D. Despite Dahua's allegation to the contrary, Judge Talwani understands how contract negotiations work.

Dahua claims that the district court did not understand that agreement on a point could be enough to warrant contract reformation. Dahua Brief at 30-37. Dahua's argument demonstrates nothing more than a failure to read the district

court's Order. To be sure, the second sentence of the very same paragraph in the Order Dahua references for its misguided argument states the very rule Dahua alleges the district court did not understand: "Central to this doctrine is the fundamental underpinning that the parties had reached an agreement on a point which they intended to enshrine in the written contract, but which, for some reason, was mistakenly omitted from that contract." <u>Compare</u> Dahua Brief at 21 <u>with</u> Add. at 22, quoting <u>Caron v. Horace Mann Ins. Co.</u>, 466 Mass. 218, 223 (2013), (citing <u>Sancta Maria Hosp. v. Cambridge</u>, 369 Mass. 586, 595-96 (1976) and <u>German Am. Ins. Co. v. Davis</u>, 131 Mass. 316, 317 (1881)).

In other words, the district court certainly understood the concept from §155 that "the prior agreement need not, however, be complete and certain enough to be a contract." Add. at 22. To Dahua's dismay, it failed to prove any prior agreement at all.

Further in the same section of its Order, the district court also cites <u>OneBeacon</u>, <u>Caron</u>, <u>Polaroid</u>, and <u>Sancta Maria</u> – the very cases that Dahua accuses the district court of ignoring. <u>Compare</u> Dahua Brief at 30-37 <u>with</u> Add. at 22, citing <u>OneBeacon Am. Ins. Co. v. Travelers Indem. Co.</u>, 465 F.3d 38, 42 (1st Cir. 2006), <u>Caron</u>, 466 Mass. at 223; <u>Polaroid Corp. v. Travelers Indem. Co.</u>, 414 Mass. 747, 756 (1993), and <u>Sancta Maria</u>, 369 Mass. at 595. In short, the district court did not fail to consider the appropriate cases. Dahua has it wrong.

Further, Judge Talwani considered the full discussion between Fu and Zhang at the hotel and its context in order to determine whether any agreement from the hotel discussion related sufficiently to the severance deal later presented at the office that it could be carried forward. It could not. As the district court found, the agreements at the office were "entirely at odds" with the discussions from the hotel. Add. at 12. Hence, the district court's conclusion that the amount in question at the hotel started with "the initial zero dollar offer." Id. at 27.

Dahua's response is to deviate from the facts, hide the "zero" from this Court, and instead cherry pick a five word fragment about honoring the 2015 Employment Agreement with continued employment. Then, Dahua would have this Court extrapolate from that out of context fragment a number that should be applied to the separate severance negotiations. Dahua asks this Court to remain blind to the rest. See Dahua Brief at 30-37. Dahua's argument lacks any evidentiary or legal support.

This Court's decision in OneBeacon proves instructive. A mistake was found from "various forms of evidence, including affidavits, the Agreement for Judgment, and lease documents that reflected the course of conduct between [the parties]." OneBeacon, 465 F.3d at 42. There, the Court found that the evidence "paint[ed] a consistent picture" of the parties' intentions. Id. (emphasis added). This Court also noted that the opposing party "[did] not offer conflicting

27

evidence." Id. at 44. Under those circumstances, this Court determined reformation was permissible. Id. at 46.

Here, unlike OneBeacon, all Dahua could muster was the testimony of Fu, whom the district court found less credible than Zhang. See Add. at 10, fn. 5. No writings or other evidence existed from the hotel discussion, nor was there any confirmation by way of email or otherwise from any of Dahua's "panoply" of lawyers (Add. at 30). Simply put, Dahua failed to demonstrate the "consistent picture" of a prior agreement this Court required in OneBeacon, and what evidence it did present was certainly opposed by Zhang.

In that same frame, if a contract must be "read as a whole," then terms discussed during negotiations must be looked at as a whole, in context. If a payment term was part of a package deal with others, then the term cannot be an agreed upon point that can exist in isolation. See Given v. Commerce Ins. Co., 440 Mass. 207, 209 (2003) ("We interpret the words of [the contract] in light of their plain meaning, giving full effect to the document as a whole."); Ober v. National Casualty Co., 318 Mass. 27, 30-31 (1945) (similar). That adage is applicable here.

To "cut" from the hotel discussion Zhang's understanding that the 2015 Employment Agreement would be taken care of without restrictions, and then "paste" that comment into the later negotiation about severance and release would be inconsistent with the context in which understanding was made. See Arch. Ins.

<u>Co. v. The Graphic Builders LLC</u>, 36 F.4th 12, 17 (1st Cir. 2022) (to "ascertain 'the scope of a party's obligations' under an agreement, we may not 'isolat[e] words and interpret[] them as though they stood alone,' but must instead 'construe the contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose…').

Demonstrating their continued lack of comprehension on this point, Dahua's Brief evidences the fatal flaw in its reasoning more fully when it states: "There could have been no mistake in expressing the severance amount in the Release Agreement without a prior agreement to which that expression could be compared." Dahua Brief at 25. Dahua simply cannot comprehend that the district court ultimately found that Zhang knew or should have known of the mistake – not by comparing the $680,000 to a prior expression of a severance amount – but rather by reasoning that the jump "from zero" to $10.8 million was too big.[4] <u>See</u> Add. at 30.

In short, because there was no prior agreement between Fu and Zhang at the hotel <u>on a severance amount</u> that could support reformation of the agreement they ultimately signed, the district court could not reform the contract under §155 and/or Massachusetts law. <u>See</u> <u>id</u>. at 41; <u>Dahua Tech. USA Inc.</u>, 988 F.3d at 539.

---

[4]     Dahua's effort to hide the words "from zero" from this Court leave it flat, again. Context matters.

**E. Dahua continues to ignore this Court's precedent from <u>Greene v. Ablon</u>, instead arguing the wrong analysis for contract formation.**

With nowhere left to go, Dahua asks that this Court conclude the severance agreement is not a valid contract. Dahua Brief at 29. In so doing, Dahua continues to deny the existence of this Court's precedent from <u>Greene v. Ablon</u>, 794 F.3d 133 (1st Cir. 2015), which establishes that a contract was indeed formed between Fu and Zhang. Instead, Dahua asks this Court to ignore its own precedent and conduct an incorrect "meeting of the minds analysis." Dahua Brief at 29.

The district court was clear in its analysis under <u>Greene</u>, in which this Court confirmed that "mutual assent" is determined "on the basis of what [the parties] say and do." Add. at 37-39, citing <u>Salem Laundry Co. v. N.E. Teamsters & Trucking Indus. Pension Fund</u>, 829 F.2d 278, 280 (1st Cir. 1987) ("Courts determine that mutual assent, not on the basis of what goes on inside the parties' heads, but rather on the basis of what they say and do."). Given Fu's objective act of signing the contract, Zhang concluded Fu's "objective manifestation" to be forming the contract. Add. at 38, citing <u>Greene</u>, 794 F.3d at 147.

That Dahua remains unable to even mention <u>Greene</u> or <u>Salem Laundry</u> demonstrates its disregard for the applicable rules of contract formation. Dahua's argument is meritless.

## II. RESTATEMENT §§161 AND 166 DO NOTHING FOR DAHUA.

### A. Dahua never raised, and therefore waived, any argument for equitable relief under §§161 and 166.

Dahua failed to raise any argument under Restatement (Second) of Contracts §§161 and 166 before the district court, and has thus waived the argument. See Mancini v. City of Providence, 909 F.3d 32, 47 (1st Cir. 2018) (claims must articulated "face-up and squarely" to be preserved), citing Muddy Watters, You Can't Lose What You Ain't Never Had, on The Chess Box (MCA Records 1989).

### B. Standard of Review.

This Court "review[s] a district court's ultimate decision to grant or withhold an equitable remedy for abuse of discretion." Texaco P.R., Inc. v. Dep't of Consumer Affairs, 60 F.3d 867, 875 (1st Cir. 1995); see also, Ferreira da Costa, 94 F.4th at 181 (declining to overturn trial Court's findings of fact, where it "did not weigh the evidence as [appellant] would have preferred – but that hardly amounts to clear error"), quoting St. Eng'g Marine, 88 F.4th at 32.

### C. Judge Talwani's inherent equitable powers include the discretion to deny equitable relief.

The district court retains discretion to deny equitable relief based on the circumstances. See Restat. 2d of Contracts §166 cmt. a. (court has discretion to withhold relief under §166 "on grounds traditionally considered by courts of equity in exercising their discretion."). Judge Talwani did just that, in a careful and

31

considered manner. Add. at 42-46. Ultimately, referencing (i) Dahua's unclean hands, (ii) Fu's reckless behavior, (iii) Zhang's detrimental reliance, (iv) the windfall Dahua would receive having secured Zhang's compliance, and (v) the injustice to Zhang, the district court used its discretion to deny equitable relief to Dahua. Id. Of note, the district court noted that the "nearly $11 million in severance payments" were not unjust given the benefit Dahua received from Zhang's performance – which saved them over $1 Billion ($500 million for preserving Project Mohawk and another $700-$800 million by avoiding product security concerns). Id. at 45; see also, Supp. App'x at p. 95:3-21 (sealed testimony) The district court's determination was well-reasoned and supported by the record. This Court should not disturb it. See Texaco P.R., Inc., 60 F.3d at 875; Ferreira da Costa, 94 F.4th at 181; St. Eng'g Marine, 88 F.4th at 32.

**D.     Restatement Sections 161 and 166 are not applicable to this case.**

Dahua misunderstands §161, which treats circumstances where "A person's non-disclosure of a fact known to him is equivalent to an assertion that the fact does not exist." Restat. 2d of Contracts, §161. No such question of a factual assertion is relevant here, and the inquiry should end.[5]

---

[5]      Further, as set forth in §161 cmt. a, "Non-disclosure without concealment is equivalent to a misrepresentation only in special situations." There is no allegation that Zhang engaged in any "concealment." And, the district court found "[t]here are no special circumstances here that justify the court fashioning equitable relief to reform an express contract." Add. at 44. This Court should not

Dahua nevertheless cites Torrao, arguing it is comparable to the present case. Dahua is wrong. In Torrao v. Cox, 26 Mass. App. Ct. 247 (1988), the Massachusetts Appeals Court considered a case involving a non-English speaker's attorney closing a real estate transaction on his behalf. The case featured a mistake about access to a garage. Id. at 249. Where the garage access was ultimately not present, the inquiry of whether the fact exists treated by §161 came into play. Id. at 251. That is not the case here.

The district court compared the present case to Torrao, and found the reference "inapt." See Add. at 46. Unlike in Torrao, Fu (the principal) was present and could have had the agreement translated for his review at any time. Add. at 11, 19. Further, also unlike Torrao, where the purchase of real estate could simply be unwound without injustice to the parties (see Torrao, 26 Mass. App. Ct. at 252), Zhang's detrimental reliance here made recission an improper result equity. Add. at 44-45. Using her equitable discretion, Judge Talwani declined to award equitable relief.

Turning to §166, the result is the same, as §166 is inapplicable to this case. §166 only applies where "a party's manifestation of assent is induced by the other party's fraudulent misrepresentation." Restat. 2d of Contracts §166 (emphasis

disturb the district court's equitable determination in that regard.

added). Yet, the district court here found quite the opposite, namely that "Dahua does not allege or show that [Zhang] committed any fraud." Add. at 43. Further, as the district court held, Dahua was the one acting with unclean hands. Add. at 6, 7, 8, 29, 32. Thus, the district court properly exercised its discretion to deny relief. See Restat. 2d of Contracts §166 cmt. a. (court has discretion to withhold relief under §166 "on grounds traditionally considered by courts of equity in exercising their discretion.").

Dahua's argument here is that Zhang somehow engaged in misrepresentation by not informing Dahua of its mistake while it was paying him $42,500 per month instead of $680,000 per month, and that represented taking advantage of Fu because he did not speak or read English. Dahua Brief at 39. That argument fails for multiple reasons.

First, Fu had a bi-lingual lawyer in the room (who he flew in from China with him), and he still chose to not have the agreement translated. Add. at 6 (Yue "spoke fluent English"), 11 and 19. And, second, Dahua historically failed to pay Zhang what it owed him, and Zhang historically did not complain. Add. at 4. For example, the district court found during 2016 (Zhang's first year of employment) Dahua only paid Zhang $193,165.34 of his $510,000.00 annual salary, and "Zhang did not complain to management about the underpayment." Id. Zhang believed that Dahua would eventually pay because he had a signed contract. Id. In February

2017, Zhang was paid the remainder of his 2016 base salary, plus a $400,000 performance bonus.[6] Id. It follows that Zhang was reasonable in expecting Dahua to pay under the severance agreement, without complaint, even if it was late.

This Court should not disturb the district court's discretionary denial of equitable relief.

## III. DAHUA'S AMBIGUITY ARGUMENT REMAINS INVALID.

### A. Dahua never raised, and instead rejected the ambiguity argument.

The district court found Dahua's argument on ambiguity had been waived:

> First, Dahua waived any argument of ambiguity long ago. Dahua did not raise ambiguity in its Answer to Amended Counterclaim or at any later stage of this proceeding, and expressly disclaimed such an argument as recently as its briefing in connection with this court's post-trial question.

> Add. at 40 (internal citations omitted).

Worse for Dahua, the district court held Dahua had <u>confirmed</u> no ambiguity existed. Add. at 40 ("Dahua asserted…'neither Dahua nor Zhang claim [ambiguity] here.'"). Due to Dahua's "express rejection of ambiguity," the

---

[6]    In 2017, Dahua again failed to pay Zhang in accordance with the employment agreement, paying less than half of what he was owed as of June 30, 2017. <u>See</u> App'x 1233-1234 (43:21-44:14). Again, Zhang did not complain. He testified that because he was eventually paid the unpaid salary from 2016, he believed Dahua would pay him the rest of his 2017 salary "eventually." <u>Id.</u> at 1234 (44:15-22) ("They're going to pay me eventually."). Zhang was eventually paid the remainder of his unpaid wages. <u>Id.</u>

argument was waived.  Id.

Dahua cannot be permitted to re-write its Complaint and Counterclaim

Answer after trial.  See Am. Med. Sys., Inc. v. Biolitec, Inc., 666 F.Supp.2d 216,

223-24 (D. Mass. 2019); Martinez v. Petrenko, 792 F.3d 173, 179-80 (1st. Cir.

2015); Calvi v. Knox County, 470 F.3d 422, 431 (1st Cir. 2006), citing Torres-Rios

v. LPS Lab., 152 F.3d 11, 15-16 (1st. Cir. 1998).

**B.   Despite Dahua's waiver, the district court nevertheless addressed Dahua's ambiguity argument and found none.**

Addressing Dahua's failing "phraseology" argument (Dahua Brief at 42), the

district court found that, "Dahua's [ambiguity] arguments strain the contractual

text and are otherwise unpersuasive." Add. at 7.

As the district court held, the provision contains no ambiguity whatsoever:

> The provision as drafted states that Dahua will make "monthly
> severance payments to [Zhang] in the amount of $680,000," and that
> these "monthly severance payments" will be made for the "Severance
> Period" of "sixteen (16) months."  Dahua's reading would require the
> court to ignore the word "monthly" in "monthly severance payments."
> But courts "interpret a contract so that every word is given effect,"
> DeWolfe v. Hingham Ctr., Ltd., 464 Mass. 795, 804 (2013), and for
> that reason alone Dahua's argument fails.
>
> Add. at 40-41 (internal citations omitted).[7]

---

[7]     Dahua argues that because the payment terms were differently worded
in Zhang's severance agreement and his separate consultancy agreement, that it
should therefore demonstrate ambiguity.  Dahua Brief at 43-44.  As with Dahua's
other arguments, this too ignores the law – namely, courts must look within the
four corners of the document and give words their plain language meaning.

The district court held rather that the language in the severance agreement is clear, as each word must be given effect. Id., citing DeWolfe v. Hingham Ctr., Ltd., 464 Mass. 795, 804 (2013) (courts 'interpret a contract so that every word is given effect, and for that reason alone, Dahua's argument fails.").

Dahua nevertheless argues that the district court "avoid[ed] the question of interpretation," claiming the severance agreement should not be interpreted against Dahua because the mistake the district court found must translate to ambiguity. Dahua Brief at 45-46.

Dahua yet again fails to understand. As the district court correctly held, whereas parol evidence is available in the reformation analysis (see OneBeacon, 465 F.3d at 41), with questions of contract interpretation (i.e. ambiguity inquiries), the evidence is strictly limited to the contents of the contract. Add. at 22, n.11. To determine whether contract language is ambiguous, courts must look to the "text of the contract as a whole." See James B. Nutter & Co. v. Estate of Murphy, 478 Mass. 664, 670 (2018), quoting Merrimack Valley Nat'l Bank v. Baird, 372 Mass. 721, 724 (1977). Indeed, where the contract language is unambiguous, it must be enforced as written. See Pride Hyundai, Inc. v. Chrysler Financial Co.,

---

"[W]hen the language of a contract is clear, it alone determines the contract's meaning." See James B. Nutter & Co., 478 Mass. at 669, quoting Balles v. Babcock Power, Inc., 476 Mass. 565, 571 (2017).

369 F.3d 603, 616 (1st Cir. 2004), quoting <u>Liberty Mut. Ins. Co. v. Gibbs</u>, 773 F.2d 15, 17 (1st Cir. 1985).

In <u>Pride Hyundai</u>, this Court ruled that the contract's plain language "trumps" the appellant's testimony about his intent. See <u>id</u>.; <u>General Hosp. Corp. v. Esoterix Genetic Labs, LLC</u>, 16 F.4th 304, 313 (1st Cir. 2021) (declining to allow extrinsic evidence to "write that phrase out of the contract" and holding that "Courts should not attempt to 'accomplish by fiat what a [party] neglected to achieve contractually.'"). The same result should apply here.

Dahua waived its ambiguity argument, and it is unfounded as a matter of fact and law anyway. This Court should not disturb the district court's findings.

## IV. THE DISTRICT COURT CORRECTLY DECIDED THE EQUITABLE CONSIDERATIONS IN ZHANG'S FAVOR.

Dahua's penultimate argument, that this Court should otherwise simply modify Dahua's contact under its equitable powers to prevent injustice (Dahua Brief at 46), similarly falls flat. As with the other questions before it, the district court carefully considered this one and it declined in its discretion. This Court should not disturb that decision.

As to the district court's equitable inquiry relevant to this appeal, both the question and answer are straightforward: what does a court do when faced with an executed contract, which it knows has a mistake in it, but cannot find any prior agreement to demonstrate the parties' clear intentions to support contract

reformation? The answer: examine the equities and analyze injustice. That's

exactly what the district court did, through multiple rounds of post-trial briefing.

Add. 42-46. In that process, the district court invited the parties to submit briefing

on its equitable powers; considered the cases cited the facts proposed, as well as

Restatement §158; and found that "enforcement of the Severance Provision as

written does not constitute injustice such that the court should craft an equitable

remedy overriding the contract." Add. at 45.

As the district court found, more specifically:

> Dahua has not demonstrated that payment of nearly $11 million would
> be an injustice sufficient to invoke this Restatement provision and has
> not suggested any remedy that would avoid injustice to Zhang and
> protect his reliance interests. As this court has already found,
> Zhejiang needed to prevent Zhang from revealing "significant" and
> serious product-related security issues until they were resolved, and
> until the company completed an acquisition. The Release Agreement
> Dahua obtained for Zhejiang prohibited Zhang from competing with
> the company, disparaging the company, disclosing confidential
> information, or making any claims based on his 2015 Employment
> Agreement—and required him to comply with the Release Agreement
> in order to receive any Severance Payments. Zhang complied with the
> terms of the Release Agreement and provided the benefit of the non-
> compete, non-disparagement, and other contractual terms to Dahua
> and Zhejiang.
>
> …
>
> Dahua merely argues that Zhang could not have reasonably expected
> to receive nearly $11 million in severance payments, but ignores the
> evidence that both Dahua and Zhejiang received the benefit of
> Zhang's performance of his obligations under the contract, and the
> absence of evidence that those benefits were not of substantial value
> to Dahua and Zhejiang.

The court thus rejects Dahua's proposal to reduce Zhang's payments for performance *after* he has already finished performance. Instead, the enforcement of the Severance Provision as written does not constitute injustice such that the court should craft an equitable remedy overriding the contract.

See Add. at 44-45.

Dahua's argument to this Court proves no more effective than the one it made before the district court.[8] See OneBeacon, 465 F.3d at 45-46 (detrimental reliance removes any equitable barriers to enforcing agreement). Critically, Dahua ignores Restatement (Second) of Contracts § 153(d), which states that where a party substantially relies on a contract, and said reliance would be left uncompensated by avoidance or reformation, even an otherwise unconscionable contract becomes enforceable.

Dahua further ignores Metro Life Ins. Co. and Armstrong, both of which the district court found persuasive. See Add. at 45; Metro. Life Ins. Co. v. Cotter, 464 Mass. 623, 644 (2013) (finding that where a party seeks relief on grounds of injustice, it bears the burden of showing the injustice of the other party's enrichment as well as its entitlement to restitution); Armstrong v. Rohm & Haas

---

[8]     Dahua also argues that because Zhang was compensated under his separate consultancy agreement, his detrimental reliance on the severance agreement would not go uncompensated if the amount was set to $680,000. Dahua Brief at 29. That is a separate contract, which Zhang also performed under, and as such, Dahua's argument is broken.

Co., 349 F. Supp. 2d 71, 80 (D. Mass. 2004) ("The law strongly favors certainty and precision of contracts, even at the expense of occasional injustice, on the theory that a contrary rule would lead to even greater injustices.").

Notably, it is Dahua's own bad faith conduct and unclean hands which preclude fashioning any new entitlement to equity. As the district court held, Dahua:

- Conspired to trick Zhang into believing he was being terminated for cause when they knew there was no basis for that (Add. at 8);

- Conspired to trick Zhang to believe he would retain the job security they stripped from him:

  > The team charged with terminating Zhang spent hours drafting documents to ensure that Zhang lost those protections and contract rights, replacing them with an arrangement that Zhang believed would continue those protections (albeit working for Dahua, rather than Zhejiang) but that Dahua knew would allow it to terminate Zhang a few months later. Add. at 32.

- Had a bilingual lawyer it brought to Boston from China to assist Fu (Add. at 6), among its panoply of counsel and Fu neglected to have her translate the agreement; and

- Did not approach Zhang about reforming the contract until after they closed Project Mohawk and had the concealed product security issues remedied – in other words having received valuable benefit from Zhang. Add. at 7.

And, Dahua's conduct has continued here before this Court, by (a) using ellipses to hide the words, "from zero," that indicate the negotiations were separate, and (b) complaining that "Fu was unaware of the mistake because he

cannot read English" (Dahua Brief at 4), while failing to mention the fact that that Fu brought a bilingual lawyer with him from China and declined to have her translate (Add. at 11).

The doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." <u>Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.</u>, 324 U.S. 806, 814-15 (1945). And the doctrine "necessarily gives wide range to the equity court's use of discretion in <u>refusing</u> to aid the unclean litigant." <u>Id</u>. at 815 (emphasis added). The doctrine of unclean hands applies where, as here, Dahua's misconduct directly relates to the merits of the controversy between the parties, that is, when the tawdry acts "in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication." <u>Texaco</u>, 60 F.3d at 880, quoting <u>Keystone Driller Co. v. Gen. Excavator Co.</u>, 290 U.S. 240, 245 (1933).

As this Court has held: "he who seeks equity must do equity." <u>K-Mart Corp. v. Oriental Plaza, Inc.</u>, 875 F.2d 907, 910-12 (1st Cir. 1989); <u>see also</u>, <u>Texaco</u>, 60 F.3d at 880 ("[s]ince this is an equitable matter [Dahua], in seeking equity, must [itself] do equity."). Because the district court found Dahua acted in bad faith and came to court with unclean hands (Add. at 6, 7, 8, 29, 32), Dahua "must lose" at equity. <u>See Ciulla v. Rigny</u>, 89 F.Supp.2d 97, 105 (D. Mass. 2000)

(applying both <u>Texaco</u> and <u>K-Mart</u>).

This Court's equitable powers here must be used, similarly, if at all, to deny Dahua relief as opposed to providing it.  <u>See</u> <u>id.</u>

## V.  DAHUA'S GOOD FAITH AND FAIR DEALING CLAIM IS BASELESS AS A MATTER OF FACT AND LAW.

Dahua finally argues that it is entitled to relief under its twisted theory that Zhang is the one who breached the agreement by breaching the implied covenant of good faith and fair dealing.  Dahua Brief at 50-51.  Dahua has turned the covenant upside down, arguing that Zhang breached the severance agreement by failing to modify it after Dahua terminated him (Dahua Brief at 50), while literally ignoring Zhang's faithful performance of every single term of the agreement, including confidentiality, noncompetition, nondisparagement, etc. – a fact the district court found.  Add. at 25, 26 and 44.

To prove its claim, Dahua must show Zhang "did not deal 'honestly and in good faith in both the performance and enforcement of the terms of their contract.'"  Add. at 26, citing <u>Hawthorne's, Inc. v. Warrenton Realty, Inc.</u>, 414 Mass. 200, 211 (1993).  Refusing to change a contract payment term to one Dahua prefers is not conduct that qualifies.  <u>Id.</u> at 25.  Dahua's good faith and fair dealing claim is nonsensical,[9] and this Court should not overrule the district court's ruling.

_____

[9]    Disturbingly, Dahua now demands disgorgement of the amounts it paid Zhang.  Dahua Brief at 50-51.  Setting aside the Dahua's misplaced hubris, it

## VI. RESPONSE TO AMICUS.

Amici are no friends of the Court, as they ignore facts which do not suit them and argue for a new impermissible rule. As becomes quickly apparent, Amici's analysis suffers from the same fundamental flaw as Dahua's, namely that Amici assuume the district court found a prior agreement to a severance payment amount during the discussions at the hotel. As set forth above, this is wrong. Perhaps acknowledging their problem, Amici simply urge this Court to ignore its own jurisprudence and adopt a new rule. Amici Brief at 18. Yet, the new rule does little to advance its case.

Before getting to that proposed new rule, we begin with the two cases Amici cite to support their argument, <u>Patton v. Mid-Continent Systems, Inc.</u>, 841 F.2d 742 (7th Cir. 1988), and <u>Thomas v. Del Biaggio</u>, 527 B.R. 33 (N.D. Cal. 2014). Neither helps Amici's position.

First, <u>Patton</u> is inapt. <u>Patton</u> had signed a franchise contract with Mid-Continent to franchise two truck stop locations. <u>Patton</u>, 841 F.2d at 744. The contract Mid-Continent drafted included only one location, and Patton claimed it was a mistake and should have included two locations – in other words, that Mid-

---

is important to note that the claw-back provision in the severance agreement Dahua cites (<u>id</u>.) is one of the substantial new terms it sought when it shifted the negotiations from job continuation to severance at the hotel. Add. at 53 ("<u>Contingent Separation Benefits</u>").

Continent had made a mistake in the drafting.  Id.  Mid-Continent insisted the

mistake should govern.  Id.  In evaluating the evidence, however, the Patton court

found that "the negotiating history makes perfectly clear that Mid-Continent

thought it was franchising two truck stops in the same area."  See id. at 744-45

(emphasis added).  In reaching this decision, the court held that, "The party

alleging mutual mistake must convince the judge, and convince him clearly.  That

is no problem here; there is no doubt at all that the parties intended to franchise

Patton's fuel stop as well as Hildebrand's."  Id. at 746 (emphasis added).

Unlike the negotiations in Patton, the negotiating history here is anything but

"perfectly clear."  Nor did Dahua prove there is "no doubt at all that the parties

intended" that $680,000 should be the severance amount.  To the contrary, the

district court here found no prior agreement, which Amici simply ignores.  Add. at

23.  Patton undermines Amici's position.

Second, Thomas also undoes Amici's position.  In Thomas, the court held

"[a]mple record evidence," the "contemporaneous documentary evidence" and "the

language of Agreement 1 itself" all supported and confirmed the conclusion that all

the assets in question were transferred.  Thomas, 527 B.R. at 43-44.  In other

words, failure to include an asset on an exhibit was simply inaccurate.  Id. at 45.

As the Thomas court held, the question was "whether, if there had been clear and

convincing evidence that the parties' mutual intent had not been embodied in their

written agreement, reformation would be available to give effect to their <u>true</u> <u>intentions</u>."  Id. at 48 (emphasis added).  Again, as in <u>Patton</u>, the evidence in <u>Thomas</u> as to the parties' "true intentions" was clear.

The district court held the opposite to be true here – Dahua failed to prove any agreement on severance terms between Fu and Zhang from the hotel discussion.  Add. at 24.

This leads us to the new rule Amici "urge this Court to adopt."  <u>See</u> Add. at 18.  Although Amici cite no precedent for their formulation, we consider the application here, nevertheless.  First, the rule:

> Where the negotiation or agreement has reached the stage both parties knew or should have known, but for a mistake as to the content or effect of the executed writing, that the writing failed to express the agreement as it stood at that point, then the court may so reform the writing.
>
> Amici Brief at 18.

Again, there was no agreement on a severance price reached at the hotel, rendering Amici's proposed new rule irrelevant to the case at bar.

Further, a careful reading shows Amici's logic is flawed.  The trouble lies with the central assumption underlying the rule, "that the writing failed to express the agreement as it stood at that point."  The proposed rule assumes the court knows "<u>the agreement as it stood</u>" at any point prior to the office negotiations between Fu and Zhang.  The issue with Amici's formulation seems to stem from a

fundamental misunderstanding of the negotiation here (or denial of the district court's findings of fact), which is that the agreements presented at the office departed so dramatically from the discussions at the hotel that they were "entirely at odds" with the understanding from the hotel. Add. at 12. This simply does not fit into their box.

Amici work from the faulty presumption that you cannot find a mistake without knowing the true intentions. As they argue, "For someone to conclude that the written document incorporated a mistake, they must have some idea from the agreements reached to that point of what it was a mistake from!" Amici Brief at 14.

As discussed above, the district court found the mistake not because the Court found a prior agreement between Fu and Zhang, but rather from the large move Dahua made "from zero" to get to $10.8 million:

> While his silence and cooperation may well have been of significant value to Zhejiang, Zhang had reason to know, from his own prior experience dealing with Fu and Zhejiang, that the company would not jump to such a large number without first trying to buy his silence and cooperation for some lesser amount.

> Add. at 30.

Amici ignore this part of the district court's Order, as well as this Court's decision in this case on the law for mistake, and simply leap off the map.

Of course, if there is no prior agreement, Amici apparently concede the point

with respect to their rule's futility – failing to present even one case where a Massachusetts court created its own replacement contractual payment provision under Restatement §158 or crafted any replacement term for that matter.  And for good reason, too.  Courts may not do so.  See, e.g., White v. Fessenden, 358 Fed. Appx. 208, 211 (1st Cir. 2009) (unpublished opinion) (reversal ordered, because while the "district court was attempting to be helpful … it was beyond the power of the district court to impose its own resolution of material disputed issues that the parties did not agree to, and it could not do so under the rubric of a settlement order."); Lexington Ins. Co. v. Gen. Accident Ins. Co. of Am., 338 F. 3d 42, 50 (1st Cir. 2003) (recognizing the "hallowed principle that, absent some amphiboly, a court cannot, in the name of equity, rewrite the language of [a] contract.").

Indeed, even when faced with indefinite contracts, "[t]he court may not rewrite the language of a claim to make sense of it."  See Am. Med. Sys., Inc., 666 F.Supp.2d at 223-24, citing Helmsderfer v. Bobrick Washroom Equip, Inc., 527 F.3d 1379, 1383 (Fed. Cir. 2008); Lexington Ins., 338 F. 3d at 50; Armstrong, 349 F. Supp. at 80; Ward v. Ward, 70 Mass. App. Ct. 366, 370 (2007) (imposing a contractual provision to which a party did not agree amounts to a "great injustice."), citing Page v. Higgins, 150 Mass. 27, 30 (1889)).

Amici's arguments ignore the district court's findings of fact and refuse to consider Massachusetts jurisprudence, which the district court followed.  Rather

than do so, Amici seek a new rule which makes no sense, and which this Court cannot create.  See Forbes v BB&S Acquisition Corp., 22 F.4th 22, 25 (1st Cir. 2021) ("The plaintiff, who made a deliberate choice to sue in federal court rather than in a [Massachusetts] state court, is not in a position to ask us to blaze a new trail that the [Massachusetts] courts have not invited."), quoting Jones v. Secord, 684 F.3d 1, 11 (1st Cir. 2012).  This Court should not disturb the district court's decision.

## CONCLUSION

Dahua has failed to demonstrate any clear error or abuse of discretion which would justify overruling the district court's well-reasoned decisions in this case. This Court should therefore affirm the district court's decision, dismiss Dahua's appeal in its entirety, order Dahua to comply with the district court's Amended Judgment, and award post-judgment interest as well as attorney's fees to Zhang for having to defend this nonsensical appeal.

Respectfully submitted,

/s/ Benjamin Flam
BENJAMIN FLAM (NO. 1150316)
PHILIP J. GORDON (NO. 1142934)
GORDON LAW GROUP LLP
585 Boylston Street, 4th Floor
Boston, Massachusetts 02116
(617) 536-1800
*Attorneys for Appellee*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this document complies with the type-volume limitations set forth in the applicable Federal Rules of Appellate Procedure because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains no more than 13,000 words.

I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in a 14 point Times New Roman font.

Dated:  July 25, 2024

/s/ Benjamin Flam
BENJAMIN FLAM

## CERTIFICATE OF SERVICE

I, Benjamin Flam, hereby certify that on July 25, 2024, I filed the foregoing Brief for Defendant-Appellee with the Clerk of Court using the CM/ECF System, which will send notices of such filing to counsel for Plaintiff-Appellant who are registered CM/ECF users. Upon acceptance by the Court of the electronically-filed document, the required paper copies will be filed with the Court, within the time provided in the Court's rules.

/s/ Benjamin Flam
BENJAMIN FLAM